**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# United States Court of Appeals
# for the District of Columbia Circuit

### No. 13-5069

FRANCIS A. GILARDI; PHILIP M. GILARDI; FRESH UNLIMITED
INCORPORATED, doing business as FRESHWAY FOODS;
and FRESHWAY LOGISTICS INCORPORATED,

*Plaintiffs – Appellants,*

*vs.*

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;
KATHLEEN SEBELIUS, in her official capacity as Secretary of United States
Department of Health and Human Services; UNITED STATES DEPARTMENT
OF THE TREASURY; JACOB J. LEW, in his official capacity as Secretary of the
United States Department of the Treasury; UNITED STATES DEPARTMENT OF
LABOR; and SETH D. HARRIS, in his official capacity as Acting Secretary of
United States Department of Labor,

*Defendants – Appellees.*

*On Appeal from the United States District Court for the District of Columbia in
Case No.1:13-CV-00104-EGS (Hon. Emmet G. Sullivan, Judge)*

## BRIEF OF APPELLANTS

COLBY M. MAY
  *Counsel of Record*
AMERICAN CENTER FOR
  LAW & JUSTICE
201 Maryland Avenue, NE
Washington, DC 20002
202-546-8890
cmmay@aclj-dc.org

CARLY F. GAMMILL
AMERICAN CENTER FOR
  LAW & JUSTICE
188 Front Street
Suite 116-19
Franklin, TN 37064
615-964-5207
cgammill@aclj-dc.org

EDWARD L. WHITE III*
AMERICAN CENTER FOR
  LAW & JUSTICE
5068 Plymouth Road
Ann Arbor, MI 48105
734-662-2984
ewhite@aclj.org

ERIK M. ZIMMERMAN*
AMERICAN CENTER FOR
  LAW & JUSTICE
1000 Regent University Dr.
Virginia Beach, VA 23464
757-226-2489
ezimmerman@aclj.org

FRANCIS J. MANION*
GEOFFREY R. SURTEES*
AMERICAN CENTER FOR
  LAW & JUSTICE
6375 New Hope Road
New Hope, KY 40052
502-549-7020
fmanion@aclj.org
gsurtees@aclj.org

*Not Admitted to
D.C. Circuit Bar

April 30, 2013

*Counsel for Appellants*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

Plaintiffs-Appellants submit the following certificate pursuant to Circuit Rule 28(a):

**1.    Parties, amici, and intervenors**

The following list includes all parties and amici curiae who appeared in the district court. The listed Plaintiffs-Appellants and Defendants-Appellants are parties to this appeal.

**Plaintiffs-Appellants:**

Francis A. Gilardi, Jr.

Philip M. Gilardi

Fresh Unlimited, Inc., d/b/a Freshway Foods

Freshway Logistics, Inc.

**Defendants-Appellees:**

United States Department of Health and Human Services

Kathleen Sebelius, in her official capacity as the Secretary of the United States Department of Health and Human Services

United States Department of the Treasury

Jacob J. Lew, in his official capacity as Secretary of the United States Department of the Treasury

United States Department of Labor

Seth D. Harris, in his official capacity as the Acting Secretary of the United States Department of Labor

**Amicus curiae:**

State of Ohio, supporting Plaintiffs-Appellants

## 2.    Rulings Under Review

Plaintiffs-Appellants are appealing from the order and supporting memorandum opinion of District Judge Emmet G. Sullivan entered on March 3, 2013, denying Plaintiffs-Appellants' motion for a preliminary injunction. The order and supporting memorandum opinion appear on the district court's docket at entries 33 and 34 respectively. The memorandum opinion appears on Lexis with the following citation: *Gilardi v. Sebelius*, 2013 U.S. Dist. LEXIS 28719 (D.D.C. Mar. 3, 2013).

## 3.  Related Cases

The instant case was never previously before this Court or any other court, other than the district court from which this case has been appealed.

ii

Plaintiffs-Appellants are not aware of any cases pending in this Court that involve the same parties. Plaintiffs-Appellants note that the following cases pending with this Court involve substantially the same issues:

*Wheaton College v. Sebelius*, No. 12-5273 (D.C. Cir.)

*Belmont Abbey College v. Sebelius*, No. 12-5291 (D.C. Cir.)

*Tyndale House Publishers v. Sebelius*, No. 13-5018 (D.C. Cir.)

*Roman Catholic Archbishop of Washington, D.C. v. Sebelius*, No. 13-5091 (D.C. Cir.)

Plaintiffs-Appellants provide the following list of cases, of which they are aware, that involve substantially the same issues involved in the instant appeal and that are currently pending in other United States Courts of Appeals:

*Conestoga Wood Specialties Corp. v. Sebelius*, No. 13-1144 (3d Cir.)

*Zubik v. Sebelius*, No. 13-1228 (3d Cir.)

*Autocam Corp. v. Sebelius*, No. 12-2673 (6th Cir.)

*Legatus v. Sebelius*, Nos. 13-1092, 13-1093 (6th Cir.)

*Korte v. U.S. HHS*, No. 12-3841 (7th Cir.)

*Grote Indus. LLC v. Sebelius*, No. 13-1077 (7th Cir.)

*University of Notre Dame v. Sebelius*, No. 13-1479 (7th Cir.)

*O'Brien v. U.S. HHS*, No. 12-3357 (8th Cir.)

*Annex Med., Inc. v. Sebelius*, No. 13-1118 (8th Cir.)

*Am. Pulverizer v. U.S. HHS*, No. 13-1395 (8th Cir.)

*Newland v. Sebelius*, No. 12-1380 (10th Cir.)

*Hobby Lobby Stores, Inc. v. Sebelius*, No. 12-6294 (10th Cir.)

/s/ Colby M. May
Colby M. May
D.C. Bar No. 394340
  *Counsel of Record*
American Center for Law & Justice
201 Maryland Avenue, N.E.
Washington, D.C. 20002
202-546-8890; Fax. 202-546-9309
cmmay@aclj-dc.org
*Attorney for Plaintiffs-Appellants*

iv

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and D.C. Circuit Rule 26.1, the undersigned certifies the following: Plaintiffs Fresh Unlimited, Inc., d/b/a Freshway Foods, and Freshway Logistics, Inc. have no parent companies, subsidiaries, or affiliates that have any outstanding securities in the hands of the public. Plaintiffs Fresh Unlimited, Inc., d/b/a Freshway Foods, and Freshway Logistics, Inc. are closely-held, family-owned Subchapter S corporations and they issue no stock to the public. Plaintiff Fresh Unlimited, Inc., d/b/a Freshway Foods, is a fresh produce processor and packer, and Plaintiff Freshway Logistics is a for-hire carrier of mainly refrigerated products.

/s/ Colby M. May
Colby M. May
D.C. Bar No. 394340
  *Counsel of Record*
American Center for Law & Justice
201 Maryland Avenue, N.E.
Washington, D.C. 20002
202-546-8890; Fax. 202-546-9309
cmmay@aclj-dc.org
*Attorney for Plaintiffs-Appellants*

# TABLE OF CONTENTS

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES ................i

CORPORATE DISCLOSURE STATEMENT....................................... v

TABLE OF AUTHORITIES................................................................ ix

GLOSSARY OF ABBREVIATIONS ................................................ xxii

JURISDICTIONAL STATEMENT ......................................................1

I.   Jurisdiction Of The District Court..................................................1

II.  Jurisdiction Of This Court................................................................1

STATEMENT OF THE ISSUES ............................................................2

STATEMENT OF THE CASE................................................................4

STATEMENT OF THE FACTS..............................................................6

I.   The Mandate, Its Exceptions, and Its Penalties .........................6

II.  The Plaintiffs .................................................................................10

SUMMARY OF THE ARGUMENT....................................................16

I.   The Mandate Substantially Burdens Plaintiffs' Religious Exercise.......16

II.  Defendants' Application Of The Mandate To Plaintiffs Does
     Not Withstand Strict Scrutiny .......................................................17

III. Plaintiffs Satisfy The Remaining Injunction Factors.................18

STANDARD OF REVIEW ........................................................19

ARGUMENT.............................................................................20

I.   Introduction....................................................................20

II.  Plaintiffs Are Likely To Succeed On Their RFRA Claim........................23

     A. The burden imposed by the Mandate is substantial ...........................25

     B. The Mandate substantially burdens the Gilardis'
        religious exercise.......................................................27

        1.  The corporate form of the Plaintiff companies does
            not negate the substantial burden that the Mandate imposes
            on the Gilardis' religious exercise ......................................32

        2.  It is beyond dispute that paying for contraception and
            abortion implicates religious and moral concerns for
            many individuals and entities because doing so *facilitates*
            the use of such products and services .................................41

     C. The Plaintiff companies are likely to succeed on their
        RFRA claim..............................................................44

        1.  The Plaintiff companies are "persons" that can
            exercise religion under RFRA ............................................45

        2.  The Plaintiff companies can assert the free exercise
            rights of the Gilardis in addition to their own rights.....................50

     D. Application of the Mandate to Plaintiffs does not
        withstand strict scrutiny ................................................52

vii

1.  Defendants lack a compelling governmental interest in applying the Mandate to Plaintiffs. ....................................................53

2.  There are other less restrictive means available to Defendants ...........................................................................60

III. The Remaining Injunction Factors Also Favor Plaintiffs...........................64

   A. Plaintiffs will suffer irreparable harm absent continued injunctive relief...........................................................................64

   B.  The balance of equities tips in Plaintiffs' favor .....................................65

   C.  The public interest favors a preliminary injunction.............................67

CONCLUSION ..........................................................................68

CERTIFICATE OF COMPLIANCE ..................................................70

CERTIFICATE OF SERVICE ...........................................................71

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Am. Mfg. Co. v. Sebelius*,
   No. 0:13-cv-295-JRT-LIB (D. Minn. 2013) ........................................................22

*Am. Pulverizer v. U.S. HHS*,
   2012 U.S. Dist. LEXIS 182307 (W.D. Mo. Dec. 20, 2012) ..................22, 55, 68

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983)........................................................................................61, 63

*Annex Med., Inc. v. Sebelius*,
   2013 U.S. App. LEXIS 2497 (8th Cir. Feb. 1, 2013)...................................22, 32

*Ardire v. Tracy*,
   77 Ohio St. 3d 409, 674 N.E.2d 1155 (1997)......................................................33

*Autocam Corp. v. Sebelius*,
   2012 U.S. App. LEXIS 26736 (6th Cir. Dec. 28, 2012) ....................................22

*Autocam Corp. v. Sebelius*,
   2012 U.S. Dist. LEXIS 184093 (W.D. Mich. Dec. 24, 2012) ...........................22

*Bick Holdings, Inc. v. U.S. HHS*,
   No. 4:13-cv-462-AGF (E.D. Mo. 2013) .............................................................22

*Briscoe v. Sebelius*,
   2013 U.S. Dist. LEXIS 26911 (D. Colo. Feb. 27, 2013) ...................................23

_____

\* Authorities upon which Plaintiffs chiefly rely are marked with asterisks.

*Brown v. Entm't Merchs. Ass'n*,
    131 S. Ct. 2738 (2011)............................................................... 53, 58-60

\* *Church of Lukumi Babalu Aye v. City of Hialeah*,
    508 U.S. 520 (1993)...........................................................17, 52, 54, 56

*Citizens United v. FEC*,
    558 U.S. 310 (2010)..................................................................46, 49

*City of Boerne v. Flores*,
    521 U.S. 507 (1997)..................................................................52

*Commack Self-Service Kosher Meats, Inc. v. Hooker*,
    680 F.3d 194 (2d Cir. 2012) ............................................................50

*Conestoga Wood Specialties Corp. v. Sebelius*,
    2013 U.S. App. LEXIS 2706 (3d Cir. Feb. 7, 2013) ........................ 23, 48-49, 65

*Conestoga Wood Specialties Corp. v. Sebelius*,
    2012 U.S. Dist. LEXIS 4449 (E.D. Pa. Jan. 11, 2013)........................................23

*Consarc Corp. & Consarc Eng'g v. U.S. Treasury Dep't*,
    71 F.3d 909 (D.C. Cir. 1997)..................................................................65

*Consol. Edison Co. v. Pub. Serv. Comm'n*,
    447 U.S. 530 (1980)..................................................................54

*Conyers v. Abitz*,
    416 F.3d 580 (7th Cir. 2005) ............................................................63

*Corp. of Presiding Bishop v. Amos*,
    483 U.S. 327 (1987)..................................................................46

x

*Davis v. Pension Benefit Guar. Corp.*,
   571 F.3d 1288 (D.C. Cir. 2009) ................................................... 19, 64

*Eden Foods, Inc. v. Sebelius*,
   2013 U.S. Dist. LEXIS 40768 (E.D. Mich. Mar. 22, 2013) ............................... 23

*EEOC v. Sunbelt Rentals, Inc.*,
   521 F.3d 306 (4th Cir. 2008) ................................................... 29

*EEOC v. Townley Eng'g & Mfg. Co.*,
   859 F.2d 610 (9th Cir. 1988) ................................................... 50

*Elrod v. Burns*,
   427 U.S. 347 (1976) ................................................... 64

*First Nat'l Bank v. Bellotti*,
   435 U.S. 765 (1978) ................................................... 48, 51

* *Geneva Coll. v. Sebelius*,
   2013 U.S. Dist. LEXIS 56087 (W.D. Pa. Apr. 19, 2013)
   (*Geneva II*) ................................................... 22, 27, 36, 55, 66

*Geneva Coll. v. Sebelius*,
   2013 U.S. Dist. LEXIS 30265 (W.D. Pa. Mar. 6, 2013)
   (*Geneva I*) ................................................... 49-50

*Girouard v. United States*,
   328 U.S. 61 (1946) ................................................... 24

* *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
   546 U.S. 418 (2006) ................................................... 17, 25, 35, 53-54, 57, 60

*Gordon v. Holder*,
   632 F.3d 722 (D.C. Cir. 2011) ................................................... 19, 64

*Grote v. U.S. HHS,*
　2013 U.S. App. LEXIS 2112 (7th Cir. Jan. 30, 2013)............................ 22, 32-33

*Harris v. McRae,*
　448 U.S. 297 (1980)...............................................................................43

*Hartenbower v. U.S. HHS,*
　No. 1:13-cv-2253 (N.D. Ill. 2013).........................................................22

*Heart of Atlanta Motel v. United States,*
　379 U.S. 241 (1964)...............................................................................40

*Hobby Lobby Stores v. Sebelius,*
　133 S. Ct. 641 (2012).............................................................................22

*Hobby Lobby Stores v. Sebelius,*
　2012 U.S. App. LEXIS 26741 (10th Cir. Dec. 20, 2012) ....................22

*Hobby Lobby Stores v. Sebelius,*
　870 F. Supp. 2d 1278 (W.D. Okla. 2012) ............................................22

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
　132 S. Ct. 694 (2012).............................................................................47

*In re Naval Chaplaincy,*
　697 F.3d 1171 (D.C. Cir. 2012).............................................................20

*Joelner v. Vill. of Wash. Park,*
　378 F.3d 613 (7th Cir. 2004) .................................................................67

*Jolly v. Coughlin,*
　76 F.3d 468 (2d Cir. 1996) ....................................................................64

xii

*Kaemmerling v. Lappin*,
    553 F.3d 669 (D.C. Cir. 2008)..................................................................25, 39

* *Korte v. U.S. HHS*,
    2012 U.S. App. LEXIS 26734 (7th Cir. Dec. 28, 2012) .22, 30, 32-33, 45, 63-64

*Legatus v. Sebelius*,
    2012 U.S. Dist. LEXIS 156144 (E.D. Mich. Oct. 31, 2012) .................22, 50, 66

*Lindsay v. U.S. HHS*,
    No. 1:13-cv-01210 (N.D. Ill. 2013) ...................................................................22

*Maher v. Roe*,
    432 U.S. 464 (1977).........................................................................................43

*McClure v. Sports & Health Club, Inc.*,
    370 N.W.2d 844 (Minn. 1985) .........................................................................48

*Mead v. Holder*,
    766 F. Supp. 2d 16 (D.D.C.),
    *aff'd sub nom. Seven Sky v. Holder*,
    661 F.3d 1 (D.C. Cir. 2011)..............................................................................27

*MK Chambers Co. v. U.S. HHS*,
    2013 U.S. Dist. LEXIS 47887 (E.D. Mich. Apr. 3, 2013) ................................23

*Mohamad v. Palestinian Auth.*,
    132 S. Ct. 1703 (2012).....................................................................................45

* *Monaghan v. Sebelius*,
    2013 U.S. Dist. LEXIS 35144 (E.D. Mich. Mar. 14, 2013)
    (*Monaghan II*).................................................... 9, 22, 30-31, 50, 55, 62

xiii

*Monaghan v. Sebelius,*
    2012 U.S. Dist. LEXIS 182857 (E.D. Mich. Dec. 30, 2012)
    (*Monaghan I*) ...............................................................................37, 67

*Monell v. Dep't of Soc. Servs.,*
    436 U.S. 658 (1978)........................................................................46

* *Newland v. Sebelius,*
    881 F. Supp. 2d 1287 (D. Colo. 2012) ......................9, 22, 32, 45, 55, 62, 66-67

*O'Brien v. U.S. HHS,*
    2012 U.S. App. LEXIS 26633 (8th Cir. Nov. 28, 2012)....................................22

*Primera Iglesia Bautista Hispana v. Broward Cnty.,*
    450 F.3d 1295 (11th Cir. 2006) ...........................................................48

*Robinson v. Cheney,*
    876 F.2d 152 (D.C. Cir. 1989).............................................................36

*Rust v. Sullivan,*
    500 U.S. 173 (1991).........................................................................43

*Sharpe Holdings, Inc. v. U.S. HHS,*
    2012 U.S. Dist. LEXIS 182942 (E.D. Mo. Dec. 31, 2012)....................22, 44, 65

* *Sherbert v. Verner,*
    374 U.S. 398 (1963)........................................ 23, 25, 27, 34, 41, 53-54

*Sherley v. Sebelius,*
    644 F.3d 388 (D.C. Cir. 2011).............................................................20

*Simms v. Dist. of Columbia,*
    872 F. Supp. 2d 90 (D.D.C. 2012)........................................................67

*Sioux Chief Mfg. Co., Inc. v. Sebelius*,
    No. 4:13-cv-036 (W.D. Mo. 2013)...................................................22

\* *Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) .............................................. 49-50

*Taverns for Tots, Inc. v. City of Toledo*,
    307 F. Supp. 2d 933 (N.D. Ohio 2004)..........................................36

*Tetlak v. Vill. of Bratenahl*,
    92 Ohio St. 3d 46, 748 N.E.2d 51 (2001).........................................33

\* *Thomas v. Review Bd.*,
    450 U.S. 707 (1981)........................................16, 25-26, 31, 33-34, 37, 39, 41, 44

*Thompson v. W. States Med. Ctr.*,
    535 U.S. 357 (2002)....................................................................59

*Tonn & Blank Constr., LLC v. Sebelius*,
    No. 1:12-cv-00325-JD-RBC (N.D. Ind. 2013)..................................22

*Triune Health Grp. v. U.S. HHS*,
    No. 1:12-cv-06756 (N.D. Ill. 2013) ..............................................22

\* *Tyndale House Publ'rs v. Sebelius*,
    2012 U.S. Dist. LEXIS 163965 (D.D.C. Nov. 16, 2012),
    *appeal docketed*, No. 13-5018 (D.C. Cir.).............22, 27, 31-32, 50-51, 55, 64, 68

*United States v. Lee*,
    455 U.S. 252 (1982)...................................................................37

*United States v. Playboy Entm't Grp., Inc.*,
    529 U.S. 803 (2000)...................................................................63

*United States v. Robel*,
   389 U.S. 258 (1967)...................................................................60

*Winter v. Natural Res. Def. Council*,
   555 U.S. 7 (2008)....................................................................19

* *Wisconsin v. Yoder*,
   406 U.S. 205 (1972)...............................23, 26, 31, 34, 39, 41, 53-54

**Statutes**

Administrative Procedure Act,
   5 U.S.C. §§ 5 *et seq*............................................................. 1-2, 5

Consolidated Appropriations Act of 2012,
   Pub. L. 112-74, 125 Stat. 786 ..................................................42

Ohio Rev. Code Ann. § 1701.03(A) ...................................................44

Ohio Rev. Code Ann. § 1702.55.......................................................35

Patient Protection and Affordable Care Act,
   111 Pub. L. No. 148, 124 Stat. 119, 111th Cong.,
   2d Sess., Mar. 23, 2010 ....................................... xxii, 2, 6, 8-9, 55-56

* Religious Freedom Restoration Act,
   42 U.S.C. §§ 2000bb *et seq* .....................xxii, 1-3, 5, 16, 23-25, 33-35, 38, 44-49,
                                                     51-52, 57, 60, 63-64, 67-68

1 U.S.C. § 1.............................................................................45

10 U.S.C. § 1093(a).....................................................................43

20 U.S.C. § 1688........................................................................40

26 U.S.C. § 1132 ................................................................................9

26 U.S.C. § 1185d ..............................................................................9

26 U.S.C. § 4980D .............................................................................9

26 U.S.C. § 4980H .............................................................................10

24 U.S.C. § 4980H(c)(2)(A) ...............................................................9

28 U.S.C. § 1292(a)(1) .......................................................................2

28 U.S.C. § 1331 ................................................................................1

28 U.S.C. § 1343(a)(4) .......................................................................1

28 U.S.C. § 1346(a)(2) .......................................................................1

28 U.S.C. § 1361 ................................................................................1

42 U.S.C. § 300a-7(b)(2)(A) ..............................................................40

42 U.S.C. § 300gg-13(a)(4) ...............................................................6

42 U.S.C. § 1395w-22(j)(3) ...............................................................42

42 U.S.C. § 1397ee(c) ........................................................................42

42 U.S.C. § 2000bb-1 ........................................................................45

42 U.S.C. § 2000bb-1(a) ....................................................................24

42 U.S.C. § 2000bb-1(b) ....................................................................24

42 U.S.C. § 2000bb-2(4) ...................................................................24, 47

42 U.S.C. § 2000cc-5(7)(A) ..............................................................24, 47

* 42 U.S.C. § 18011 ...........................................................................8, 55

42 U.S.C. § 18023 ................................................................................42

## Regulations

29 C.F.R. § 2590.715-1251 ....................................................................7

45 C.F.R. § 147.130(a)(1)(iv) ........................................................... 7-8, 57

45 C.F.R. § 147.140 ......................................................................... 7-8, 56

75 Fed. Reg. 41726 ...........................................................................8, 56

77 Fed. Reg. 8725 .............................................................................7, 54

77 Fed. Reg. 16501 ..............................................................................8

78 Fed. Reg. 8456 ........................................................................8, 43, 57

## Rules

D.C. Cir. R. 26.1 ................................................................................ v

D.C. Cir. R. 28(a) ...............................................................................i

Fed. R. App. P. 4 ................................................................................2

Fed. R. App. P. 26.1 ........................................................................... v

Fed. R. App. P. 32(a)(5)..................................................................................70

Fed. R. App. P. 32(a)(6)..................................................................................70

Fed. R. App. P. 32(a)(7)(B)..............................................................................70

Fed. R. App. P. 32(a)(7)(B)(iii) ........................................................................70

**Other Authorities**

*Application of the New Health Reform Provisions of Part A
    of Title XXVII of the PHS Act to Grandfathered Plans,*
    http://www.dol.gov/ebsa/pdf/grandfatherregtable.pdf .........................8, 56

Becket Fund of Religious Liberty, *HHS Mandate Information
    Central,* http://www.becketfund.org/hhsinformationcentral/ ....................21

*Catechism of the Catholic Church* (2d ed. 1997) ....................................................11

Cong. Research Serv., RL 7-5700, *Private Health Insurance
    Provisions in PPACA* (May 4, 2012) ...............................................8, 56

*Contraception in America, Unmet Needs Survey, Executive
    Summary,* http://www.contraceptioninamerica.com/
    downloads/Executive_Summary.pdf...............................................58

Dep't of Health & Human Servs., *Guidance on the Temporary
    Enforcement Safe Harbor,* http://cciio.cms.gov/resources/
    files/prev-services-guidance-08152012.pdf ......................................8

Drugstore.com, http://www.drugstore.com/plan-b-one-step-
    emergency-contraceptive-must-be-17-or-over-to-purchase-
    without-a-prescription/qxp161395 ................................................58

Family Planning Health Services, Inc., http://shop.fphs.org/
     plan-b-one-step-1/ ..............................................................................58

Food and Drug Administration, Office of Women's Health,
     *Birth Control Guide*, http://www.fda.gov/downloads/
     forconsumers/byaudience/forwomen/freepublications/
     ucm282014.pdf ....................................................................................7

Guttmacher Institute, *Facts on Publicly Funded Contraceptive
     Services in the United States*, May 2012, http://www.
     guttmacher.org/pubs/fb_contraceptive_serv.html ......................................62

Health Res. & Servs. Admin., *Women's Preventive Services:
     Required Health Plan Coverage Guidelines*, http://www.hrsa.gov/
     womensguidelines/ ..............................................................................6

KwikMed, https://www.ella-kwikmed.com/default.asp ................................58

*Merriam-Webster Dictionary*, http://www.merriam-webster.com/
     dictionary ..........................................................................................47

*Statistics about Business Size (including Small Business) from
     the U.S. Census Bureau*, http://www.census.gov/econ/
     smallbus.html ................................................................................9, 57

United States Conference of Catholic Bishops, *United for Religious
     Freedom: A Statement of the Administrative Committee of the United
     States Conference of Catholic Bishops* (Mar. 14, 2012), http://www.
     usccb.org/issues-and-action/religious-liberty/march-14-
     statement-on-religious-freedom-and-hhs-mandate.cfm .............................29

*Vocation of the Business Leader: A Reflection* (Nov. 2012),
     http://www.stthomas.edu/cathstudies/cst/VocationBusinessLead/
     VocationTurksonRemar/VocationBk3rdEdition.pdf .............................. 28-29

Writings of Thomas Jefferson: Replies to Public Addresses:
  To the Society of the Methodist Episcopal Church at New
  London, Conn., on Feb. 4, 1809 (Monticello ed. 1904) vol. XVI .................20

# GLOSSARY OF ABBREVIATIONS

**Add.**: Addendum.

**Affordable Care Act**: Patient Protection and Affordable Care Act, 111 Pub. L. No. 148, 124 Stat. 119, 111th Cong., 2d Sess., Mar. 23, 2010.

**App.**: Appendix.

**DCT Doc.**: Entries on the district court's docket.

**FDA**: Food and Drug Administration.

**Freshway Foods**: Plaintiff Fresh Unlimited, Inc., d/b/a Freshway Foods.

**Freshway Logistics**: Plaintiff Freshway Logistics, Inc.

**Gilardis**: Plaintiffs Francis and Phil Gilardi.

**Mandate**: Federal regulations enacted pursuant to the Affordable Care Act, requiring non-exempt group health plans to provide coverage without cost-sharing for all FDA approved contraceptive methods—including abortion-inducing drugs—sterilization procedures, and patient education and counseling for women with reproductive capacity.

**RFRA**: Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq*.

## JURISDICTIONAL STATEMENT

### I.  Jurisdiction Of The District Court

The district court had subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1346(a)(2) because it is brought against agencies and officials of the United States based on claims arising under the United States Constitution (the First Amendment), the laws of the United States (the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq.* (RFRA) and the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.*), and regulations of executive departments ("the Mandate" discussed herein). The district court also had jurisdiction under 28 U.S.C. § 1343(a)(4) because this is a civil action to secure equitable or other relief under an Act of Congress providing for the protection of civil rights (RFRA), and also under 28 U.S.C. § 1361 because the district court may compel officers and agencies of the United States to perform a duty owed Plaintiffs.

### II.  Jurisdiction Of This Court

This Court has jurisdiction over this appeal because the order of the district court from which this appeal is taken denied Plaintiffs' motion for a

preliminary injunction and was immediately appealable. 28 U.S.C. § 1292(a)(1); App. 56-81. This appeal was timely filed. Fed. R. App. P. 4. The district court entered its order denying Plaintiffs' motion for a preliminary injunction on March 3, 2013, App. 56-81, and Plaintiffs filed their notice of interlocutory appeal from that order on March 4, 2013. App. 82.

The district court's order denying Plaintiffs' motion for a preliminary injunction dealt with Count I of Plaintiffs' complaint (Violation of RFRA). App. 56-81. Still pending in the district court are the remaining claims raised in Plaintiffs' complaint, which are based on the First Amendment's Free Exercise and Free Speech Clauses and the Administrative Procedure Act. App. 28-32. The district court has stayed all proceedings pending the resolution of this appeal. App. 15.

## STATEMENT OF THE ISSUES

Federal regulations enacted pursuant to the Affordable Care Act require non-exempt employers to include coverage for all contraceptive methods—including abortion-inducing drugs—sterilization procedures, and related patient education and counseling in their employee health plans ("the

2

Mandate"). Plaintiffs Francis and Philip Gilardi own the controlling interest in Plaintiffs Freshway Foods and Freshway Logistics. The Gilardis' Catholic beliefs forbid them from arranging for, paying for, or providing the Mandate-required products and services, directly or indirectly, including through their companies' health plans. Plaintiffs would likely face over $14.4 million in annual penalties if they do not comply with the Mandate. The district court denied Plaintiffs' motion for a preliminary injunction. This Court, however, granted an injunction pending appeal.

The issues presented are:

1.  Whether the district court erred in holding that the Mandate, which requires Plaintiffs to choose between taking actions that violate the tenets of their religion or paying ruinous penalties for adhering to their religious beliefs, does not substantially burden Plaintiffs' religious exercise.

2. Whether Defendants can meet their heavy burden under RFRA of demonstrating that application of the Mandate to Plaintiffs is necessary to further a compelling governmental interest, and is the least restrictive means of doing so, when Defendants have excluded millions of Americans

from the Mandate's scope through employer exemptions and several alternative means of furthering the government's interests exist that would not substantially burden Plaintiffs' religious exercise.

3. Whether the remaining injunction factors (irreparable harm, balance of the equities, and the public interest) weigh in Plaintiffs' favor to warrant the grant of a preliminary injunction.

## STATEMENT OF THE CASE

This case arises from the enactment of the Mandate, which requires Plaintiffs to arrange for, pay for, and provide an employee health plan that includes coverage, without cost-sharing, for all FDA approved contraceptive methods—including abortion-inducing drugs—sterilization procedures, and related education and counseling. Plaintiffs' Catholic religious beliefs and company standards dictate that it is immoral to arrange for, pay for, or provide such products and services and, as such, they have intentionally excluded coverage of those products and services from their self-insured employee health plan for the last ten years. App. 18-32, 38-55.

4

On January 24, 2013, Plaintiffs brought suit alleging that the Mandate violates their rights under RFRA and under the Free Exercise and Free Speech Clauses of the First Amendment; Plaintiffs also alleged that the Mandate violates the Administrative Procedure Act. App. 6-7, 18-32. On February 8, 2013, Plaintiffs filed a motion for a preliminary injunction based upon their RFRA claim, preserving their other claims for further proceedings. App. 11, 33-37.

On March 3, 2013, the district court denied the motion. App. 14-15, 56-81. The court held that Plaintiffs had not established a likelihood of success on the merits because they did not show that the Mandate substantially burdens their religious exercise. App. 64-80. Plaintiffs filed their notice of interlocutory appeal on March 4, 2013, App. 15, 82, and on March 6, 2013, Plaintiffs filed with this Court an emergency motion for an injunction pending appeal before April 1, 2013, when the Mandate would begin to apply to Plaintiffs. On March 21, 2013, a motions panel of this Court denied the emergency motion over Judge Brown's dissent. App. 84.

On March 25, 2013, Plaintiffs filed an emergency petition for rehearing

en banc of the motions panel's denial. On March 29, 2013, the motions

panel issued an order reconsidering and granting the emergency motion

for an injunction pending appeal. App. 86. The petition for rehearing en

banc was dismissed as moot. App. 87.

## STATEMENT OF THE FACTS

### I.  The Mandate, Its Exceptions, and Its Penalties

The Affordable Care Act requires non-exempt group health plans to

provide coverage for preventative care and screening for women without

cost-sharing in accordance with guidelines created by the Health Resources

and Services Administration. 42 U.S.C. § 300gg-13(a)(4); Add. 2. These

guidelines include, among other things, "[a]ll Food and Drug

Administration ["FDA"] approved contraceptive methods, sterilization

procedures, and patient education and counseling for women with

reproductive capacity."[1]/ FDA-approved contraceptive methods include

---

[1]/ Health Res. & Servs. Admin., *Women's Preventive Services: Required Health Plan Coverage Guidelines,* http://www.hrsa.gov/womensguidelines/ (last visited Apr. 24, 2013); Add. 6.

emergency contraception that can act post-conception (such as "Plan B" and "Ella"), diaphragms, oral contraceptive pills, and intrauterine devices.[2]/ The Mandate applies to all non-exempt employers once their group health plans are renewed on or after August 1, 2012; as discussed herein, non-compliance will lead to significant annual penalties. 45 C.F.R. § 147.130(a)(1)(iv); 77 Fed. Reg. 8725.

Although the Mandate applies to Plaintiffs and their approximately 395 employees (about 340 work for Freshway Foods and about fifty-five work for Freshway Logistics), Defendants have exempted many other employers from the Mandate. For example, grandfathered health plans are indefinitely exempt from compliance with the Mandate. Grandfathered plans are those that were in existence on March 23, 2010, and that have not undergone any of a defined set of changes. *See* 29 C.F.R. § 2590.715-1251; 45 C.F.R. § 147.140. The government describes the rules for grandfathered health plans as preserving a "right to maintain existing coverage." 42

---

[2]/ Food and Drug Administration, Office of Women's Health, *Birth Control Guide*, http://www.fda.gov/downloads/forconsumers/byaudience/ forwomen/freepublications/ucm282014.pdf (last visited Apr. 24, 2013).

U.S.C. § 18011; Add. 8; 45 C.F.R. § 147.140.[3]/ Defendant Department of

Health and Human Services has estimated that "98 million individuals will

be enrolled in grandfathered group health plans in 2013." 75 Fed. Reg.

41726, 41732. Although the Mandate does not apply to grandfathered

plans, many provisions of the Affordable Care Act do (for example, the

prohibition on excessive waiting periods).[4]/

"Religious employers" are also exempt from the Mandate. 45 C.F.R. §

147.130(a)(1)(iv)(B); 78 Fed. Reg. 8456, 8461-62. And, a temporary

enforcement safe harbor is currently in place for non-profit entities that

satisfy certain criteria.[5]/ Moreover, employers with fewer than fifty full-

time employees have no obligation to provide employee health insurance

---

[3]/ According to the Congressional Research Service, "[e]nrollees could continue and renew enrollment in a grandfathered plan *indefinitely*." Cong. Research Serv., RL 7-5700, *Private Health Insurance Provisions in PPACA*, at 11 (May 4, 2012) (emphasis added).

[4]/ *Application of the New Health Reform Provisions of Part A of Title XXVII of the PHS Act to Grandfathered Plans*, http://www.dol.gov/ebsa/pdf/ grandfatherregtable.pdf (last visited Apr. 24, 2013).

[5]/ 77 Fed. Reg. 16501, 16503; 78 Fed. Reg. at 8459; *see* Dep't of Health & Human Servs., *Guidance on the Temporary Enforcement Safe Harbor*, http://cciio.cms.gov/resources/files/prev-services-guidance-08152012.pdf (last visited Apr. 24, 2013).

under the Affordable Care Act and, as a result, can bypass the Mandate without penalty by not providing any group health plan.[6]/ 26 U.S.C. § 4980H(c)(2)(A).

Courts have estimated that *about 190 million Americans* are enrolled in health plans that do not have to comply with the Mandate.[7]/

A non-exempt employer that provides health insurance that does not comply with the Mandate faces penalties of $100 per day for each full-time employee, 26 U.S.C. § 4980D, as well as potential enforcement lawsuits, 26 U.S.C. §§ 1132, 1185d. For Plaintiffs, that would amount to roughly $39,500 in penalties for *each day* that their health plan continues to exclude the coverage to which they object, totaling over $14.4 million in penalties *every year*. *See id.* Moreover, non-exempt employers with fifty or more full-time employees that fail to provide any employee health plan are subject to

---

[6]/ As of 2008, more than twenty-one million individuals worked for employers with fewer than twenty employees, and many others worked for employers with between twenty and forty-nine employees. *See Statistics about Business Size (including Small Business) from the U.S. Census Bureau*, http://www.census.gov/econ/smallbus.html (last visited Apr. 24, 2013).

[7]/ *E.g., Monaghan v. Sebelius*, 2013 U.S. Dist. LEXIS 35144, at *30 (E.D. Mich. Mar. 14, 2013) (*Monaghan II*); *Newland v. Sebelius*, 881 F. Supp. 2d 1287, 1298 (D. Colo. 2012).

annual penalties of $2,000 for each full-time employee, not counting thirty of them. 26 U.S.C. § 4980H.

## II. The Plaintiffs

Francis and Philip Gilardi are brothers who are the sole owners of Freshway Foods and Freshway Logistics. They each hold a fifty percent ownership stake in the two companies and, therefore, together they own the full and controlling interest in those companies. Francis Gilardi is the Chief Executive Officer and Treasurer of Freshway Foods and Freshway Logistics and Philip Gilardi is the President and Secretary. They are the only Directors and together they set the policies governing the conduct of all phases of the Plaintiff companies. App. 21, 38, 50.

Freshway Foods is a closely-held and family-owned fresh produce processor and packer that has approximately 340 full-time employees. Freshway Logistics is a closely-held and family-owned for-hire carrier of mainly refrigerated products that has approximately fifty-five full-time employees. They are both Subchapter S corporations that are incorporated, and based, in the State of Ohio. App. 21-22, 38-39, 50-51.

10

The Gilardis hold to the teachings of the Catholic Church regarding the sanctity of human life from conception to natural death. They sincerely believe that actions intended to terminate an innocent human life by abortion, including through the use of drugs that act post-conception, are gravely sinful. They also sincerely hold to the Catholic Church's teaching regarding the immorality of artificial means of contraception and sterilization. They manage and operate Freshway Foods and Freshway Logistics in a way that reflects the teachings, mission, and values of their Catholic faith, and they desire to continue to do so.[8]/ App. 22-23, 39, 51.

Examples of how Plaintiffs further their religious beliefs and moral values include the following:

- For approximately the last ten years, the Gilardis have directed that a sign stating "It's not a choice, it's a child" be affixed to the back of trucks that bear the Freshway Foods name as a way to express their

_____

[8]/ Moral opposition to contraception, abortion, and sterilization has been a longstanding teaching of the Catholic Church. *See, e.g., Catechism of the Catholic Church*, Nos. 2270-75, 2370, 2399 (2d ed. 1997).

religious views regarding the sanctity of human life to the public. App. 23, 39, 44, 51;

- The Gilardis support their Catholic parish, schools, and seminary financially and otherwise. App. 23, 39, 51;

- In or about 2004, the Gilardis drafted a statement listing the values by which their companies would be run. They listed "Ethics" first because that is their primary business value. App. 23, 39, 51;

- At the direction of the Gilardis, Freshway Foods makes annual monetary and/or in-kind donations (primarily food) to many community non-profit charitable organizations, including Compassionate Care, the YMCA, Holy Angel's Soup Kitchen, United Way, Habitat for Humanity, American Legion, Bill McMillian's Needy Children, Elizabeth's New Life Center, and local schools. App. 23, 39-40, 51-52;

- At the direction of the Gilardis, Freshway Logistics donates a trailer for use by the local Catholic parish for the annual parish picnic and uses its trucks to deliver the food donated by Freshway Foods to food

banks outside the Sidney, Ohio, area, where the two Plaintiff companies are located. App. 23, 40, 52;

- At the direction of the Gilardis, during Plaintiffs' Monthly Associate Appreciation Lunches, Plaintiffs provide their employees with alternative foods to accommodate their religious dietary requirements. App. 23, 40, 52; and

- At the direction of the Gilardis, Freshway Foods and Freshway Logistics provide their Muslim employees with space to pray during breaks and lunches, and Plaintiffs also adjust break periods during Ramadan to allow their Muslim employees to eat after sundown pursuant to their religion. App. 24, 40, 52.

Moreover, Freshway Foods and Freshway Logistics provide their full-time employees with a self-insured health plan that provides health insurance and prescription drug insurance through a third-party administrator and stop-loss provider. The plan is renewed annually on April 1. Francis and Philip Gilardi consider the provision of employee health insurance to be an integral component of furthering the mission and

13

values of their companies. For approximately the last ten years, at the direction of the Gilardis, Plaintiffs have specifically excluded coverage of all contraceptives, abortion, and sterilization from their employee health plan because paying for and providing such products and services through the plan would violate their sincerely-held religious beliefs and moral values. App. 24, 40-41, 45-49, 52.

Freshway Foods and Freshway Logistics are not exempt from the Mandate. They each employ more than fifty full-time employees and are not "religious employers," as that term is defined by the Mandate. They do not fall within any "temporary enforcement safe harbor" provided by Defendants to certain non-profit entities, and their employee health plan is not "grandfathered." App. 25, 41-42, 53.

The Gilardis want to continue providing health insurance for their full-time employees without violating their Catholic religious beliefs by arranging for, paying for, or providing the objectionable products and services. App. 25-26, 42, 53. Absent continued injunctive relief, however, the Mandate will require Francis and Philip Gilardi to *direct* Freshway

14

Foods and Freshway Logistics to include those products and services in their employee health plan contrary to Plaintiffs' religious beliefs and moral values. App. 42-43, 54-55.

If Freshway Foods and Freshway Logistics fail to comply with the Mandate, they would likely incur significant annual penalties (over $14.4 million annually) that would have a crippling impact on their ability to survive economically. This would, by extension, greatly harm the Gilardis financially. Also, dropping the employee health plan altogether would lead to annual penalties, have a severe impact on Plaintiffs' ability to compete with other companies that offer health coverage, and also harm Plaintiffs' employees who would have to find expensive individual policies in the private marketplace. App. 26, 42, 54.

In short, the Mandate requires Plaintiffs to choose between (a) complying with the Mandate and violating their religious beliefs and moral values and (b) not complying with the Mandate and paying ruinous annual penalties in order to continue to conduct business consistent with their religious beliefs and moral values. The Mandate prevents Francis and

15

Philip Gilardi from following the dictates of their Catholic faith in the operation and management of Freshway Foods and Freshway Logistics, and the Mandate violates the religious-based principles by which Freshway Foods and Freshway Logistics are run. App. 4, 42-43, 54-55.

## SUMMARY OF THE ARGUMENT

## I. The Mandate Substantially Burdens Plaintiffs' Religious Exercise.

The Mandate substantially burdens Plaintiffs' religious exercise by pressuring them, under pain of penalty, to arrange and pay for coverage of contraceptives, including abortion-inducing drugs, sterilization procedures, and related patient education and counseling, in violation of their religious beliefs. *See Thomas v. Review Bd.*, 450 U.S. 707, 717-18 (1981). Plaintiffs must either modify their behavior and violate their beliefs or face financial ruin. RFRA's protections extend to the Gilardis as well as to Freshway Foods and Freshway Logistics, as RFRA protects *any* religious exercise of *a person* (including natural and corporate persons) and is not limited to only protecting the free exercise of a religious person. Business

owners who desire to operate their businesses in accordance with their faith do not forfeit their religious freedom by entering the marketplace.

## II. Defendants' Application Of The Mandate To Plaintiffs Does Not Withstand Strict Scrutiny.

Because the Mandate substantially burdens Plaintiffs' religious exercise, Defendants must prove that application of the Mandate to Plaintiffs is necessary to further a compelling governmental interest and is the least restrictive means of doing so (that is, Defendants must satisfy strict scrutiny regarding the application of the Mandate to Plaintiffs). *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006). Defendants cannot meet their heavy burden mainly because the government has exempted the employers of millions of individuals from the Mandate, bringing to mind the Supreme Court's observation that "a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 547 (1993) (citations omitted). In addition, the government could provide greater access to contraceptives through various means that would not

17

substantially burden Plaintiffs' religious exercise (for example, by expanding eligibility for existing federal programs that provide free contraception).

## III. Plaintiffs Satisfy The Remaining Injunction Factors.

Plaintiffs would be irreparably harmed in the absence of continued injunctive relief because their religious exercise would be infringed on a continuing basis. The issuance of an injunction pending the final resolution of Plaintiffs' claims would preserve the status quo because Plaintiffs have been specifically excluding coverage of all contraceptive methods and sterilization procedures in their self-insured health plan for the past decade based on their religious beliefs. Moreover, an injunction would not harm Defendants' interests, especially because the government has excluded tens of millions of Americans from the Mandate's scope, and it would further the public's interest in ensuring the protection of religious freedom.

Consequently, this Court should reverse the decision of the district court and hold that Plaintiffs are entitled to preliminary injunctive relief.

## STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008)). "The four factors have typically been evaluated on a 'sliding scale.' If the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009) (internal citations omitted). "For example, if the movant makes a very strong showing of irreparable harm and there is no substantial harm to the non-movant, then a correspondingly lower standard can be applied for likelihood of success." *Id.* at 1292. "When

seeking a preliminary injunction, the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Id.*[9]/

This Court reviews "the district court's ultimate decision to deny injunctive relief, as well as its weighing of the preliminary injunction factors, for abuse of discretion." *In re Naval Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012). This Court reviews "the district court's legal conclusions de novo and its findings of fact for clear error." *Id.*

## ARGUMENT

No provision in our Constitution ought to be dearer to man than that which protects the rights of conscience against the enterprises of the civil authority.[10]/

## I. Introduction

The Mandate substantially burdens Plaintiffs' religious exercise because it presents them with a stark and inescapable choice: either arrange and

---

[9]/ Although some judges of this Court have recently suggested that the sliding scale approach should no longer be applied, *see Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011), Plaintiffs are entitled to preliminary injunctive relief regardless of the balancing approach utilized because they make a sufficiently strong showing on each of the four factors.

[10]/ Writings of Thomas Jefferson: Replies to Public Addresses: To the Society of the Methodist Episcopal Church at New London, Conn., on Feb. 4, 1809 (Monticello ed. 1904) vol. XVI, pp. 331, 332.

pay for contraceptive methods, including abortion-inducing drugs, sterilization procedures, and related education and counseling, in violation of their religious beliefs and religiously-inspired company standards, or face crippling annual penalties. Defendants have decided not to impose this same choice upon thousands of other employers (some of whom share Plaintiffs' religious objection), leaving millions of individuals outside of the Mandate's scope. This massive under-inclusiveness illustrates that applying the Mandate to Plaintiffs is not the least restrictive means of achieving a compelling governmental interest.

There are more than fifty ongoing federal lawsuits brought by both for-profit and non-profit employers seeking a religious exemption from the Mandate. *See* Becket Fund for Religious Liberty, *HHS Mandate Information Central*, http://www.becketfund.org/hhsinformationcentral/ (last visited Apr. 24, 2013) (listing most of the Mandate cases). At present, for-profit plaintiffs are protected by injunctions preventing application of the

Mandate to them in nineteen cases, including this one,[11]/ whereas

injunctive relief has been denied in six cases.[12]/

---

[11]/ *Annex Med., Inc. v. Sebelius*, 2013 U.S. App. LEXIS 2497 (8th Cir. Feb. 1, 2013) (granting injunction pending appeal); *Grote v. Sebelius*, 2013 U.S. App. LEXIS 2112 (7th Cir. Jan. 30, 2013) (same); *Korte v. U.S. HHS*, 2012 U.S. App. LEXIS 26734 (7th Cir. Dec. 28, 2012) (same); *O'Brien v. U.S. HHS*, 2012 U.S. App. LEXIS 26633 (8th Cir. Nov. 28, 2012) (same); *Geneva Coll. v. Sebelius*, 2013 U.S. Dist. LEXIS 56087 (W.D. Pa. Apr. 19, 2013) (*Geneva II*) (granting preliminary injunction); *Monaghan II*, 2013 U.S. Dist. LEXIS 35144 (same); *Triune Health Grp., Inc. v. U.S. HHS*, No. 1:12-cv-06756, ECF Doc. 50 (N.D. Ill. Jan. 3, 2013) (same); *Am. Pulverizer Co. v. U.S. HHS*, 2012 U.S. Dist. LEXIS 182307 (W.D. Mo. Dec. 20, 2012) (same); *Tyndale House Publ'rs v. Sebelius*, 2012 U.S. Dist. LEXIS 163965 (D.D.C. Nov. 16, 2012) (same); *Legatus v. Sebelius*, 2012 U.S. Dist. LEXIS 156144 (E.D. Mich. Oct. 31, 2012) (same); *Newland*, 881 F. Supp. 2d 1287 (same); *Hartenbower v. U.S. HHS*, No. 1:13-cv-2253, ECF Doc. 16 (N.D. Ill. Apr. 18, 2013) (granting unopposed motion for preliminary injunction); *Am. Mfg. Co. v. Sebelius*, No. 0:13-cv-295-JRT-LIB, ECF Doc. 11 (D. Minn. Apr. 2, 2013) (same); *Bick Holdings, Inc. v. U.S. HHS*, No. 4:13-cv-462-AGF, ECF Doc. 19 (E.D. Mo. Apr. 1, 2013) (same); *Tonn & Blank Constr., LLC v. Sebelius*, No. 1:12-cv-00325-JD-RBC, ECF Doc. 43 (N.D. Ind. Apr. 1, 2013) (same); *Lindsay v. U.S. HHS*, No. 1:13-cv-01210, ECF Docs. 20-21 (N.D. Ill. Mar. 20, 2013) (same); *Sioux Chief Mfg. Co., Inc. v. Sebelius*, No. 4:13-cv-036, ECF Doc. 9 (W.D. Mo. Feb. 28, 2013) (same); *Sharpe Holdings, Inc. v. U.S. HHS*, 2012 U.S. Dist. LEXIS 182942 (E.D. Mo. Dec. 31, 2012) (granting TRO).

[12]/ *Hobby Lobby Stores v. Sebelius*, 870 F. Supp. 2d 1278 (W.D. Okla. 2012) (denying preliminary injunction), 2012 U.S. App. LEXIS 26741 (10th Cir. Dec. 20, 2012) (denying injunction pending appeal), *and* 133 S. Ct. 641 (2012) (Sotomayor, J., in chambers) (same); *Autocam Corp. v. Sebelius*, 2012 U.S. Dist. LEXIS 184093 (W.D. Mich. Dec. 24, 2012) (denying preliminary injunction), *and* 2012 U.S. App. LEXIS 26736 (6th Cir. Dec. 28, 2012)

*(Text of footnote continues on following page.)*

**II. Plaintiffs Are Likely To Succeed On Their RFRA Claim.**

In denying Plaintiffs' motion for a preliminary injunction, the district court held that the Mandate does not substantially burden Plaintiffs' religious exercise. App. 64-80. This is reversible error because the Mandate requires Plaintiffs to take direct actions that violate the tenets of their faith, with the threat of substantial penalties for non-compliance. The Mandate presents a classic example of a substantial burden upon religious exercise, which triggers the application of strict scrutiny under RFRA.

RFRA "restore[s] the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)" by "guarantee[ing] its application in all cases where free exercise of religion is substantially burdened" by the federal government. 42 U.S.C. § 2000bb(b); Add. 11-12. RFRA continues the longstanding American tradition of

(denying injunction pending appeal); *Conestoga Wood Specialties Corp. v. Sebelius*, 2012 U.S. Dist. LEXIS 4449 (E.D. Pa. Jan. 11, 2013) (denying preliminary injunction), *and* 2013 U.S. App. LEXIS 2706 (3d Cir. Feb. 7, 2013) (denying injunction pending appeal); *MK Chambers Co. v. U.S. HHS*, 2013 U.S. Dist. LEXIS 47887 (E.D. Mich. Apr. 3, 2013) (denying TRO); *Eden Foods, Inc. v. Sebelius*, 2013 U.S. Dist. LEXIS 40768 (E.D. Mich. Mar. 22, 2013) (same); *Briscoe v. Sebelius*, 2013 U.S. Dist. LEXIS 26911 (D. Colo. Feb. 27, 2013) (same).

protecting the freedom of conscience while providing even greater protection than the First Amendment. *Cf. Girouard v. United States*, 328 U.S. 61, 68 (1946) ("The victory for freedom of thought recorded in our Bill of Rights recognizes that in the domain of conscience there is a moral power higher than the State.").

The general rule under RFRA is that the federal government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a); Add. 12. The term "exercise of religion" is broadly defined to "include[] any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A), *incorporated by* 42 U.S.C. § 2000bb-2(4); Add. 13, 15. RFRA provides an exception for instances in which the federal government "demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b); Add. 12. The government must "demonstrate that the compelling interest test is satisfied through

24

application of the challenged law . . . [*to*] *the particular claimant* whose sincere exercise of religion is being substantially burdened." *O Centro*, 546 U.S. at 430-31 (emphasis added). Courts must "look[] beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Id*. at 431.

### A. The burden imposed by the Mandate is substantial.

Under RFRA, a substantial burden to religious exercise is present when the government puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas*, 450 U.S. at 717-18; *accord Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008). This typically occurs when a law forces a person to choose between (1) doing something his faith forbids or discourages (or not doing something his faith requires or encourages), and (2) incurring financial penalties, the loss of a government benefit, criminal prosecution, or other substantial harm.

For example, in *Sherbert*, the Court held that a state's denial of unemployment benefits to a Seventh-Day Adventist employee, whose

religious beliefs prohibited her from working on Saturdays, substantially burdened her exercise of religion. The Court explained that the regulation

> force[d] her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.

374 U.S. at 404. Also, in *Yoder*, the Court held that a state compulsory school-attendance law substantially burdened the religious exercise of Amish parents who were fined five dollars after refusing to send their children to high school. The Court found the burden "not only severe, but inescapable," requiring the parents "to perform acts undeniably at odds with fundamental tenets of their religious belief." 406 U.S. at 218.

Plaintiffs here face a similar, inescapable choice. Absent continued injunctive relief, they must either act contrary to their faith by directly paying for and providing products and services they believe are immoral or incur over $14.4 million in annual penalties. App. 26, 41-43, 53-55. This choice substantially pressures both the Gilardis and the companies to modify their behavior and violate their beliefs. *See Thomas*, 450 U.S. at 717-

26

18; *Geneva II*, 2013 U.S. Dist. LEXIS 56087, at *25-26 ( "This kind of Hobson's choice is similar to that faced by the plaintiff in *Sherbert*.").[13]/

**B. The Mandate substantially burdens the Gilardis' religious exercise.**

The Mandate substantially burdens the religious exercise of Francis and Philip Gilardi because it compels them to manage and operate their companies in a manner that is inconsistent with their Catholic faith. App. 41-43, 53-55. As the sole owners and operators of the two Plaintiff companies, it is ultimately Francis and Philip Gilardi who face, and have to make, the difficult decision to either direct their companies to comply with the Mandate, in violation of their religious beliefs, or incur millions of dollars in annual penalties that will cripple their companies and harm themselves. App. 38-43, 50-55.

---

[13]/ *Mead v. Holder*, 766 F. Supp. 2d 16 (D.D.C.), *aff'd sub nom. Seven Sky v. Holder*, 661 F.3d 1 (D.C. Cir. 2011), is distinguishable, as the district court explained in *Tyndale House Publishers*, 2012 U.S. Dist. LEXIS 163965, at *45-48. Plaintiffs here, unlike the plaintiffs in *Mead*, have no alternative but to violate the Mandate and be subjected to severe financial penalties "and, therefore, the pressure to violate their religious beliefs remains undiminished." *Id.* at *47.

The Gilardis have managed and operated their companies pursuant to their Catholic faith, and they wish to continue to do so. App. 39-43, 51-55. The record reflects, without contradiction, that the Gilardis engage in religious acts, such as donating to their Catholic parish, schools, and seminary, and they also direct their companies to engage in religious acts, such as accommodating the religious needs of their employees and displaying signs stating, "It's not a choice, it's a child," on Freshway Foods trucks. App. 22-24, 39-41, 44-49, 51-52. The record also reflects, without contradiction, that providing their employees with health insurance that complies with the Gilardis' religious beliefs not only furthers those beliefs, but is an integral component of furthering the mission and values of their companies. App. 40-43, 52-54.

As the Catholic Church's Pontifical Council for Justice and Peace explains, for Catholics, "[t]he vocation of the businessperson is a genuine human and Christian calling."[14]/ According to the Council,

---

[14]/ *Vocation of the Business Leader: A Reflection* at ¶ 6 (Nov. 2012), http://www.stthomas.edu/cathstudies/cst/VocationBusinessLead/Vocation TurksonRemar/VocationBk3rdEdition.pdf (last visited Apr. 24, 2013).

[one of the biggest obstacles to fulfilling this Christian calling] at a personal level is a *divided life*, or what Vatican II described as "the split between the faith which many profess and their daily lives." . . . Dividing the demands of one's faith from one's work in business is a fundamental error which contributes to much of the damage done by businesses in our world today. . . . The divided life is not unified or integrated; it is fundamentally disordered, and thus fails to live up to God's call.[15]/

This position is shared by the United States Conference of Catholic Bishops, who view the Mandate as "unjust and illegal" because it violates the rights of those striving to act in accordance with their faith and moral values in how they run their businesses.[16]/ Simply put, the Mandate will prevent the Gilardis from living up to God's call as they understand it; the Mandate will prevent them from staying true to their faith in the operation and management of their businesses. *See EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008) ("Free religious exercise would mean little if

---

[15]/ *Id.* at ¶ 10.

[16]/ U.S. Conf. of Catholic Bishops, *United for Religious Freedom: A Statement of the Administrative Committee of the United States Conference of Catholic Bishops*, at 1, 4 (Mar. 14, 2012), http://www.usccb.org/issues-and-action/religious-liberty/march-14-statement-on-religious-freedom-and-hhs-mandate.cfm (last visited Apr. 24, 2013).

29

restricted to places of worship or days of observance, only to disappear the next morning at work.").

The substantial burden imposed upon the Gilardis' religious exercise is not dependent upon the extent to which covered individuals may ultimately use the contraception, abortion-inducing drugs, or sterilization procedures that Plaintiffs are required to arrange and pay for pursuant to the Mandate. Rather, as explained by the United States Court of Appeals for the Seventh Circuit, in granting an injunction pending appeal preventing enforcement of the Mandate against a for-profit business and its Catholic owners, "[t]he religious-liberty violation at issue here inheres in the *coerced coverage* of contraception, abortifacients, sterilization, and related services, *not*—or perhaps more precisely, *not only*—in the later purchase or use of contraception or related services." *Korte*, 2012 U.S. App. LEXIS 26734, at *8-9 (citation omitted).

Similarly, the district court in *Monaghan II* correctly held that the Mandate forces Monaghan, a Catholic business owner, "to violate his beliefs and modify his behavior or else pay substantial penalties for

30

noncompliance. Government action that places Monaghan in such a 'Catch-22' dilemma sufficiently constitutes a substantial burden on his free exercise of religion." 2013 U.S. Dist. LEXIS 35144, at *19 (citing *Thomas*, 450 U.S. at 718, and *Yoder*, 406 U.S. at 218); *see also Tyndale House Publ'rs*, 2012 U.S. Dist. LEXIS 163965, at *38-40 (quoting *Thomas*, 450 U.S. at 718) ("[T]he contraceptive coverage mandate affirmatively compels the plaintiffs to violate their religious beliefs in order to comply with the law and avoid the sanctions that would be imposed for their noncompliance. Indeed, the pressure on the plaintiffs to violate their religious beliefs is 'unmistakable.'").

To be clear, Plaintiffs are not attempting to impose their religious views on their employees, who remain free to purchase the Mandate-required products and services with their own money if they so choose. Rather, Plaintiffs object to being forced to engage in immoral activity themselves by arranging for, paying for, and providing those products and services free of charge. From the perspective of Plaintiffs' Catholic faith, paying an employee's salary, which may be spent on any number of things, is morally

31

distinguishable from Plaintiffs directly arranging and paying for specific objectionable products and services themselves. As such, providing salaries to employees does not require Plaintiffs to violate their religious beliefs, unlike compliance with the Mandate.[17]/

1. **The corporate form of the Plaintiff companies does not negate the substantial burden that the Mandate imposes on the Gilardis' religious exercise.**

The district court erred in holding that it would be required to ignore the corporate form and effectively treat the companies' assets as if they were the Gilardis' assets in order to conclude that the Mandate substantially burdens the Gilardis' religious exercise. App. 66-68. The Gilardis do not dispute that the Plaintiff companies are distinct legal

---

[17]/ The substantiality of the burden is magnified because Plaintiffs have a *self-insured* health plan under which they directly pay for products and services used by their employees. *See Tyndale House Publ'rs*, 2012 U.S. Dist. LEXIS 163965, at *43. Even if Plaintiffs offered a non-self-insured group plan, however, the Mandate would still impose a substantial burden because Plaintiffs would be pressured to arrange and pay for a plan that provides the Mandate-required coverage, in violation of their religious beliefs. *Compare Annex Med., Inc.*, 2013 U.S. App. LEXIS 2497, at *3-9 (injunction granted to plaintiffs with a non-self-insured plan); *Korte*, 2013 U.S. App. LEXIS 26734, at *8-11 (same) *with Grote*, 2013 U.S. App. LEXIS 2112, at *9 (injunction granted to plaintiffs with a self-insured plan); *Newland*, 881 F. Supp. 2d at 1292 (same).

entities that are directly subject to the Mandate, nor do they suggest that the companies' assets are, in fact, their own assets. Under the substantial burden test, however, courts examine the substantiality of "the coercive impact" on the claimants' religious exercise, *Thomas*, 450 U.S. at 717, *not* how direct or indirect that coercive impact is. *Id.* at 718 ("While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial."); *see also Korte*, 2012 U.S. App. LEXIS 26734, at *7-8 (explaining that the Mandate required Catholic business owners "to violate their religious beliefs to operate their company in compliance with it"); *Grote*, 2013 U.S. App. LEXIS 2112, at *10-11 (noting that the corporate form is not dispositive of a RFRA claim).

The Plaintiff companies are closely-held Subchapter S corporations, App. 22, 39, 51, and any penalty imposed on them for non-compliance with the Mandate would be passed through to the Gilardis, the sole shareholders, on a pro rata basis and subtracted from the Gilardis' gross income. *See Tetlak v. Village of Bratenahl*, 92 Ohio St. 3d 46, 49, 748 N.E.2d 51, 54 (2001); *Ardire v. Tracy*, 77 Ohio St. 3d 409 n.1, 674 N.E.2d 1155 n.1 (1997).

33

Thus, any penalties paid by the companies for non-compliance with the Mandate, based on the Gilardis' decision to adhere to their Catholic faith, will not only harm the companies but will also have a direct, negative financial impact on the Gilardis solely because of their refusal to compromise their Catholic beliefs. Indeed, the specter of this significant harm to both their companies and themselves substantially pressures *the Gilardis* to take actions that violate their religious beliefs by complying with the Mandate. *See Thomas*, 450 U.S. at 717-18; *Yoder*, 406 U.S. at 218; *Sherbert*, 374 U.S. at 404. The threatened destruction of an asset that is a distinct legal entity, such as a corporation or a 401(k) plan, clearly harms the owner of that asset and pressures the owner to modify his behavior.

Although the companies are distinct entities for purposes of corporate law, the threatened imposition of massive penalties against the companies has an undeniable "coercive impact" upon the Gilardis themselves for purposes of RFRA. *See Thomas*, 450 U.S. at 717. The Gilardis would have to manage and operate their companies in a way they believe to be immoral in order for the companies to provide a Mandate-compliant health plan.

34

The Gilardis' religious faith does not excuse their participation in, and facilitation of, immoral behavior because of a corporate veil or other legal technicalities. For purposes of substantial burden analysis, the dictates of Plaintiffs' religious beliefs control, not the nuances of corporate law. *See* App. 41-43, 52-55.

The district court stated that because the Gilardis had chosen to run their businesses as corporations, "with their accompanying rights and benefits of limited liability," they could not "disregard the same corporate status when it is advantageous to do so" to avoid application of the Mandate. App. 66-67. Yet, *non-profit* corporations, such as churches, and their individual leaders also enjoy similar "rights and benefits," including limited liability, but the leaders of a church (as well as the church itself) would be able to bring a RFRA claim if the government substantially burdens their religious exercise. *See O Centro*, 546 U.S. at 432-37; *see also* Ohio Rev. Code Ann. § 1702.55 (establishing that "[t]he members, the directors, and the officers of a [non-profit] corporation shall not be personally liable for any obligation of the corporation" except in certain

35

limited circumstances); *Taverns for Tots, Inc. v. City of Toledo*, 307 F. Supp. 2d 933, 941-42 (N.D. Ohio 2004) (noting that the rationale for piercing the corporate veil in limited circumstances is the same for both for-profit and non-profit corporations). An entity does not forfeit its right to exercise religion by securing limited liability for its owners or other leaders.

An employee group health plan does not will itself into existence. It can only be created through a business that arranges for the plan. And, a business does not make such decisions or take necessary actions except through human agency, that is, through its managers, officers, and owners pursuant to the policies established by those individuals. Consequently, it would ignore reality to suggest that the Mandate's requirements have no impact upon the religious exercise of the business owners who are the ultimate decision-makers regarding a company's group health plan. *See Robinson v. Cheney*, 876 F.2d 152, 159 (D.C. Cir. 1989) (noting that "a corporation cannot act except through the human beings who may act for it"); *Geneva II*, 2013 U.S. Dist. LEXIS 56087, at *29 ("Regardless of who purchases the insurance . . . [it] will necessarily include coverage for the

36

objected to services, thus imposing a substantial pressure on the [owners] to 'modify [their] behavior and to violate their beliefs' . . . . This is a quintessential substantial burden."); *Monaghan v. Sebelius*, 2012 U.S. Dist. LEXIS 182857, at *9 (E.D. Mich. Dec. 30, 2012) (*Monaghan I*) (noting that a corporation cannot "act (or sin) on its own" and that a court should not dispute an owner's assertion that the Mandate's requirement that he direct his company to provide the required coverage will cause him to commit a "grave sin").[18]/

The Gilardis, like other business owners who operate their businesses in accordance with their religious principles, did not consent to the imposition of any and all substantial burdens upon their religious exercise by entering the commercial marketplace. In *United States v. Lee*, 455 U.S. 252 (1982), for example, the Supreme Court held that the requirement to pay social security taxes substantially burdened a for-profit Amish employer's

---

[18]/ Plaintiffs *do not* claim that a burden upon a person's religious exercise is substantial merely because a plaintiff declares it to be so, App. 75-76; rather, the substantiality of a burden is measured by the real-world pressure that the claimant faces to take actions contrary to his faith, regardless of the directness or indirectness of that pressure. *See Thomas*, 450 U.S. at 717-18.

religious exercise. The Court held that "[b]ecause the payment of the taxes or receipt of benefits violates Amish religious beliefs, compulsory participation in the social security system interferes with their free exercise rights." *Id*. at 257. Although the Court noted in the context of applying strict scrutiny that religious adherents who enter the commercial marketplace do not have an *absolute* right to receive a religious exemption from *all* legal requirements that conflict with their faith, *id.* at 261, the fact that the Court concluded that there *was* a substantial burden and proceeded to apply strict scrutiny illustrates that the government does not have *carte blanche* to substantially burden the religious exercise of business owners.[19]/

The district court also erred in holding that the Mandate cannot substantially burden the religious exercise of the Gilardis because the Mandate applies by its literal terms to their companies. App. 78-79. The

---

[19]/ In other words, RFRA claims like Plaintiffs' should be resolved on the basis of whether there is a substantial burden and whether application of the requirement satisfies strict scrutiny, *not* on the grounds that the employer could *never* have its religious exercise substantially burdened. The idea that RFRA categorically excludes employers who do not run a religious non-profit organization is untenable.

court distinguished *Thomas* on the basis that the claimant himself faced a financial loss (the denial of benefits), whereas here it is the companies that would directly incur a financial loss. App. 79. This reliance on legal formalism ignores the reality that the imposition of massive penalties upon the Plaintiff companies *will harm both the companies and the Gilardis*, as previously explained, and will also pressure the Gilardis to operate and manage the Plaintiff companies contrary to their Catholic faith. *See Kaemmerling*, 553 F.3d at 678-79.

Under the district court's reading of the law, the religious exercise of the parents in *Yoder* would not have been substantially burdened if Wisconsin had penalized *their children*, rather than them, for the children's failure to attend school, as the parents would not themselves be directly burdened by a government sanction. Such a conclusion would be incorrect, however, because the parents were the ultimate decision-makers concerning whether the children attended school and would have felt substantial pressure to modify their behavior in a manner that violated their beliefs (by sending their children to school). As in various other areas of the law, the

39

substantiality of the impact controls, rather than its directness. *See generally*

*Heart of Atlanta Motel v. United States*, 379 U.S. 241, 258 (1964) ("[I]f it is

interstate commerce that feels the pinch, it does not matter how local the

operation which applies the squeeze.") (citation omitted).

Furthermore, federal law acknowledges that requiring individuals or

entities to allow *their property* to be used to facilitate immoral conduct

implicates their religious exercise. 42 U.S.C. § 300a-7(b)(2)(A) (the

government cannot require a recipient of certain federal funds "to . . . make

its facilities available for the performance of any sterilization procedure or

abortion if the performance of such procedure or abortion in such facilities

is prohibited by the entity on the basis of religious beliefs or moral

convictions"); 20 U.S.C. § 1688 ("Nothing in this title shall be construed to

require or prohibit any person . . . to provide or pay for any benefit or

service, including the use of facilities, related to an abortion."). Regardless

of whether the requirement is technically imposed upon the owner of the

property or the property itself, the substantial burden that the religious

objector experiences is identical.

In sum, corporations, like Freshway Foods and Freshway Logistics, do not think, act, and establish business values and practices except through human agency. It is this human agency (here, the actions of the Gilardis) that defines the corporation's purposes and shapes its character and ethos—in addition to fulfilling the business's commercial mission. The Mandate will prevent the Gilardis from continuing to run their companies pursuant to the tenets of their Catholic faith, App. 39-43, 51-55, which causes a substantial burden on their religious exercise. *See Thomas*, 450 U.S. at 717-18; *Yoder*, 406 U.S. at 218; *Sherbert*, 374 U.S. at 404.

**2. It is beyond dispute that paying for contraception and abortion implicates religious and moral concerns for many individuals and entities because doing so *facilitates* the use of such products and services.**

Plaintiffs' objection to the requirements of the Mandate is not novel. Federal law recognizes that many Americans have religious and moral objections to providing or paying for certain products and services, such as contraceptives and abortion. For example, there are many federal laws that provide exemptions, in various contexts, for providers of health care, insurance, and prescription drug coverage as well as for other individuals

and entities who do not want to provide, pay for, or cover by insurance certain products and services to which they object on religious and moral grounds.[20]/

Additionally, the federal government itself often excludes the funding of most elective abortions from otherwise neutral programs, *including through the provision of health insurance coverage*, to avoid facilitating such procedures and to promote the government's interest in encouraging childbirth.[21]/ Various Supreme Court cases have recognized that the

---

[20]/ *See*, *e.g.*, 42 U.S.C. § 18023 (stating that health plans offered through an Exchange may not discriminate against health care providers or facilities due to their "unwillingness to provide, pay for, provide coverage of, or refer for abortions"); 42 U.S.C. § 1395w-22(j)(3) (providing an exemption for organizations offering a Medicare + Choice plan that object on moral or religious grounds to providing, reimbursing for, or providing coverage for a counseling or referral service); Consolidated Appropriations Act of 2012, Pub. L. 112-74, § 808, 125 Stat. 786, Dec. 23, 2011 (requiring any D.C. regulation concerning the provision of contraceptive coverage to "include a 'conscience clause' which provides exceptions for religious beliefs and moral convictions"); *id* § 727 (exempting carriers of prescription drug coverage plans that object to the provision of contraceptive coverage "on the basis of religious beliefs" from a ban on the use of appropriated funds to provide prescription drug coverage that excludes contraceptives).

[21]/ *See*, *e.g.*, 42 U.S.C. § 1397ee(c) (prohibiting the use of certain federal funds to subsidize State-provided health insurance coverage for low-income children if that coverage includes abortion other than for instances

*(Text of footnote continues on following page.)*

government's refusal to subsidize medical expenses associated with most abortions is a proper means of encouraging childbirth and *declining to facilitate abortion*, and requiring individuals seeking an abortion to pay for it themselves does not violate their rights or improperly interfere with the doctor-patient relationship.[22]/

Furthermore, the government has acknowledged the substantial burden that the Mandate imposes upon many non-profit employers, *see* 78 Fed. Reg. 8456, 8461-64. Plaintiffs' religious opposition to arranging and paying for contraceptives, abortion, and sterilization *is no different* from the opposition held by those employers. The record here demonstrates,

_____

in which the mother's life is endangered or the pregnancy resulted from rape or incest); 10 U.S.C. § 1093(a) (under the TRICARE program, no federal funds may be used to perform abortions except where the mother's life would be endangered).

[22]/ *See, e.g., Rust v. Sullivan*, 500 U.S. 173, 200, 203 (1991) (concluding that regulations that required Title X funding recipients to ensure that any counseling in favor of abortion was conducted outside the funded program did not improperly interfere with the doctor-patient relationship); *Harris v. McRae*, 448 U.S. 297, 325 (1980) (stating that, by subsidizing medical expenses of childbirth while not subsidizing medical expenses of most abortions, "Congress has established incentives that make childbirth a more attractive alternative than abortion"); *Maher v. Roe*, 432 U.S. 464, 478-79 (1977) ("The subsidizing of costs incident to childbirth [but not incident to most abortions] is a rational means of encouraging childbirth.").

43

without contradiction, that the Plaintiff companies have adopted, and operate in accordance with, the religious beliefs and values of the Gilardis. App. 5-8, 39-43, 51-55. Simply put, compliance with the Mandate would require the Plaintiff companies (and the Gilardis) to take actions contrary to their religious belief system. App. 25-27, 41-43, 52-55. That is enough to establish a substantial burden under RFRA. *See Thomas*, 450 U.S. at 717-18; *Sharpe Holdings, Inc.*, 2012 U.S. Dist. LEXIS 182942, at *13.

### C. The Plaintiff companies are likely to succeed on their RFRA claim.

The Gilardis' operation and management of their companies pursuant to their religious beliefs conforms with Ohio law, which states that for-profit companies (such as the Plaintiff companies) may be formed for "any purpose or combination of purposes for which individuals lawfully may associate themselves." Ohio Rev. Code Ann. § 1701.03(A). And, as explained in the amicus curiae brief filed by the State of Ohio in the district court, Ohio recognizes that "[f]amily-owned companies . . . surely can be operated according to agreed guiding religious principles of their owners regardless of whether they are organized under the general or the non-

44

profit sections of Title 17 of the Ohio Revised Code (Ohio's corporations

chapter)." State of Ohio Amicus Br., DCT Doc. 27 at 23-24.[23]/

### 1. The Plaintiff companies are "persons" that can exercise religion under RFRA.

RFRA protects the religious exercise of "a person," not just the exercise

of a *religious person*. 42 U.S.C. § 2000bb-1; Add. 12. Although RFRA does

not define the term "person," it is well-established that the term "person"

generally includes both an individual and a corporation. *See, e.g.*, 1 U.S.C. §

1 ("In determining the meaning of any Act of Congress, unless the context

indicates otherwise. . . 'person' . . . include[s] corporations . . . as well as

individuals."); *Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1707 (2012)

(explaining that the word "person" often includes corporations, and

---

[23]/ If this Court concludes that the Gilardis' religious exercise is substantially burdened and that they are entitled to continued injunctive relief, this Court could bypass the question of whether a for-profit company can exercise religion under RFRA and still grant the relief each Plaintiff is requesting. *See, e.g., Korte*, 2012 U.S. App. LEXIS 26734 (granting an injunction pending appeal to a business and its owners based upon the substantial burden imposed on the owners' religious exercise without deciding whether the company itself exercises religion under RFRA); *Newland*, 881 F. Supp. 2d at 1296, 1299-1300 (granting a preliminary injunction to a business and its owners without deciding whether the company itself exercises religion under RFRA and the First Amendment).

Congress and the Supreme Court often use the word "individual" "to distinguish between a natural person and a corporation"); *Citizens United v. FEC*, 558 U.S. 310, 342 (2010) (noting that corporations are legal persons that enjoy free speech rights); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 687 (1978) ("[B]y 1871, it was well understood that corporations should be treated as natural persons for virtually all purposes of constitutional and statutory analysis.").[24]/

Corporations, whether for-profit or non-profit, can, and often do, engage in a plethora of quintessentially religious acts such as tithing, donating money to charities, and committing to act in accordance with the teachings of a religious faith, as the Plaintiff corporations do here. *See Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 345 n.6 (1987) (Brennan, J., concurring) (observing that it is possible "that some for-profit activities could have a religious character"). For example, as noted previously, the Plaintiff companies, at the direction of the Gilardis, display pro-life signage

---

[24]/ The district court declined to directly address whether for-profit corporations are "persons" under RFRA or whether they can ever exercise religion. App. 69 n.13, 74.

on their trucks to express a religious message about the sanctity of human life and make annual monetary and/or in-kind donations to various charities. App. 23-24, 39-40, 44, 51-52. These are religious acts, especially under RFRA's broad definition of religious exercise. *See* 42 U.S.C. § 2000cc-5(7)(A), *incorporated by* 42 U.S.C. § 2000bb-2(4); Add. 13, 15. These acts do not reflect purely commercial conduct, as the district court wrongly concluded. App. 71.[25]/

Religious freedom extends both to an organization that primarily engages in religious acts (such as a church) and to an organization that primarily engages in secular acts in a manner consistent with religious principles (such as the Plaintiff companies). Although the Free Exercise Clause "gives special solicitude to the rights of religious organizations," *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 132 S. Ct. 694, 706 (2012), that does not mean that the Free Exercise Clause (or RFRA) *only*

---

[25]/ Although the district court disregarded the companies' statement of values because it only mentions ethics and not religion, App. 70-71, ethics are a set of moral principles or values by which one is governed, often derived from religious teachings. *See Merriam-Webster Dictionary*, http://www.merriam-webster.com/dictionary/ethics (last visited Apr. 24, 2013).

protects religious organizations. As discussed previously, a corporate religious conscience can only be established through policies created by the owners or directors according to their own moral, ethical, and religious beliefs. Freshway Foods and Fresh Logistics are no less substantially burdened by the Mandate than would be a non-profit corporation that is also run in accordance with the same religious principles. *See Conestoga*, 2013 U.S. App. LEXIS 2706, at *40-42 (Jordan, J., dissenting) (concluding that the government's distinction between for-profit and non-profit corporations for purposes of RFRA is untenable and listing cases rejecting that distinction).[26]/

Just as a for-profit corporation need not be organized, operated, and maintained for the primary purpose of engaging in free speech activity to invoke First Amendment free speech protections, *see First National Bank v.*

---

[26]/ *See also Primera Iglesia Bautista Hispana v. Broward Cnty.*, 450 F.3d 1295, 1305 (11th Cir. 2006) ("[C]orporations possess Fourteenth Amendment rights of equal protection, due process, and, through the doctrine of incorporation, the free exercise of religion."); *McClure v. Sports & Health Club, Inc.*, 370 N.W.2d 844, 850 (Minn. 1985) (stating that the "conclusory assertion that a corporation has no constitutional right to free exercise of religion is unsupported by any cited authority").

*Bellotti*, 435 U.S. 765 (1978), a for-profit corporation need not be organized, operated, and maintained for the primary purpose of religious exercise to invoke the protections of the Free Exercise Clause and RFRA. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1120, n.9 (9th Cir. 2009) ("[A]n organization that asserts the free exercise rights of its owners need not be primarily religious. . . ."). Nowhere has the Supreme Court suggested that "First Amendment protection extends to corporations" *except* for the Free Exercise Clause. *See Citizens United*, 558 U.S. at 342; *Geneva Coll. v. Sebelius*, 2013 U.S. Dist. LEXIS 30265, at *62 (W.D. Pa. Mar. 6, 2013) (*Geneva I*) ("[T]here is no contextual distinction in the language of the First Amendment between freedom of speech and freedom to exercise religion."). As Judge Jordan of the United States Court of Appeals for the Third Circuit explained, "[a]n entity's incorporated status does not . . . alter the underlying reality that corporations can and often do reflect the particular viewpoints held by their flesh and blood owners." *Conestoga*, 2013 U.S. App. LEXIS 2706, at *38-40 (Jordan, J., dissenting).

## 2.  The Plaintiff companies can assert the free exercise rights of the Gilardis in addition to their own rights.

Courts have recognized that for-profit corporations can assert the free exercise rights of their owners in some cases. Where, as here, a company is owned and controlled by a few like-minded individuals who share the same religious values and run the company pursuant to those values, the company itself holds and/or asserts the values of its owners. *See, e.g., Commack Self-Service Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 210-12 (2d Cir. 2012) (addressing free exercise claim brought by kosher deli and butcher shop and its owners); *Stormans, Inc.*, 586 F.3d at 1127-38 (addressing free exercise claim of for-profit pharmacy and its owners); *Geneva I*, 2013 U.S. Dist. LEXIS 30265, at *53-62 (explaining that a for-profit business may assert its owners' religious freedom); *Monaghan II*, 2013 U.S. Dist. LEXIS 35144, at *9-17 (same); *Legatus*, 2012 U.S. Dist. LEXIS 156144, at *13 (same); *Tyndale House Publ'rs*, 2012 U.S. Dist. LEXIS 163965, at *17-33 (same); *see also EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 620-21 & n.15 (9th Cir. 1988) (addressing free exercise defense raised by manufacturing company and its owners).

50

The district court determined that the Plaintiff companies were, in effect, not religious enough to prevail on their RFRA claim. App. 71-72. In so ruling, the district court erred by distinguishing *Tyndale House Publishers* on the basis that the publishing company there was uniquely religious despite its for-profit status. App. 71-72. Although application of the Mandate to the publishing company does violate its rights, there is no basis in RFRA or the First Amendment to suggest that some businesses are religious *enough* to exercise religion while others (such as the Plaintiff companies) are *not* religious enough to do so. A "religious enough" standard is inescapably vague, and it would make no sense to hold, for example, that closely-held Company X engages in religious exercise when it financially supports religious charities and missions, or advocates in favor of religious causes, but closely-held Company Y does not engage in religious exercise when it does the same things for the same religious reasons, because Company X is considered "more religious" than Company Y. *See generally Bellotti*, 435 U.S. at 781-85 (rejecting the notion that corporations that are not part of the press only enjoy freedom of speech with respect to their business interests).

51

In other words, under the district court's reading of RFRA, a business that is deemed "not religious enough" would be foreclosed from ever challenging a law on the basis that it imposes a substantial burden on its religious exercise, no matter how extreme, and no matter how trivial the government's asserted interests. For example, a kosher deli would have no possible claim against a mandate forcing it, under pain of penalty, to sell pork, and a physicians' practice operated by pro-life doctors would have no possible claim against a mandate forcing it, under pain of penalty, to perform abortions, regardless of how attenuated those mandates were to the protection of any important, let alone compelling, governmental interest. RFRA does not support or require such absurd results.

### D. Application of the Mandate to Plaintiffs does not withstand strict scrutiny.

Because the district court held that the Mandate does not substantially burden Plaintiffs' religious exercise, it did not apply RFRA's strict scrutiny test. App. 74-75, 80. This test, which requires "the most rigorous of scrutiny," *Lukumi*, 508 U.S. at 546, "is the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

52

When the Supreme Court applied strict scrutiny in both *Sherbert* and *Yoder*, it "looked beyond broadly formulated interests justifying the general applicability of government mandates and scrutinized the asserted harm of granting specific exemptions to particular religious claimants." *O Centro*, 546 U.S. at 431. It is therefore not enough for the government to describe a compelling interest in the abstract or in a categorical fashion; the government must demonstrate that the interest "would be adversely affected by granting an exemption" *to the religious claimant. Id.* In this case, Defendants must demonstrate *that exempting Plaintiffs* from the Mandate would significantly jeopardize the government's asserted interests.

> **1. Defendants lack a compelling governmental interest in applying the Mandate to Plaintiffs**.

Just two years ago, the Supreme Court described a compelling interest as a "high degree of necessity," noting that "[t]he State must specifically identify an 'actual problem' in need of solving, and the curtailment of [the asserted right] must be actually necessary to the solution." *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738, 2741 (2011) (citations omitted). The

"[m]ere speculation of harm does not constitute a compelling state interest." *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 543 (1980).

While recognizing "the general interest in promoting public health and safety," the Court has held that "invocation of such general interests, standing alone, is not enough." *O Centro*, 546 U.S. at 438. The government must demonstrate "some substantial threat to public safety, peace, or order" (or an equally compelling interest) that would be posed by exempting the claimant. *Yoder*, 406 U.S. at 230. In this context, "only the gravest abuses, endangering paramount interests, give occasion for permissible limitation." *Sherbert*, 374 U.S. at 406. Also, "a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547 (internal quotation marks omitted).

Defendants have proffered two governmental interests in support of the Mandate: health and gender equality. 77 Fed. Reg. 8725, 8729. The massive number of individuals whose health and equality interests are completely unaffected by the Mandate due to employer exemptions leaves appreciable

damage to any asserted governmental interest and also demonstrates the
lack of a compelling need to apply the Mandate to Plaintiffs in violation of
their consciences. *See, e.g., Geneva II*, 2013 U.S. Dist. LEXIS 56087, at *32-35;
*Monaghan II*, 2013 U.S. Dist. LEXIS 35144, at *30; *Am. Pulverizer*, 2012 U.S.
Dist. LEXIS 182307, at *14; *Newland*, 881 F. Supp. 2d at 1298. Indeed, courts
have estimated that about 190 million Americans (close to two-thirds of the
population) are not covered by the Mandate, *Geneva II*, 2013 U.S. Dist.
LEXIS 56087, at *32; *Monaghan II*, 2013 U.S. Dist. LEXIS 35144, at *30;
*Tyndale House Publ'rs*, 2012 U.S. Dist. LEXIS 163965, at *57-60; *Newland*, 881
F. Supp. 2d at 1298, and the government has conceded that at least 90
million individuals will remain outside the Mandate's scope by the end of
2013. *Geneva II*, 2013 U.S. Dist. LEXIS 56087, at *32, n.12.

Defendants' asserted interests cannot be of the highest order when, for
example, the Mandate does not apply to health plans grandfathered under
the Affordable Care Act. Grandfathered plans have a right to maintain
their grandfathered status permanently (and thus to ignore the Mandate
indefinitely). *See, e.g.,* 42 U.S.C. § 18011, Add. 8 ("Preservation of *right to*

*maintain* existing coverage") (emphasis added); 45 C.F.R. § 147.140 (same); *Private Health Insurance Provisions in PPACA*, *supra* note 3 ("Enrollees could continue and renew enrollment in a grandfathered plan *indefinitely*.") (emphasis added). The government has estimated that "98 million individuals will be enrolled in grandfathered group health plans in 2013." 75 Fed. Reg. 41726, 41732.

Additionally, grandfathered plans must comply with various other provisions of the Affordable Care Act.[27]/ The *government's decision* to impose the Affordable Care Act's prohibition on excessive waiting periods on grandfathered plans, for example, but not require them to comply with the Mandate, indicates that the *government itself* does not think the Mandate is necessary to protect interests of the highest order. *See Lukumi*, 508 U.S. at 547.

Furthermore, Defendants cannot explain how there is a compelling need to apply the Mandate to Plaintiffs when employers with fewer than fifty

---

[27]/ For a summary of which Affordable Care Act provisions apply to grandfathered health plans, see *Application of the New Health Reform Provisions, supra* note 4.

full-time employees (employing millions of individuals)[28]/ can avoid the Mandate entirely by not providing insurance. With respect to the interests offered in support of the Mandate, there is no principled difference between an employer with fifty full-time employees that must provide a Mandate-compliant plan and an employer with forty-nine full-time employees that need not provide any plan. This further illustrates that the Mandate is not a necessary means of protecting any compelling governmental interest. *See O Centro*, 546 U.S. at 432-37 (granting relief under RFRA to a church with 130 members to allow them to use a Schedule I drug in their religious ceremonies because the government allowed hundreds of thousands of Native Americans to use a different Schedule I drug in their religious ceremonies).[29]/

The government has also failed to meet its burden of demonstrating a "high degree of necessity" for the Mandate in the first place. The

---

[28]/ *See Statistics about Business Size*, *supra* note 6.

[29]/ Countless other individuals work for "religious employers," as defined by the government, which are permanently exempt from compliance with the Mandate. *See* 45 C.F.R. § 147.130(a)(1)(iv)(B); 78 Fed. Reg. 8456, 8461-62.

government has not established that there is "an 'actual problem' in need of solving," and that substantially burdening Plaintiffs' religious exercise is "actually necessary to the solution." *Brown*, 131 S. Ct. at 2738, 2741. For example, according to a recent study, cost is not a prohibitive factor to contraceptive access. Among women currently not using birth control, only 2.3% said it was due to birth control being "too expensive," and among women currently using birth control, only 1.3% said they chose their particular method of birth control because it was "affordable."[30]/ This is unsurprising; contraceptives such as Plan B and Ella are readily available online and at countless locations for less than fifty dollars.[31]/ The absence of real, concrete evidence that the Mandate is actually necessary to prevent

---

[30]/ *Contraception in America, Unmet Needs Survey, Executive Summary*, http://www.contraceptioninamerica.com/downloads/Executive_Summary. pdf at 14 (Fig. 10), 16 (Fig. 12) (2012) (last visited Apr. 24, 2013).

[31]/ *See, e.g.,* KwikMed, https://www.ella-kwikmed.com/default.asp (last visited Apr. 24, 2013) (offering Ella for $40 with free shipping); Family Planning Health Services, Inc., http://shop.fphs.org/plan-b-one-step-1/ (last visited Apr. 24, 2013) (offering Plan B for $35); Drugstore.com, http://www.drugstore.com/plan-b-one-step-emergency-contraceptive-must -be-17-or-over-to-purchase-without-a-prescription/qxp161395 (last visited Apr. 24, 2013) (offering Plan B for $47.99).

significant harm to any compelling governmental interest undercuts Defendants' claims.

Even if one assumed *arguendo* that cost was a prohibitive factor to contraceptive access, there is no evidence whatsoever that substantially burdening Plaintiffs' religious exercise by enforcing the Mandate is *actually necessary* (that is, that none of the various less restrictive alternatives discussed in the next section would be adequate). *See Brown*, 131 S. Ct. at 2738; *cf. Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002) ("The Government simply has not provided sufficient justification here. If the First Amendment means anything, it means that regulating speech must be a last—not first—resort. Yet here it seems to have been the first strategy the Government thought to try.").

In sum, Defendants cannot demonstrate a compelling need to require Plaintiffs to comply with the Mandate while employers of millions of individuals nationwide are exempt from the Mandate. Although health and equality are important interests in the abstract, exempting Plaintiffs from the Mandate would pose no compelling threat to those interests in

actuality. Because there is little that is uniform about the Mandate, as demonstrated by the massive number of individuals who are untouched by it, this is not an instance where there is "a need for uniformity [that] precludes the recognition of exceptions to generally applicable laws under RFRA." *O Centro*, 546 U.S. at 436.

### 2.   There are other less restrictive means available to Defendants.

The existence of a compelling interest in the abstract does not give the government *carte blanche* to promote that interest through any regulation of its choosing particularly where, as here, a fundamental right is substantially burdened. *See, e.g., United States v. Robel*, 389 U.S. 258, 263 (1967) (noting that compelling interests "cannot be invoked as a talismanic incantation to support any [law]"). Even where, for example, an interest as compelling as the protection of children is the object of government action, "the constitutional limits on governmental action apply." *Brown*, 131 S. Ct. at 2741. If the government "has open to it a less drastic way of satisfying its legitimate interests, it may not choose a [regulatory] scheme that broadly

stifles the exercise of fundamental personal liberties." *Anderson v. Celebrezze*, 460 U.S. 780, 806 (1983).

Assuming *arguendo* that the interests proffered by Defendants were compelling in this context, the Mandate is not the least restrictive means of furthering those interests. The government can provide greater access to contraceptive services in a variety of ways without coercing Plaintiffs to violate their religious beliefs. For example, the government could (1) provide these services to citizens itself (as it *already does* for many individuals); (2) provide incentives for pharmaceutical companies that manufacture contraceptives to provide such products to pharmacies, doctors' offices, and health clinics free of charge; (3) allow citizens who pay to use contraceptives to submit receipts to the government for reimbursement; or (4) offer tax deductions or credits for the purchase of contraceptive services. Each of these options would further Defendants' proffered interests in a direct way that would not impose a substantial burden on persons such as Plaintiffs, and Defendants cannot prove that *all* of these options would be insufficient or unworkable.

61

To illustrate, the federal government already provides low-income individuals with free access to contraception through Title X and Medicaid funding. It could raise the income cap to make free contraception available to more Americans.[32]/ *See, e.g., Monaghan II*, 2013 U.S. Dist. LEXIS 35144, at *31-33 (noting that applying the Mandate to plaintiffs was not the least restrictive means in light of the existing programs under which the government pays for contraceptive services); *Newland*, 881 F. Supp. 2d at 1299 ("'[T]he government already provides free contraception to women.' . . . Defendants have failed to adduce facts establishing that government provision of contraception services will necessarily entail logistical and administrative obstacles defeating the ultimate purpose of providing no-cost preventive health care coverage to women.").

Even if Defendants claim these options would not be as effective as the Mandate, "a court should not assume a plausible, less restrictive alternative

---

[32]/ In 2010, public expenditures for family planning services totaled $2.37 billion, and Title X of the Public Health Service Act, devoted specifically to supporting family planning services, contributed $228 million during the same year. Guttmacher Institute, *Facts on Publicly Funded Contraceptive Services in the United States*, May 2012, http://www.guttmacher.org/pubs/fb_contraceptive_serv.html (last visited Apr. 24, 2013).

would be ineffective." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 824 (2000). If a less restrictive alternative would serve the government's purposes, "the legislature must use that alternative." *Id.* at 813. In addition, hypothetical concerns over administrative efficiency or convenience are insufficient to meet the government's burden. *See Conyers v. Abitz*, 416 F.3d 580, 585-86 (7th Cir. 2005) (holding that the government improperly relied upon a "rigid and unsupported assumption" that administrative convenience necessarily justifies the imposition of substantial burdens upon an inmate's free exercise). Indeed, of the various ways the government could achieve its interests, it has chosen perhaps the *most burdensome* means for non-exempt employers with religious objections to contraceptive services, such as Plaintiffs. *Anderson*, 460 U.S. at 806; *see Korte*, 2012 U.S. App. 26734, at *12.

In sum, Plaintiffs have shown a likelihood of success on the merits on their RFRA claim, and the district court reversibly erred in concluding otherwise.

## III. The Remaining Injunction Factors Also Favor Plaintiffs.

The district court did not address the remaining three factors which are part of the analysis to determine whether a preliminary injunction is warranted. *E.g., Gordon*, 632 F.3d at 724; *Davis*, 571 F.3d at 1291-92. These factors weigh in Plaintiffs' favor.

### A. Plaintiffs will suffer irreparable harm absent continued injunctive relief.

It is well settled that even the momentary loss of First Amendment freedoms constitutes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The same is true regarding a violation of RFRA because it protects the same type of religious exercise protected by the First Amendment. *See, e.g., Korte*, 2012 U.S. App. LEXIS 26734, at *12 ("RFRA protects the same religious liberty protected by the First Amendment, and it does so under a more rigorous standard of judicial scrutiny."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("Courts have persuasively found that irreparable harm accompanies a substantial burden on an individual's rights to the free exercise of religion under RFRA."); *accord Tyndale House Publ'rs*, 2012 U.S. Dist. LEXIS 163965, at *61-62. Therefore, as demonstrated above, absent

64

continued injunctive relief the Mandate will irreparably harm Plaintiffs'

religious exercise on a continuing basis.

## B. The balance of equities tips in Plaintiffs' favor.

A grant of a preliminary injunction would preserve the status quo

pending a final resolution of the merits of Plaintiffs' claims. The enactment

and enforcement of the Mandate against Plaintiffs created the present

controversy between the parties. Before this controversy arose, Plaintiffs

exercised a freedom to fashion a health plan in accordance with their

religious beliefs and company standards, which Plaintiffs have done for the

last ten years. App. 19, 40-41, 45-49, 52; *see Consarc Corp. & Consarc Eng'g v.*

*U.S. Treasury Dep't*, 71 F.3d 909, 913 (D.C. Cir. 1997) ("[T]he status quo is

the last uncontested status which preceded the pending controversy.")

(internal quotations marks and citations omitted); *Conestoga*, 2013 U.S. App.

LEXIS 2706, at *30, n.6 (Jordan, J., dissenting) ("The equities favor granting

a preliminary injunction when the owners of a company stand to lose their

business unless the status quo is maintained."); *Sharpe Holdings, Inc.*, 2012

U.S. Dist. LEXIS 182942, at *19 (concluding that "plaintiffs are entitled to

injunctive relief that maintains the status quo until the important relevant issues [regarding the Mandate] have been more fully heard").

Moreover, a preliminary injunction preventing Defendants' enforcement of the Mandate against Plaintiffs will not harm Defendants' interests. *Geneva II*, 2013 U.S. Dist. LEXIS 56087, at *39-41 ("Defendants will suffer little, if any, harm should the requested relief be granted. . . . It strikes the court that defendants cannot claim irreparable harm in this case while acquiescing to preliminary injunctive relief in several similar cases.").[33]/ As previously explained, Defendants have already exempted thousands of employers of millions of individuals from the Mandate, and the government has no valid interest in infringing the religious exercise of Plaintiffs. *See Legatus,* 2012 U.S. Dist. LEXIS 156144, at *44 ("The harm in delaying the implementation of a statute that may later be deemed constitutional must yield to the risk presented here of substantially infringing the sincere exercise of religious beliefs."); *Newland*, 881 F. Supp. 2d at 1295 (noting that the government's asserted interests regarding the

---

[33]/ For a list of cases in which Defendants did not oppose the granting of preliminary injunctive relief, see *supra* note 11.

Mandate were undermined by the existence of numerous exemptions); *see also Joelner v. Vill. of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004) (explaining that there is no legitimate governmental interest to be furthered by violating someone's rights).[34]/ Consequently, the balance of the equities tips in Plaintiffs' favor.

### C. The public interest favors a preliminary injunction.

The public has a strong interest in the preservation of religious freedom, as Congress recognized in enacting RFRA. *See Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) ("It is always in the public interest to prevent the violation of a party's constitutional rights.") (internal quotation marks and citations omitted); *Newland*, 881 F. Supp. 2d at 1295 (stating that the government's asserted interests regarding the Mandate were "countered, and indeed outweighed, by the public interest in the free exercise of religion"); *Monaghan I*, 2012 U.S. Dist. LEXIS 182857, at *20 ("It is

---

[34]/ Plaintiffs' employees will not be harmed by an injunction. They would be similarly situated with the millions of employees covered by exempt health plans, and they have been covered by health insurance that has specifically excluded all contraceptive methods and sterilization procedures for the past decade. App. 19, 40-41, 45-49, 52.

in the best interest of the public that Monaghan [the Catholic owner of a for-profit business] not be compelled [by the Mandate] to act in conflict with his religious beliefs."); *Am. Pulverizer*, 2012 U.S. Dist. LEXIS 182307, at *9 ("Defendants' stated interests [concerning the Mandate] are outweighed by the public's interest in the rights afforded by RFRA [to plaintiffs]."); *accord Tyndale House Publ'rs*, 2012 U.S. Dist. LEXIS 163965, at *65-66. Thus, the public interest favors the granting of a preliminary injunction to preserve Plaintiffs' rights while their claims are fully adjudicated.

## CONCLUSION

Plaintiffs respectfully request that this Court reverse the decision of the district court denying Plaintiffs' motion for a preliminary injunction and remand this case to the district court with instructions to enter a preliminary injunction as requested by Plaintiffs.

Respectfully submitted on this 30th day of April, 2013,


Edward L. White III*
American Center
  for Law & Justice
5068 Plymouth Road
Ann Arbor, Michigan 48105
734-662-2984; Fax. 734-302-1758
ewhite@aclj.org


Francis J. Manion*
Geoffrey R. Surtees*
American Center
  for Law & Justice
6375 New Hope Road
New Hope, Kentucky 40052
502-549-7020; Fax. 502-549-5252
fmanion@aclj.org
gsurtees@aclj.org


Erik M. Zimmerman*
American Center
  for Law & Justice
1000 Regent University Drive
Virginia Beach, Virginia 23464
757-226-2489; Fax. 757-226-2836
ezimmerman@aclj.org


* Not admitted to D.C. Circuit Bar


/s/ Colby M. May
Colby M. May
D.C. Bar No. 394340
  *Counsel of Record*
American Center
  for Law & Justice
201 Maryland Avenue, N.E.
Washington, D.C. 20002
202-546-8890; Fax. 202-546-9309
cmmay@aclj-dc.org


Carly F. Gammill
D.C. Bar No. 982663
American Center
  for Law & Justice
188 Front Street, Suite 116-19
Franklin, Tennessee 37064
615-415-4822; Fax. 615-599-5189
cgammill@aclj-dc.org


*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

In reliance on the word count feature of the word processing system used to prepare this brief, Microsoft Word 2003, the undersigned counsel certifies that the foregoing Brief of Plaintiffs-Appellants complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,100 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

The undersigned counsel further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14-point Palatino Linotype font.

/s/ Colby M. May
Colby M. May
D.C. Bar No. 394340
  *Counsel of Record*
American Center for Law & Justice
201 Maryland Avenue, N.E.
Washington, D.C. 20002
202-546-8890; Fax. 202-546-9309
cmmay@aclj-dc.org
*Attorney for Plaintiffs-Appellants*

70

## CERTIFICATE OF SERVICE

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that: Counsel Press was retained by the AMERICAN CENTER FOR LAW AND JUSTICE, Attorneys for Plaintiffs-Appellants, to print this document. I am an employee of Counsel Press. On **April 30, 2013**, Counsel for Appellants authorized me to electronically file the foregoing **Brief of Appellants** with the Clerk of Court using the CM/ECF System, which will serve, via e-mail notice of such filing, to any of the following counsel registered as CM/ECF users:

ALISA B. KLEIN
MARK B. STERN
US DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
(202) 514-1597
alisaklein@usdoj.gov
mark.stern@usdoj.gov
*Counsel for Defendants-Appellees*

A courtesy copy has also been mailed to the above-listed counsel.

Eight paper copies have been hand-delivered to the Court on the same date.

April 30, 2013                                   /s/ John Kruesi
                                                Counsel Press

71

ADDENDUM

# TABLE OF CONTENTS

42 U.S.C. § 300gg-13.................................................................... Add. 2

Health Resources and Services Administration, *Required Health Plan Coverage Guidelines*, http://www.hrsa.gov/ womensguidelines/ ...Add. 4

42 U.S.C. § 18011.....................................................................Add. 8

Religious Freedom Restoration Act........................................Add. 11

42 U.S.C. § 2000bb ................................................................Add. 11

42 U.S.C. § 2000bb-1..............................................................Add. 12

42 U.S.C. § 2000bb-2..............................................................Add. 13

42 U.S.C. § 2000bb-3..............................................................Add. 13

42 U.S.C. § 2000bb-4..............................................................Add. 13

42 U.S.C. § 2000cc-5..............................................................Add. 14

**42 U.S.C. § 300gg-13.  Coverage of preventive health services**

(a) In general.  A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for--

  (1) evidence-based items or services that have in effect a rating of "A" or "B" in the current recommendations of the United States Preventive Services Task Force;

  (2) immunizations that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention with respect to the individual involved; and

  (3) with respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the Health Resources and Services Administration.

  (4) with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph.

  (5) for the purposes of this Act [42 USCS §§ 201 et seq.], and for the purposes of any other provision of law, the current recommendations of the United States Preventive Service Task Force regarding breast cancer screening, mammography, and prevention shall be considered the most current other than those issued in or around November 2009.

Nothing in this subsection shall be construed to prohibit a plan or issuer from providing coverage for services in addition to those recommended by

Add. 2

United States Preventive Services Task Force or to deny coverage for services that are not recommended by such Task Force.

(b) Interval.

  (1) In general. The Secretary shall establish a minimum interval between the date on which a recommendation described in subsection (a)(1) or (a)(2) or a guideline under subsection (a)(3) is issued and the plan year with respect to which the requirement described in subsection (a) is effective with respect to the service described in such recommendation or guideline.

  (2) Minimum. The interval described in paragraph (1) shall not be less than 1 year.

(c) Value-based insurance design.  The Secretary may develop guidelines to permit a group health plan and a health insurance issuer offering group or individual health insurance coverage to utilize value-based insurance designs.

**Health Resources and Services Administration,** *Required Health Plan Coverage Guidelines***, http://www.hrsa.gov/ womensguidelines/**.

**Affordable Care Act Expands Prevention Coverage for Women's Health and Well-Being**

The Affordable Care Act – the health insurance reform legislation passed by Congress and signed into law by President Obama on March 23, 2010 – helps make prevention affordable and accessible for all Americans by requiring health plans to cover preventive services and by eliminating cost sharing. Preventive services that have strong scientific evidence of their health benefits must be covered and plans can no longer charge a patient a copayment, coinsurance or deductible for these services when they are delivered by a network provider.

**Women's Preventive Services: Required Health Plan Coverage Guidelines Supported by the Health Resources and Services Administration**

Under the Affordable Care Act, women's preventive health care – such as mammograms, screenings for cervical cancer, prenatal care, and other services – is covered with no cost sharing for new health plans. However, the law recognizes and HHS understands the need to take into account the unique health needs of women throughout their lifespan.

The HRSA-supported health plan coverage guidelines, developed by the Institute of Medicine (IOM), will help ensure that women receive a comprehensive set of preventive services without having to pay a co-payment, co-insurance or a deductible. HHS commissioned an IOM study to review what preventive services are necessary for women's health and well-being and should be considered in the development of comprehensive guidelines for preventive services for women. HRSA is supporting the IOM's recommendations on preventive services that address health needs specific to women and fill gaps in existing guidelines.

Add. 4

**Health Resources and Services Administration Supported Women's Preventive Services: Required Health Plan Coverage Guidelines**

*Non-grandfathered plans and issuers are required to provide coverage without cost sharing consistent with these guidelines in the first plan year (in the individual market, policy year) that begins on or after August 1, 2012.*

| Type of Preventive Service | HHS Guideline for Health Insurance Coverage | Frequency |
|---|---|---|
| **Well-woman visits.** | Well-woman preventive care visit annually for adult women to obtain the recommended preventive services that are age and developmentally appropriate, including preconception and prenatal care. This well-woman visit should, where appropriate, include other preventive services listed in this set of guidelines, as well as others referenced in section 2713. | Annual, although HHS recognizes that several visits may be needed to obtain all necessary recommended preventive services, depending on a woman's health status, health needs, and other risk factors. *(see note) |
| **Screening for gestational diabetes.** | Screening for gestational diabetes. | In pregnant women between 24 and 28 weeks of gestation and at the first prenatal visit for pregnant women identified to be at high risk for diabetes. |

Add. 5

| | | |
|---|---|---|
| **Human papillomavirus testing.** | High-risk human papillomavirus DNA testing in women with normal cytology results. | Screening should begin at 30 years of age and should occur no more frequently than every 3 years. |
| **Counseling for sexually transmitted infections.** | Counseling on sexually transmitted infections for all sexually active women. | Annual. |
| **Counseling and screening for human immune-deficiency virus.** | Counseling and screening for human immune-deficiency virus infection for all sexually active women. | Annual. |
| **Contraceptive methods and counseling.** **(see note)** | All Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity. | As prescribed. |
| **Breastfeeding support, supplies, and counseling.** | Comprehensive lactation support and counseling, by a trained provider during pregnancy and/or in the postpartum period, and costs for renting breastfeeding equipment. | In conjunction with each birth. |

Add. 6

| **Screening and counseling for interpersonal and domestic violence.** | Screening and counseling for interpersonal and domestic violence. | Annual. | |
|---|---|---|---|

\* *Refer to recommendations listed in the July 2011 IOM report entitled Clinical Preventive Services for Women: Closing the Gaps concerning individual preventive services that may be obtained during a well-woman preventive service visit.*

\*\* *Group health plans sponsored by certain religious employers, and group health insurance coverage in connection with such plans, are exempt from the requirement to cover contraceptive services. A religious employer is one that: (1) has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a non-profit organization under Internal Revenue Code section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii). 45 C.F.R. §147.130(a)(1)(iv)(B). See the Federal Register Notice:* <u>Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act</u> *(PDF - 201 KB)*

## 42 U.S.C. § 18011.  Preservation of right to maintain existing coverage

(a) No changes to existing coverage.

  (1) In general. Nothing in this Act (or an amendment made by this Act) shall be construed to require that an individual terminate coverage under a group health plan or health insurance coverage in which such individual was enrolled on the date of enactment of this Act.

  (2) Continuation of coverage. Except as provided in paragraph (3), with respect to a group health plan or health insurance coverage in which an individual was enrolled on the date of enactment of this Act [enacted March 23, 2010], this subtitle and subtitle A (and the amendments made by such subtitles) shall not apply to such plan or coverage, regardless of whether the individual renews such coverage after such date of enactment.

  (3) Application of certain provisions. The provisions of sections 2715 and 2718 of the Public Health Service Act [42 USCS §§ 300gg-15 and 300gg-18] (as added by subtitle A) shall apply to grandfathered health plans for plan years beginning on or after the date of enactment of this Act [enacted March 23, 2010].

  (4) Application of certain provisions.

   (A) In general. The following provisions of the Public Health Service Act (as added by this title) shall apply to grandfathered health plans for plan years beginning with the first plan year to which such provisions would otherwise apply:

     (i) Section 2708 [42 USCS § 300gg-7] (relating to excessive waiting periods).

(ii) Those provisions of section 2711 [42 USCS § 300gg-11] relating to lifetime limits.

(iii) Section 2712 [42 USCS § 300gg-12] (relating to rescissions).

(iv) Section 2714 [42 USCS § 300gg-14] (relating to extension of dependent coverage).

(B) Provisions applicable only to group health plans.

(i) Provisions described. Those provisions of section 2711 [42 USCS § 300gg-11] relating to annual limits and the provisions of section 2704 [42 USCS § 300gg-3] (relating to pre-existing condition exclusions) of the Public Health Service Act (as added by this subtitle) shall apply to grandfathered health plans that are group health plans for plan years beginning with the first plan year to which such provisions otherwise apply.

(ii) Adult child coverage. For plan years beginning before January 1, 2014, the provisions of section 2714 of the Public Health Service Act [42 USCS § 300gg-14] (as added by this subtitle) shall apply in the case of an adult child with respect to a grandfathered health plan that is a group health plan only if such adult child is not eligible to enroll in an eligible employer-sponsored health plan (as defined in section 5000A(f)(2) of the Internal Revenue Code of 1986 [26 USCS § 5000A(f)(2)]) other than such grandfathered health plan.

(b) Allowance for family members to join current coverage.  With respect to a group health plan or health insurance coverage in which an individual was enrolled on the date of enactment of this Act [enacted March 23, 2010] and which is renewed after such date, family members of such individual shall be permitted to enroll in such plan or coverage if such enrollment is permitted under the terms of the plan in effect as of such date of enactment.

(c) Allowance for new employees to join current plan.  A group health plan that provides coverage on the date of enactment of this Act [enacted March 23, 2010] may provide for the enrolling of new employees (and their families) in such plan, and this subtitle and subtitle A (and the amendments made by such subtitles) shall not apply with respect to such plan and such new employees (and their families).

(d) Effect on collective bargaining agreements.  In the case of health insurance coverage maintained pursuant to one or more collective bargaining agreements between employee representatives and one or more employers that was ratified before the date of enactment of this Act [enacted March 23, 2010], the provisions of this subtitle and subtitle A (and the amendments made by such subtitles) shall not apply until the date on which the last of the collective bargaining agreements relating to the coverage terminates. Any coverage amendment made pursuant to a collective bargaining agreement relating to the coverage which amends the coverage solely to conform to any requirement added by this subtitle or subtitle A (or amendments) shall not be treated as a termination of such collective bargaining agreement.

(e) Definition.  In this title, the term "grandfathered health plan" means any group health plan or health insurance coverage to which this section applies.

**Religious Freedom Restoration Act**

**42 U.S.C. § 2000bb.    Congressional findings and declaration of purposes**

(a) Findings.  The Congress finds that--

   (1) the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;

   (2) laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;

   (3) governments should not substantially burden religious exercise without compelling justification;

   (4) in Employment Division v. Smith, 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; and

   (5) the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

(b) Purposes.  The purposes of this Act are--

   (1) to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and

Add. 11

(2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

## 42 U.S.C. § 2000bb-1.  Free exercise of religion protected

(a) In general.   Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

(b) Exception.  Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

  (1) is in furtherance of a compelling governmental interest; and

  (2) is the least restrictive means of furthering that compelling governmental interest.

(c) Judicial relief.  A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government.  Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

## 42 U.S.C. § 2000bb-2.  Definitions

As used in this Act--

  (1) the term "government" includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity;

Add. 12

(2) the term "covered entity" means the District of Columbia, the Commonwealth of Puerto Rico, and each territory and possession of the United States;

(3) the term "demonstrates" means meets the burdens of going forward with the evidence and of persuasion; and

(4) the term "exercise of religion" means religious exercise, as defined in section 8 of the Religious Land Use and Institutionalized Persons Act of 2000 [42 USCS § 2000cc-5].

## 42 U.S.C. § 2000bb-3.  Applicability

(a) In general.  This Act applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after the enactment of this Act [enacted Nov. 16, 1993].

(b) Rule of construction.  Federal statutory law adopted after the date of the enactment of this Act [enacted Nov. 16, 1993] is subject to this Act unless such law explicitly excludes such application by reference to this Act.

(c) Religious belief unaffected.  Nothing in this Act shall be construed to authorize any government to burden any religious belief.

## 42 U.S.C. § 2000bb-4.  Establishment Clause unaffected

Nothing in this Act shall be construed to affect, interpret, or in any way address that portion of the First Amendment prohibiting laws respecting the establishment of religion (referred to in this section as the "Establishment Clause"). Granting government funding, benefits, or exemptions, to the extent permissible under the Establishment Clause, shall not constitute a violation of this Act. As used in this section, the term "granting", used with respect to government funding, benefits, or

Add. 13

exemptions, does not include the denial of government funding, benefits, or exemptions.

## 42 U.S.C. § 2000cc-5.  Definitions

In this Act:

   (1) Claimant. The term "claimant" means a person raising a claim or defense under this Act.

   (2) Demonstrates. The term "demonstrates" means meets the burdens of going forward with the evidence and of persuasion.

   (3) Free Exercise Clause. The term "Free Exercise Clause" means that portion of the first amendment to the Constitution that proscribes laws prohibiting the free exercise of religion.

   (4) Government. The term "government"--

    (A) means--

      (i) a State, county, municipality, or other governmental entity created under the authority of a State;

      (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and

      (iii) any other person acting under color of State law; and

    (B) for the purposes of sections 4(b) and 5 [42 USCS §§ 2000cc-2(b) and 2000cc-3], includes the United States, a branch, department, agency, instrumentality, or official of the United States, and any other person acting under color of Federal law.

Add. 14

(5) Land use regulation. The term "land use regulation" means a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest.

(6) Program or activity. The term "program or activity" means all of the operations of any entity as described in paragraph (1) or (2) of section 606 of the Civil Rights Act of 1964 (42 U.S.C. 2000d-4a).

(7) Religious exercise.

(A) In general. The term "religious exercise" includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief.

(B) Rule. The use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose.