No. 13-5069

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

GILARDI, et al.,

*Plaintiffs-Appellants*,

v.

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES, et al.,

*Defendants-Appellees*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA,
CASE NO. 1:13-cv-00104-EGS
HON. EMMET G. SULLIVAN, PRESIDING

_____

## BRIEF OF THE NATIONAL WOMEN'S LAW CENTER AND
## FOURTEEN OTHER NATIONAL, REGIONAL, STATE AND LOCAL
## ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF
## DEFENDANTS-APPELLEES AND AFFIRMANCE

_____

Charles E. Davidow                     Marcia D. Greenberger
Ilana D. Waxman                        Judith G. Waxman
Andrée J. Goldsmith                    Emily J. Martin
Kimberley K. Allen                     Gretchen Borchelt
PAUL, WEISS, RIFKIND,                  Leila Abolfazli
    WHARTON & GARRISON LLP             NATIONAL WOMEN'S LAW CENTER
2001 K Street, NW                      11 Dupont Circle, NW #800
Washington, D.D. 20006                 Washington, D.C. 20036
(202) 223-7300                         (202) 588-5180

*Counsel for Amici Curiae*

**AMICI CURIAE**

National Women's Law Center

American Association of University Women (AAUW)

American Federation of State, County and Municipal Employees

Black Women's Health Imperative

Ibis Reproductive Health

MergerWatch

NARAL Pro-Choice America

NARAL Pro-Choice Ohio

National Organization for Women (NOW) Foundation

Population Connection

Planned Parenthood Federation of America

Planned Parenthood of Greater Ohio

Planned Parenthood Southwest Ohio Region

Raising Women's Voices for the Health Care We Need

Service Employees International Union

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici.

Except for the following, all parties, intervenors and *amici* appearing in this court are listed in the Brief for Appellees United States Department of Health and Human Services, et al.

**1.**    *Amici*:  *Amici* are the National Women's Law Center; American Association of University Women (AAUW); American Federation of State, County and Municipal Employees; Black Women's Health Imperative; Ibis Reproductive Health; MergerWatch; NARAL Pro-Choice America; NARAL Pro-Choice Ohio; National Organization for Women (NOW) Foundation; Population Connection; Planned Parenthood Federation of America; Planned Parenthood of Greater Ohio; Planned Parenthood Southwest Ohio Region; Raising Women's Voices for the Health Care We Need; Service Employees International Union.

### B.    Rulings Under Review.

References to the rulings at issue appear in the Brief for Appellees United States Department of Health and Human Services, et al.

### C.    Related Cases.

*Amici* are aware of no related cases other than those set forth in the Brief for Appellees United States Department of Health and Human Services, et al.

## CERTIFICATE PURSUANT TO CIRCUIT RULE 29

Pursuant to Circuit Rule 29(d), counsel for *amici curiae* the National Women's Law Center; American Association of University Women (AAUW); American Federation of State, County and Municipal Employees; Black Women's Health Imperative; Ibis Reproductive Health; MergerWatch; NARAL Pro-Choice America; NARAL Pro-Choice Ohio; National Organization for Women (NOW) Foundation; Population Connection; Planned Parenthood Federation of America; Planned Parenthood of Greater Ohio; Planned Parenthood Southwest Ohio Region; Raising Women's Voices for the Health Care We Need; Service Employees International Union certify that as of the date of this certification, no other *amicus curiae* brief of which we are aware addresses in depth the compelling governmental interests served by the contraception regulations in the Patient Protection and Affordable Care Act, nor the issue of why those regulations are the least restrictive means of furthering those compelling interests, as required under the Religious Freedom Restoration Act.

In this brief, *amici*, which are organizations that specialize in studying and advocating issues related to women, argue that the contraception regulations in the Affordable Care Act further the dual compelling governmental interests of women's health and women's equality.  Moreover, *amici* explain herein why the contraception regulations are the least restrictive means of furthering those

iv

compelling interests, and why the alternatives suggested by Plaintiffs are neither feasible nor as effective as the contraception regulations at guaranteeing women access to contraception.  *Amici* also address Plaintiffs' argument that the exemptions to the contraception regulations undermine the government's compelling interests by explaining the true nature of the "exemptions" upon which Plaintiffs' argument rests.  Because *amici* offer a unique perspective on the compelling governmental interest/least restrictive means test set forth in the Religious Freedom Restoration Act, *amici* did not consider it practical to consolidate this brief with the briefs of any other *amici*.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, counsel for *amici curiae* makes the following disclosure:

The National Women's Law Center; American Association of University Women (AAUW); American Federation of State, County and Municipal Employees; Black Women's Health Imperative; Ibis Reproductive Health; MergerWatch; NARAL Pro-Choice America; NARAL Pro-Choice Ohio; National Organization for Women (NOW) Foundation; Population Connection; Planned Parenthood Federation of America; Planned Parenthood of Greater Ohio; Planned Parenthood Southwest Ohio Region; Raising Women's Voices for the Health Care We Need; Service Employees International Union are organizations committed to protecting and advancing women's health**.**  MergerWatch has a fiscal sponsor called Community Catalyst, a national non-profit consumer health organization.  Raising Women's Voices for the Health Care We Need is a collaborative project of three non-profit organizations:  the Black Women's Health Imperative, the MergerWatch project of Community Catalyst, and the National Women's Health Network.  None of these organizations has any parent company.  All other *amici* have no parent company.  No publicly-held corporation has a 10% or greater ownership in any of the *amici* parties.

# TABLE OF CONTENTS

Page

INTEREST OF AMICI CURIAE ......................................................................1

BACKGROUND AND SUMMARY OF ARGUMENT ....................................1

ARGUMENT ....................................................................................................5

I.     THE CONTRACEPTION REGULATIONS WERE ENACTED TO
       ADDRESS A GAP IN WOMEN'S HEALTH COVERAGE........................6

II.    THE CONTRACEPTION REGULATIONS SIGNIFICANTLY
       ADVANCE THE COMPELLING GOVERNMENTAL INTEREST
       OF SAFEGUARDING PUBLIC HEALTH...................................................11

       A.     Safeguarding Public Health Is a Compelling Governmental
              Interest. ..........................................................................................11

       B.     Contraception Is Critical to Comprehensive Preventive Health
              Care for Women. .............................................................................11

              1.     Unintended Pregnancies Are Highly Prevalent in the
                     United States. .......................................................................12

              2.     Unintended Pregnancies Have Real Health Consequences
                     for Women and Children. ......................................................14

              3.     Cost Poses a Substantial Barrier to Effective
                     Contraceptive Use. ...............................................................16

III.   THE CONTRACEPTION REGULATIONS SIGNIFICANTLY
       ADVANCE THE COMPELLING GOVERNMENTAL INTEREST
       OF PROMOTING GENDER EQUALITY....................................................17

       A.     Promoting Gender Equality, Including Equal Access to Health
              Care, Is a Compelling State Interest.................................................17

       B.     Women Are Uniquely Affected by Gaps in Health Care,
              Including a Lack of Access to Affordable Contraceptives. ...............19

1.   Women are disproportionately burdened by health care costs. ........................................................................................19

2.   The high cost of contraception is a primary contributor to gender inequality in health care. ...............................................22

3.   Promoting women's access to contraception leads to greater social and economic opportunities for women. ............23

IV.   THAT THE ADMINISTRATION PROVIDES FOR CERTAIN EXEMPTIONS DOES NOT NEGATE THE COMPELLING GOVERNMENTAL INTERESTS ..................................................26

V.   THE CONTRACEPTION REGULATIONS ARE THE LEAST RESTRICTIVE MEANS OF FURTHERING THE GOVERNMENT'S COMPELLING INTERESTS ......................................28

CONCLUSION ........................................................................................32

# TABLE OF AUTHORITIES[*]

Page(s)

**CASES**

*Buchwald* v. *Univ. of N.M. Sch. of Med.*,
  159 F.3d 487 (10th Cir. 1998) ........................................................11

*\*Catholic Charities of the Diocese of Albany* v. *Serio*,
  859 N.E.2d 459 (N.Y. 2006)........................................................4, 11

*\*Catholic Charities of Sacramento, Inc.* v. *Super. Ct.*,
  85 P.3d 67 (Cal. 2004) ................................................................4, 18

*Eisenstadt* v. *Baird*,
  405 U.S. 438 (1972) ........................................................................23

*Equal Emp't Opportunity Comm'n* v. *Fremont Christian Sch.*,
  781 F.2d 1362 (9th Cir. 1986) ........................................................18

*Erickson* v. *Bartell Drug Co.*,
  141 F. Supp. 2d 1266 (W.D. Wash. 2001) ......................................25

*Fegans* v. *Norris*,
  537 F.3d 897 (8th Cir. 2008) ..........................................................30

*Griswold* v. *Conn.*,
  381 U.S. 479 (1965)........................................................................23

*Kaemmerling* v. *Lappin*,
  553 F.3d 669 (D.C. Cir. 2008)...................................................29, 30

*Legatus* v. *Sebelius*,
  No. 12-12061, 2012 WL 5359630 (E.D. Mich. Oct. 31, 2012) ........26

*\*Mead* v. *Holder*,
  766 F. Supp. 2d 16 (D.D.C. 2011)...................................................11

*New Life Baptist Church Acad.* v. *Town of E. Longmeadow*,
  885 F.2d 940 (1st Cir. 1989).............................................................30

---

[*]  Authorities upon which *amici* chiefly rely are marked with asterisks.

*Planned Parenthood of Se. Pa.* v. *Casey*,
   505 U.S. 833 (1992)................................................................................25

\**Roberts* v. *U.S. Jaycees*,
   468 U.S. 609 (1984)................................................................................18

*S. Ridge Baptist Church* v. *Indus. Comm'n of Ohio*,
   911 F.2d 1203 (6th Cir. 1990) ...............................................................30

*St. John's United Church of Christ* v. *City of Chicago*,
   502 F.3d 616 (7th Cir. 2007) ..................................................................31

*U.S.* v. *Virginia*,
   518 U.S. 515 (1996).................................................................................18

*U.S.* v. *Wilgus*,
   638 F.3d 1274 (10th Cir. 2011) .........................................................29, 31

**STATUTES**

26 U.S.C. § 4980H.........................................................................................27

42 U.S.C. § 300gg-13...............................................................................2, 6, 9

42 U.S.C. § 2000bb-1.......................................................................................5

42 U.S.C. § 2000e...........................................................................................27

42 U.S.C. § 18011...........................................................................................26

**RULES AND REGULATIONS**

45 C.F.R. § 147.140........................................................................................26

75 Fed. Reg. 34,538 (June 17, 2010) .............................................................27

76 Fed. Reg. 46,621 (Aug. 3, 2011)...............................................................10

77 Fed. Reg. 8,725 (Feb. 15, 2012) ...............................................................11

**LEGISLATIVE MATERIALS**

155 Cong. Rec. S11,985 (daily ed. Nov. 30, 2009).........................................7

155 Cong. Rec. S12,021 (daily ed. Dec. 1, 2009) ......................................6, 7

x

155 Cong. Rec. S12,033 (daily ed. Dec. 1, 2009) ...............................................8, 25

155 Cong. Rec. S12,106 (daily ed. Dec. 2, 2009) ...............................................8

155 Cong. Rec. S12,265 (daily ed. Dec. 3, 2009) ...............................................6, 7, 9

H.R. 3590, 111th Cong. (as of Nov. 19, 2009).........................................................6

H.R. Rep. No. 111-443, pt. 2 (2010) .......................................................................30

OTHER AUTHORITIES

Bailey et al., THE OPT-IN REVOLUTION? CONTRACEPTION AND THE GENDER
    GAP IN WAGES (2012), *available at* http://www-
    personal.umich.edu/~baileymj/Opt_In_Revolution.pdf ....................................24

Boonstra et al., Guttmacher Inst., ABORTION IN WOMEN'S LIVES (2006),
    *available at* http://www.guttmacher.org/pubs/2006/05/04/AiWL.pdf. ..............13

Contraception in America, *Unmet Needs Survey, Executive Summary*,
    http://www.contraceptioninamerica.com/downloads/executive_summary.
    pdf. ....................................................................................................................17

Ctrs. for Disease Control & Prevention, *Ten Great Public Health
    Achievements–United States, 1900-1999*,
    48 MORBIDITY & MORTALITY WKLY. REP. 241 (1999), *available at*
    http://www.cdc.gov/mmwr/preview/mmwrhtml/00056796.htm (last
    visited June 12, 2013) ........................................................................................15

DeNavas-Walt et al., U.S. Census Bureau, INCOME, POVERTY, AND HEALTH
    INSURANCE COVERAGE IN THE UNITED STATES: 2011 (2012), *available at*
    http://www.census.gov/prod/2012pubs/p60-243.pdf. .......................................20

Dep't of Health & Human Servs., *Healthy People 2020: Family Planning*,
    http://healthypeople.gov/2020/topicsobjectives2020/overview.
    aspx?topicId=13 (last visited June 12, 2013) ..............................................12, 14

Equal Emp't Opportunity Comm'n, Decision on Coverage of Contraception
    (Dec. 14, 2000) ..............................................................................................10, 25

Finer & Henshaw, *Disparities in Rates of Unintended Pregnancy in the
    United States, 1994 and 2001*, 38 PERSPS. ON SEXUAL & REPROD.
    HEALTH 90 (2006)...............................................................................................12

Frost & Lindberg, Guttmacher Inst., REASONS FOR USING CONTRACEPTION: PERSPECTIVES OF US WOMEN SEEKING CARE AT SPECIALIZED FAMILY PLANNING CLINICS (2012), *available at* http://www.guttmacher.org/pubs/ journals/j.contraception.2012.08.012.pdf .....................................................23, 24

Gold, *The Need for and Cost of Mandating Private Insurance Coverage of Contraception*, GUTTMACHER REP. ON PUB. POL'Y, Aug. 1998 ..................16, 20

Goldin & Katz, *The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions*, 110 J. POL. ECON. 730 (2002) .......................24

Guttmacher Inst., A REAL-TIME LOOK AT THE IMPACT OF THE RECESSION ON WOMEN'S FAMILY PLANNING AND PREGNANCY DECISIONS (2009), *available at* http://www.guttmacher.org/pubs/RecessionFP.pdf..................16, 22

Health Res. & Servs. Admin., Dep't of Health & Human Servs., *Women's Preventive Services: Required Health Plan Coverage Guidelines*, http://www.hrsa.gov/womensguidelines (last visited June 12, 2013)............2, 10

Inst. of Med., *About the IOM*, http://www.iom.edu/About-IOM.aspx (last visited June 12, 2013) .......................................................................9

*Inst. of Med., CLINICAL PREVENTIVE SERVICES FOR WOMEN: CLOSING THE GAPS (2011), *available at* http://www.iom.edu/ Reports/2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps.aspx .............................................................6, 9, 12, 14, 19, 22

Iowa Initiative to Reduce Unintended Pregnancies, *Preliminary Findings*, http://www.iowainitiative.org/uploads/pdf/iiclinicresearch.pdf........................13

Logan et al., *The Consequences Of Unintended Childbearing: A White Paper* (Child Trends, Inc., 2007), *available at* http://www.thenationalcampaign.org/resources/pdf/consequences.pdf. ............15

*Mikulski Amendment Improves Coverage of Women's Preventive Health Services and Lowers Costs to Women*, http://www.mikulski.senate.gov/_ pdfs/Press/MikulskiAmendmentSummary.pdf (last visited June 12, 2013) ........7

Nat'l Women's Law Ctr., FAQ ABOUT THE WAGE GAP, at 2 (2012), *available at* http://www.nwlc.org/sites/default/files/pdfs/wage_gap_faqs_ sept_2012.pdf...........................................................................................20

Nat'l Women's Law Ctr., INSECURE AND UNEQUAL: POVERTY AND INCOME
     AMONG WOMEN AND FAMILIES 2000-2011 (2012), *available at* http://
     www.nwlc.org/sites/default/files/pdfs/nwlc_2012_povertyreport.pdf...............20

Peipert et al., *Preventing Unintended Pregnancies by Providing No-Cost
     Contraception*, 120 OBSTETRICS & GYNECOLOGY 1291 (2012)........................16

Postlethwaite et al., *A Comparison of Contraceptive Procurement Pre- and
     Post-Benefit Change*, 76 CONTRACEPTION 360 (2007).......................................17

Robertson & Collins, The Commonwealth Fund, WOMEN AT RISK: WHY
     INCREASING NUMBERS OF WOMEN ARE FAILING TO GET THE HEALTH
     CARE THEY NEED AND HOW THE AFFORDABLE CARE ACT WILL HELP
     (2011), *available at* http://www.commonwealthfund.org/~/media/
     Files/Publications/Issue%20Brief/2011/May/1502_Robertson_
     women_at_risk_reform_brief_v3.pdf..................................................................21

*Rustgi et al., The Commonwealth Fund, WOMEN AT RISK: WHY MANY
     WOMEN ARE FORGOING NEEDED HEALTH CARE (2009), *available at*
     http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20
     Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_r
     isk_issue_brief_Final.pdf...........................................................................19, 21

Santelli & Melnikas, *Teen Fertility in Transition:  Recent and Historic
     Trends in the United States*, 31 ANN. REV. OF PUB. HEALTH 371 (2010)...........13

Simmons & Skopec, Dep't of Health & Human Servs., 47 MILLION WOMEN
     WILL HAVE GUARANTEED ACCESS TO WOMEN'S PREVENTIVE SERVICES
     WITH ZERO COST-SHARING UNDER THE AFFORDABLE CARE ACT (2012),
     *available at* http://aspe.hhs.gov/health/reports/2012/
     womensPreventiveServicesACA/ib.shtml (last visited June 12, 2013) .............28

Trussell et al., *Erratum to "Cost Effectiveness of Contraceptives in the
     United States,"* 80 CONTRACEPTION 229 (2009)..................................................22

Trussell & Wynn, *Reducing Unintended Pregnancy in the United States*,
     77 CONTRACEPTION 1 (2008).............................................................................12

Women's Research and Educ. Inst., WOMEN'S HEALTH INSURANCE COSTS
     AND EXPERIENCES (1994)...................................................................................20

# GLOSSARY

ACA:        Patient Protection and Affordable Care Act

EEOC:       United States Equal Employment Opportunity Commission

HHS:        United States Department of Health and Human Services

HRSA:       Health Resources and Services Administration

IOM:        Institute of Medicine

PDA:        Pregnancy Discrimination Act

RFRA:       Religious Freedom Restoration Act

USPSTF:     United States Preventive Services Task Force

## INTEREST OF AMICI CURIAE

The National Women's Law Center; American Association of University Women (AAUW); American Federation of State, County and Municipal Employees; Black Women's Health Imperative; Ibis Reproductive Health; MergerWatch; NARAL Pro-Choice America; NARAL Pro-Choice Ohio; National Organization for Women (NOW) Foundation; Population Connection; Planned Parenthood Federation of America; Planned Parenthood of Greater Ohio; Planned Parenthood Southwest Ohio Region; Raising Women's Voices for the Health Care We Need; Service Employees International Union are national, regional, state, and local organizations committed to protecting and advancing women's health, with a particular interest in ensuring that women receive the full benefits of access to no-cost-sharing contraceptive coverage as intended by the Affordable Care Act.[2]

## BACKGROUND AND SUMMARY OF ARGUMENT

Contraceptive services are a key component of preventive health care for women. To further its goals of bettering the health and welfare of all Americans, the ACA includes a preventive health services coverage provision,

---

[2] All parties have consented to the filing of this brief. Pursuant to Fed. R. App. P. 29(c)(5), the undersigned counsel certify that no party's counsel authored this brief in whole or in part; no party or party's counsel, or any other person, other than amici or their counsel, contributed money that was intended to fund the preparation or submission of this brief.

which requires all new insurance plans to cover certain preventive care and screenings with no cost-sharing requirement.  42 U.S.C. § 300gg-13(a).  Because women have unique health needs, particularly with respect to their reproductive capacities, Congress passed the Women's Health Amendment to ensure adequate coverage of preventive health services for women.  *Id.* at § 300gg-13(a)(4).  With the help of independent experts who studied women's health issues, the Health Resources and Services Administration ("HRSA"), an agency within the U.S. Department of Health and Human Services ("HHS"), recommended coverage of eight preventive services for women with no cost-sharing requirement, including "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity."   Health Res. & Servs. Admin., HHS, *Women's Preventive Services: Required Health Plan Coverage Guidelines*, http://www.hrsa.gov/womensguidelines ("HRSA Guidelines") (last visited June 12, 2013), *implemented by* 77 Fed. Reg. 8,725 (Feb. 15, 2012).

Plaintiffs challenge the regulations that require contraceptive coverage with no cost-sharing requirement (the "contraception regulations") on several grounds, including an alleged violation of the Religious Freedom Restoration Act ("RFRA").  This challenge must fail.  The contraception regulations do not violate RFRA because they do not substantially burden Plaintiffs' exercise of religion.

Moreover, as *Amici* will demonstrate herein, even if the regulations did substantially burden religious exercise, they do not run afoul of RFRA because they further the compelling governmental interests of safeguarding public health and promoting gender equality in the least restrictive means possible. The regulations further ensure that women will have complete control over their reproductive lives by guaranteeing women's ability to access medically-recommended preventive services free from employer interference.

First, contraception is critical to women's health, and providing it with no cost-sharing requirement advances the compelling governmental interest in public health. Contraception is highly effective at reducing unintended pregnancy, which, as countless studies have shown and experts agree, can have severe negative health consequences for both women and children. Yet, prior to the enactment of the contraception regulations, the high costs of contraception—including cost-sharing requirements—affected whether women used contraceptives consistently and whether women used the most appropriate or effective forms of contraception for their circumstances.

Second, the provision of contraceptive coverage without cost sharing addresses gender gaps in the provision of health care and advances the compelling governmental interest in promoting gender equality. Before the ACA went into effect, costs associated with women's health care—and specifically

3

contraception—disproportionately burdened women.  These high costs negatively affected women's health and well-being, as women often lacked access to or forewent necessary health care in order to keep costs down.  Moreover, access to contraception is key to progress and equal opportunity in other aspects of women's lives, thus improving women's social and economic outcomes more generally.

The contraception regulations are the least restrictive means of advancing these compelling governmental interests.  Plaintiffs have not identified any practicable modifications that would be equally effective.  Instead, their proposed alternative schema would be difficult if not impossible to implement and would be ineffective in achieving the goal of providing broader and more ready access to contraception.

Twenty-eight states mandate contraceptive coverage.  The highest courts in both California and New York rejected challenges to such laws, holding that the laws advance the governmental interests in women's health and gender equality.  *See Catholic Charities of the Diocese of Albany* v. *Serio*, 859 N.E.2d 459, 461 (N.Y. 2006), *cert. denied* 552 U.S. 816 (2007) (holding that a contraceptive coverage law did not violate the establishment or free exercise clauses of the federal or state constitutions); *Catholic Charities of Sacramento, Inc.* v. *Super. Ct.*, 85 P.3d 67, 73-74 (Cal. 2004), *cert denied* 543 U.S. 816 (2004) (same).  This Court, too, should find that the inclusion of contraception as a

4

required component of preventive health services with no cost-sharing requirement will withstand Plaintiffs' challenge.

## ARGUMENT

Defendants, acting within the scope of their authority to regulate the health insurance market, have issued regulations setting forth the minimum requirements for the provision of preventive care and screenings for women. Plaintiffs challenge the contraception regulations under RFRA, which provides that the Government shall not "substantially burden a person's exercise of religion" unless the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1.

The District Court properly denied Plaintiffs' motion for a preliminary injunction, finding that Plaintiffs were unlikely to prevail on their claim because the contraception regulations do not "substantially burden" Plaintiffs' exercise of religion. Because there is no substantial burden, this Court need not reach the question of whether the contraception regulations are the least restrictive means of furthering a compelling governmental interest. In the event that it does, however, as this brief demonstrates, the contraception regulations clearly further the compelling governmental interests of public health and equal opportunity for women, and they do so in the least restrictive means possible.

## I.     THE CONTRACEPTION REGULATIONS WERE ENACTED TO ADDRESS A GAP IN WOMEN'S HEALTH COVERAGE

A key component of the ACA is the preventive health services coverage provision, which is designed to avoid preventable conditions and improve health overall by increasing access to preventive care and screenings. *See* Inst. of Med., CLINICAL PREVENTIVE SERVICES FOR WOMEN:  CLOSING THE GAPS, at 16-18, 168 (2011), *available at* http://www.iom.edu/Reports/2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps.aspx ("IOM REP.").  This provision requires all new health insurance plans to provide coverage for certain preventive services with no cost-sharing requirement.  42 U.S.C. § 300gg-13(a).

The bill as originally introduced in the Senate provided coverage for (1) items or services recommended by the U.S. Preventive Services Task Force ("USPSTF"); (2) immunizations recommended by the  Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention; and (3) with respect to children, preventive care and screenings recommended by the HRSA.  *See* H.R. 3590, 111th Cong. (as of Nov. 19, 2009).  The USPSTF recommendations, however, "d[id] not include certain recommendations that many women's health advocates and medical professionals believe are critically important."  155 Cong. Rec. S12,021, S12,025 (daily ed. Dec. 1, 2009) (statement of Sen. Boxer); *see also* 155 Cong. Rec. S12,265, S12,271 (daily ed. Dec. 3, 2009)

6

(statement of Sen. Franken) ("The problem is, several crucial women's health services are omitted" from USPSTF recommendations).

Recognizing this limitation for what it was—a significant gap in coverage that threatened women's health—Senator Mikulski sponsored the Women's Health Amendment to ensure "essential protection for women's access to preventive health care not currently covered in other prevention sections of the [ACA]." *Mikulski Amendment Improves Coverage of Women's Preventive Health Services and Lowers Costs to Women*, http://www.mikulski.senate.gov/_pdfs/ Press/MikulskiAmendmentSummary.pdf (last visited June 12, 2013).

In relevant part, the Amendment proposed a fourth category of preventive coverage:

> (4) with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph.

155 Cong. Rec. S11,985, S11,986 (daily ed. Nov. 30, 2009) (Amend. No. 2791). The Amendment "require[d] coverage of women's preventive services developed by women's health experts to meet the unique needs of women." 155 Cong. Rec. S12,265, 12,273 (statement of Sen. Stabenow).

Congress intended the Amendment to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit." 155 Cong. Rec. S12,021, S12,026 (statement of Sen. Mikulski); *see*

7

*also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator

Mikulski on her efforts to see to it that women are treated equally, and particularly

in preventive care.").  Of particular concern was that cost posed a unique barrier to

women's ability to access basic and necessary care.

> Women must shoulder the worst of the health care crisis, including
> outrageous discriminatory practices in care and coverage.  Not only
> do we pay more for the coverage we seek for the same age and the
> same coverage as men do, but in general women of childbearing age
> spend 68 percent more in out-of-pocket health care costs than men.
> . . .  In America today, too many women are delaying or skipping
> preventive care because of the costs and copays and limited access.
> . . . This fundamental inequity in the current system is dangerous and
> discriminatory and we must act.

*Id.* at S12,027 (statement of Sen. Gillibrand).

In considering the Amendment, Congress expressed its expectation

that the HRSA Guidelines would incorporate family planning services.  *See, e.g.*,

*id.* ("With Senator Mikulski's amendment, even more preventive screening will be

covered, including . . . family planning."); 155 Cong. Rec. S12,033, S12,052 (daily

ed. Dec. 1, 2009) (statement of Sen. Franken) ("[A]ffordable family planning

services must be accessible to all women in our reformed health care system.");

155 Cong. Rec. S12,106, S12,114 (daily ed. Dec. 2, 2009) (statement of Sen.

Feinstein) ("[The amendment] will require insurance plans to cover at no cost basic

preventive services and screenings for women.  This may include mammograms,

Pap smears, family planning, screenings to detect postpartum depression, and other

annual women's health screenings."). Following three days of debates, the Senate

adopted the Women's Health Amendment by a vote of 61 to 39. *See* 155 Cong.

Rec. S12,265, S12,277; 42 U.S.C. § 300gg-13(a)(4).

To meet the Amendment's objectives, the HRSA commissioned the

Institute of Medicine ("IOM")[3] to "convene a diverse committee of experts in

disease prevention, women's health issues, adolescent health issues, and evidence-

based guidelines to review existing guidelines, identify existing coverage gaps, and

recommend services and screenings for HHS to consider in order to fill those

gaps." IOM REP. at 20-21. The IOM assembled a committee of independent

experts in the subject fields, which employed a rigorous methodology to

thoroughly analyze the relevant evidence. *See id.* at 67. IOM's Report, issued at

the conclusion of its review, articulated the need to focus on the unique preventive

health needs of women because women suffer from chronic disease and disability

at rates disproportionate to those of men, have different health needs and manifest

different symptoms and responses to treatment modalities from men, and face

unique health risks due to their reproductive capacities. *Id.* at 18. The Report

recommended eight preventive services for women, including "the full range of

Food and Drug Administration-approved contraception methods, sterilization

---

[3]  The IOM is an independent, nonprofit organization that provides unbiased
evidence to help those in government and the private sector make informed
health decisions. *See* Inst. of Med., *About the IOM*,
http://www.iom.edu/About-IOM.aspx (last visited June 12, 2013).

procedures, and patient education and counseling for women with reproductive capacity." *Id.* at 8-12, Table S-1.

The IOM's inclusion of contraceptive services in standard preventive care for women is significant, but not groundbreaking. "Numerous health care professional associations and other organizations recommend the use of family planning services as part of preventive care for women . . . ." *Id.* at 104. Twenty-eight states require contraceptive coverage, and contraceptive coverage has become standard practice for most private and federally-funded insurance programs. *Id.* at 108. Since 1972, Medicaid has required coverage for family planning in all state programs with no cost-sharing requirements. *Id.* Moreover, since 2000, the Equal Employment Opportunity Commission ("EEOC") has required, pursuant to Title VII, as amended by the Pregnancy Discrimination Act ("PDA"), that employers that provide health coverage for preventive health services also provide coverage for contraception. EEOC, Decision on Coverage of Contraception, at 2-4 (Dec. 14, 2000) ("EEOC Decision").

On August 1, 2011, HRSA adopted the recommendations set forth in the IOM Report. *See* HRSA Guidelines. In response to public comments, HRSA exempted certain religious employers from the requirement to cover contraception. *See id.*; 76 Fed. Reg. 46,621, 46,623 (Aug. 3, 2011). Defendants implemented the HRSA Guidelines to apply to all non-grandfathered health insurance plans with

10

plan years beginning on or after August 1, 2012.  *See* 77 Fed. Reg. 8,725, 8,725-26 (Feb. 15, 2012).

## II.    THE CONTRACEPTION REGULATIONS SIGNIFICANTLY ADVANCE THE COMPELLING GOVERNMENTAL INTEREST OF SAFEGUARDING PUBLIC HEALTH

### A.    Safeguarding Public Health Is a Compelling Governmental Interest.

"[T]he Government clearly has a compelling interest in safeguarding the public health by regulating the health care and insurance markets." *Mead* v. *Holder*, 766 F. Supp. 2d 16, 43 (D.D.C. 2011) (citing *Olsen* v. *Drug Enforcement Admin.*, 878 F.2d 1458, 1462 (D.C. Cir. 1989)), *aff'd by Seven-Sky* v. *Holder*, 661 F.3d 1 (D.C. Cir. 2011); *see also Buchwald* v. *Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 498 (10th Cir. 1998) (noting that "public health is a compelling government interest"); *Catholic Charities of the Diocese of Albany*, 859 N.E.2d at 468 (rejecting a challenge to contraceptive coverage, in part in consideration of "the State's substantial interest in fostering equality between the sexes, and in providing women with better health care").

### B.    Contraception Is Critical to Comprehensive Preventive Health Care for Women.

As the IOM Report and HRSA Guidelines make clear, access to contraception without cost sharing is a critical component of preventive care for women that has demonstrable benefits for the health of women and children. Simply put, increasing access to contraception is a matter of public health.

11

1.    *Unintended Pregnancies Are Highly Prevalent in the United States*.

Nearly half of all pregnancies in the United States each year are unintended (*i.e.*, unwanted or mistimed at the time of conception).  *See* Finer & Henshaw, *Disparities in Rates of Unintended Pregnancy in the United States, 1994 and 2001*, 38 PERSPS. ON SEXUAL & REPROD. HEALTH 90, 92 (2006).  While all sexually active women with reproductive capacity are at risk, unintended pregnancy is particularly prevalent in racial or ethnic minority groups.  *See id*. at 94.  Unintended pregnancy is associated with a wide range of negative health consequences for the woman and any resulting child.  Addressing this public health crisis is of great interest to the government.  The HHS program that sets national objectives for improving U.S. public health seeks to increase the proportion of pregnancies that are intended.  *See* HHS, *Healthy People 2020:  Family Planning*, http://healthypeople.gov/2020/topicsobjectives2020/overview. aspx?topicId=13 (last visited June 12, 2013) ("*Healthy People 2020*").

While unintended pregnancy is highly prevalent in the United States—significantly more so than in comparably-developed countries[4]—this need not be the case.  *See* IOM REP. at 104.  Contraception is highly effective in

---

[4]    For example, "[w]hile 49% of pregnancies in the United States are unintended, the corresponding percentage in France is only 33%, and in Edinburgh, Scotland, it is only 28%."  Trussell & Wynn, *Reducing Unintended Pregnancy in the United States*, 77 CONTRACEPTION 1, 4 (2008).

preventing unintended pregnancy.  Failure rates of FDA-approved contraception

are negligible with proper use, as compared with an 85% chance of pregnancy

within 12 months with no contraception.  *See id.* at 105.  As rates of contraceptive

use increase, rates of unintended pregnancy and abortion decline.  For example,

one study found that between 1982 and 2002, an increase in contraceptive use

among unmarried women contributed significantly to a decrease in unintended

pregnancy and abortion rates.  *See* Boonstra et al., Guttmacher Inst., ABORTION IN

WOMEN'S LIVES, at 18 (2006), *available at* http://www.guttmacher.

org/pubs/2006/05/04/AiWL.pdf.  A study of teen pregnancy rates found that a

decline from 1991 to 2005 and increase in 2006 and 2007 could be explained by a

corresponding increase and then decline in teen contraceptive use over the same

period.  *See* Santelli & Melnikas, *Teen Fertility in Transition:  Recent and Historic*

*Trends in the United States*, 31 ANN. REV. OF PUB. HEALTH 371, 379 (2010).  A

research project in Iowa that implemented programs to increase knowledge and

access to contraception found significant increases in contraceptive use and

corresponding decreases in unintended pregnancy and abortion from 2007 through

2012.  *See* Iowa Initiative to Reduce Unintended Pregnancies, *Preliminary*

*Findings*, http://www.iowainitiative.org/uploads/pdf/iiclinicresearch.pdf.

2.    *Unintended Pregnancies Have Real Health Consequences for Women and Children.*

The negative health consequences of unintended pregnancy are well documented. Women who experience unintended pregnancy are more likely to receive delayed or no prenatal care, to be depressed during pregnancy, and to suffer from domestic violence during pregnancy. *See* IOM REP. at 103; *Healthy People 2020*. Contraception allows a woman to avoid risks that pregnancy may pose due to other medical conditions.[5] For example, it may be advisable for women with chronic medical conditions, such as diabetes and obesity, to postpone pregnancy until their health stabilizes. *See* IOM REP. at 103. Women with certain medical conditions, such as pulmonary hypertension and cyanotic heart disease, may need to avoid pregnancy altogether or risk serious medical consequences. *See id.* at 103-104.

The negative health consequences extend to children resulting from unintended pregnancy.[6] Without contraception, women are more likely to have short inter-pregnancy intervals, which are associated with preterm birth, low birth

---

[5]    Contraception can also have independent health benefits, including treating menstrual disorders, acne or hirsutism, and pelvic pain; reducing risks of endometrial cancer; protecting against pelvic inflammatory disease and some benign breast disease; and, potentially, preventing ovarian cancer. *See* IOM REP. at 107.

[6]    This, of course, assumes the unintended pregnancy results in a live birth. 42% of unintended pregnancies are aborted. *See* IOM REP. at 102.

14

weight, and small-for-gestational-age births. *See id.* at 103. Once born, children

of unintended pregnancy are less likely to be breastfed, depriving them of the

known benefits of breastfeeding to early development. *See id.* These children are

more likely to experience poor mental and physical health during childhood, and

have lower educational attainment and more behavioral issues in their teen years.

*See* Logan et al., *The Consequences Of Unintended Childbearing: A White Paper*,

at 11 (Child Trends, Inc., 2007), *available at*

http://www.thenationalcampaign.org/resources/pdf/consequences.pdf.

      For all these reasons, the Centers for Disease Control and Prevention

identified "family planning" as one of ten great public health achievements of the

twentieth century, noting:

> Family planning has provided health benefits such as smaller family
> size and longer interval between the birth of children; increased
> opportunities for preconceptional counseling and screening; fewer
> infant, child, and maternal deaths; and the use of barrier
> contraceptives to prevent pregnancy and transmission of human
> immunodeficiency virus and other STDs.

Ctrs. for Disease Control & Prevention, *Ten Great Public Health Achievements–*

*United States, 1900-1999*, 48 MORBIDITY & MORTALITY WKLY. REP. 241 (1999),

*available at* http://www.cdc.gov/mmwr/preview/mmwrhtml/00056796.htm (last

visited June 12, 2013).

3.    *Cost Poses a Substantial Barrier to Effective Contraceptive Use.*

Despite its effectiveness at preventing unintended pregnancy, many women misuse or fail to use contraception because of cost.  Studies show that high costs lead women to forego contraception altogether, to choose less effective contraception methods, or to use contraception inconsistently or incorrectly.  *See, e.g.*, Guttmacher Inst., A REAL-TIME LOOK AT THE IMPACT OF THE RECESSION ON WOMEN'S FAMILY PLANNING AND PREGNANCY DECISIONS, at 5 (2009), *available at* http://www.guttmacher.org/pubs/ RecessionFP.pdf ("A REAL-TIME LOOK") (finding that, to save money, women forewent contraception, skipped birth control pills, delayed filling prescriptions, went off the pill for at least a month, or purchased fewer birth control packs at once).  These responses to contraception's costs pose significant risks of unintended pregnancy, as "even a brief gap in [contraceptive] method use can have a major impact."  Gold, *The Need for and Cost of Mandating Private Insurance Coverage of Contraception*, GUTTMACHER REP. ON PUB. POL'Y, Aug. 1998, at 6 ("Gold").

Eliminating cost barriers to contraception can greatly reduce the incidence of unintended pregnancy.  One study found a "clinically and statistically significant reduction" in unintended pregnancies when at-risk women received contraceptive counseling and reversible contraceptive methods of their choice at no cost.  *See* Peipert et al., *Preventing Unintended Pregnancies by Providing No-Cost*

16

*Contraception*, 120 OBSTETRICS & GYNECOLOGY 1291, 1291 (2012). In another

recent study, Kaiser Permanente found that when out-of-pocket costs for

contraceptives were eliminated or reduced, women were more likely to rely on

more effective, long-acting contraceptive methods. *See* Postlethwaite et al., *A*

*Comparison of Contraceptive Procurement Pre- and Post-Benefit Change*, 76

CONTRACEPTION 360, 363 (2007).[7]

## III.  THE CONTRACEPTION REGULATIONS SIGNIFICANTLY ADVANCE THE COMPELLING GOVERNMENTAL INTEREST OF PROMOTING GENDER EQUALITY

### A.  Promoting Gender Equality, Including Equal Access to Health Care, Is a Compelling State Interest.

The Supreme Court has held promoting women's equality and

eliminating gender discrimination to be compelling state interests, justifying state

action burdening First Amendment interests through the least restrictive means

---

[7] Plaintiffs ignore the abundant evidence demonstrating that cost impedes access to contraception and instead refer to a single study finding that 2.3% of women reported not using contraception because it was "too expensive." (App. Br. 58.) *See* Contraception in America, *Unmet Needs Survey, Executive Summary*, http://www.contraceptioninamerica.com/downloads/executive_summary.pdf. In focusing on this one figure, Plaintiffs ignore a key finding that many women are unfamiliar with the differences between contraceptive methods, and are unsure which method best meets their requirements. Indeed, the method that may be best for a woman may be out of her price range. The contraception regulations ensure that women will receive education and counseling on the various methods of contraception, and that they will have access to these various methods without cost-sharing, thereby guaranteeing that women can access the most appropriate and effective method for them, including longer-acting contraceptives that have higher up-front costs.

17

available. *Roberts* v. *U.S. Jaycees*, 468 U.S. 609 (1984) (finding that a state law forbidding gender discrimination in public accommodations did not unconstitutionally burden First Amendment right of expressive association). Specifically, the Court has recognized "the importance, both to the individual and to society, of removing the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups, including women," and has thus found that "[a]ssuring women equal access to . . . goods, privileges, and advantages clearly furthers compelling state interests." *Id.* at 626; *see also id.* at 623 (holding that the state's "compelling interest in eradicating discrimination against its female citizens" justified the statute's impact on associational freedoms); *U.S.* v. *Virginia*, 518 U.S. 515, 532 (1996) (noting the fundamental principle that is violated when "women, simply because they are women" are denied the "equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capacities"); *Equal Emp't Opportunity Comm'n* v. *Fremont Christian Sch.*, 781 F.2d 1362, 1368-69 (9th Cir. 1986) (rejecting a free exercise challenge to the application of Title VII to a health insurance plan offered only to "heads of households"—defined as single persons and married men—based on the government's compelling interest in eliminating employment discrimination); *Catholic Charities of Sacramento, Inc.*,

85 P.3d at 92-93 ("The [contraceptive coverage law] serves the compelling state interest of eliminating gender discrimination.").

**B.    Women Are Uniquely Affected by Gaps in Health Care, Including a Lack of Access to Affordable Contraceptives.**

Pervasive gender inequalities exist in the provision of health care.[8] Women's unique health needs generate additional costs, causing health care expenditures to disproportionately burden women.  *See* IOM REP. at 19.  A primary contributing factor to cost disparities is the high cost of contraception.  And improving access to contraception promotes gender equality generally, as it improves the social and economic status of women.

> *1.    Women are disproportionately burdened by health care costs.*

Women pay substantially more to access basic health care than do men and are significantly more likely to be burdened with high medical costs. "Compared with men, women require more health care services during their reproductive years (ages 18 to 45), have higher out-of-pocket medical costs, and have lower average incomes."  Rustgi et al., The Commonwealth Fund, WOMEN AT RISK: WHY MANY WOMEN ARE FORGOING NEEDED HEALTH CARE, at 1 (2009), *available at* http://www.commonwealthfund.org/~/media/Files/Publications/ Issue%20Brief/2009/May/Women%20at%20Risk/PDF_1262_Rustgi_women_at_r

---

[8]    Of course, once fully implemented, the ACA—in particular, the contraception regulations promulgated thereunder—will take great steps towards eradicating the disparities discussed herein.

isk_issue_brief_Final.pdf ("Rustgi et al."). Women of childbearing age spend 68%
more in out-of-pocket health care costs than men. Gold at 5; *see also* Women's
Research and Educ. Inst., WOMEN'S HEALTH INSURANCE COSTS AND EXPERIENCES,
at 2 (1994).

The impact of these higher health care costs is magnified by women's
lower incomes. Women earn, on average, just 77 cents for every dollar earned by
men. *See* DeNavas-Walt et al., U.S. Census Bureau, INCOME, POVERTY, AND
HEALTH INSURANCE COVERAGE IN THE UNITED STATES: 2011, at 7 (2012),
*available at* http://www.census.gov/prod/ 2012pubs/p60-243.pdf. Women of color
earn even less.[9] Moreover, women, particularly women of color, are more likely to
be poor than men,[10] thus increasing the likelihood that women will face cost
barriers to accessing needed health care.

Indeed, in 2007, 62% of women, compared with 48% of men,
reported trouble paying medical bills, cost barriers to needed health care, or both.

---

[9]  For every dollar earned by white, non-Hispanic men, African American women
earn just 64 cents, while Hispanic women earn just 55 cents. Nat'l Women's
Law Ctr., FAQ ABOUT THE WAGE GAP, at 2 (2012), *available at*
http://www.nwlc.org/sites/default/files/pdfs/wage_gap_faqs_sept_2012.pdf.

[10]  In 2011, the poverty rate for women in the U.S. was 14.6%, compared with
10.9% for men. For African American women, the rate rose to 25.9%, and to
23.9% for Hispanic women. Nat'l Women's Law Ctr., INSECURE AND
UNEQUAL: POVERTY AND INCOME AMONG WOMEN AND FAMILIES 2000-2011, at
3 (2012), *available at* http://www.nwlc.org/sites/default/files/pdfs/nwlc_
2012_povertyreport.pdf.

Rustgi et al. at 2.  In addition, women are more likely to spend a significant share of their income on out-of-pocket health care costs than men—in 2007, 35% of women, compared with 31% of men, spent 10% or more of their income on such costs.  *Id.* at 3.  The figures are even starker among low-income women:  55% of women earning less than $20,000 spent more than 10% of their income on out-of-pocket health care costs in 2007.  *Id.*  Studies also show that women more so than men—32% of women versus 24% of men—are, as a result of medical bills, unable to pay for basic necessities, such as food, heat, or rent, or take on debt.  *Id.* at 5.

The financial barriers to health care, coupled with gendered income disparities, lead women to forego necessary medical care at a higher rate than men.  A 2007 survey showed that 52% of women did not fill a prescription; skipped a recommended medical test, treatment or follow-up; did not visit a doctor when they had a medical problem; or did not get necessary specialist care due to cost, compared with 39% of men.  *Id.* at 3.  Moreover, 79% of women with medical debt or problems paying medical bills reported not pursuing necessary health care because of cost.  *Id.* at 5.  And, although women are more frequent users of preventive health care services, a 2010 study showed that only 46% of women were up-to-date on recommended preventive screenings, including blood pressure, cholesterol, cervical cancer, colon cancer and breast cancer.  Robertson & Collins, The Commonwealth Fund, WOMEN AT RISK: WHY INCREASING NUMBERS OF

WOMEN ARE FAILING TO GET THE HEALTH CARE THEY NEED AND HOW THE AFFORDABLE CARE ACT WILL HELP, at 8-9 (2011), *available at* http://www.commonwealthfund.org/~/media/Files/Publications/ Issue%20Brief/2011/May/1502_Robertson_women_at_risk_reform_brief_v3.pdf. Another study reported that "[n]early one out of four women report having put off a gynecological or birth control visit to save money in the past year." A REAL-TIME LOOK at 6.

Given these statistics, it is beyond dispute that the disproportionately high health care costs borne by women create "financial barriers [] that prevent women from achieving health and well-being for themselves and their families." IOM REP. at 20.

> 2.   *The high cost of contraception is a primary contributor to gender inequality in health care*.

A significant portion of the health care cost disparities faced by women result from reproductive and gender-specific conditions, including the costs of contraception. IOM REP. at 19. Oral contraception costs women, on average, $2,630 over five years. Trussell et al., *Erratum to "Cost Effectiveness of Contraceptives in the United States*," 80 CONTRACEPTION 229, 229 (2009). Other hormonal contraceptives—including injectable contraceptives, transdermal patches and the vaginal ring—cost women between $2,300 and $2,800 over a five-year period. *Id.*

22

3.    *Promoting women's access to contraception leads to greater social and economic opportunities for women*.

Contraception puts women in control of their fertility, allowing them to decide whether, and when, to become mothers.  As the Supreme Court has recognized, the government has a compelling interest in protecting a woman's ability to control her own reproductive choices.  *See Eisenstadt* v. *Baird*, 405 U.S. 438, 453 (1972) ("If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."); *Griswold* v. *Conn.*, 381 U.S. 479, 485-86 (1965) (invalidating a law that prohibited the use of contraception as unconstitutionally infringing the right to marital privacy).  In one study, 60% of women reported the ability to better control their lives as a very important reason for using birth control.  Frost & Lindberg, Guttmacher Inst., REASONS FOR USING CONTRACEPTION:  PERSPECTIVES OF US WOMEN SEEKING CARE AT SPECIALIZED FAMILY PLANNING CLINICS, at 9 (2012), *available at* http://www.guttmacher.org/pubs/journals/j.contraception.2012.08.012.pdf ("Frost & Lindberg").

Increased control over reproductive decisions, in turn, provides women with educational and professional opportunities that have increased gender equality over the decades since birth control was introduced.  Indeed, "[e]conomic

analyses have found clear associations between the availability and diffusion of oral contraceptives[,] particularly among young women, and increases in U.S. women's education, labor force participation, and average earnings, coupled with a narrowing in the wage gap between women and men." Frost & Lindberg at 3. A number of analyses have connected the advent of oral contraception to significant augmentation of women's wages. One study found that "the Pill-induced effects on wages amount to roughly one-third of the total wage gains for women in their forties born from the mid-1940s to early 1950s." Bailey et al., THE OPT-IN REVOLUTION? CONTRACEPTION AND THE GENDER GAP IN WAGES, at 26-27 (2012), *available at* http://www-personal.umich.edu/~baileymj/Opt_In_Revolution.pdf. That same study estimates that approximately 10% of the narrowing of the wage gap during the 1980s and 31% during the 1990s can be attributed to access to oral contraceptives prior to age 21. *Id.* at 27. Another study concludes that the advent of oral contraceptives contributed to an increase in the number of women employed in professional occupations, including as doctors and lawyers. *See* Goldin & Katz, *The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions*, 110 J. POL. ECON. 730, 759-62 (2002). Thus, as even the Supreme Court has recognized, "[t]he ability of women to participate equally in the economic and social life of the Nation has been facilitated by their ability to

24

control their reproductive lives." *Planned Parenthood of Se. Pa.* v. *Casey*, 505

U.S. 833, 856 (1992).

      The proponents of the ACA were not alone in recognizing that access

to contraception would further gender equality.  In considering a Title VII

challenge to an employer's failure to include contraceptive coverage in its health

insurance policy, the EEOC found that Congress, in passing the PDA, sought to

"equalize employment opportunities for men and women" and "address

discrimination against female employees that was based on assumptions that they

would become pregnant."  EEOC Decision at 2-3.  Accordingly, it concluded that

"the PDA's prohibition of discrimination in connection with a woman's ability to

become pregnant necessarily includes the denial of benefits for contraception."  *Id.*

at 2; *see also Erickson* v. *Bartell Drug Co.*, 141 F. Supp. 2d 1266, 1276 (W.D.

Wash. 2001) (agreeing with the EEOC and holding that "the exclusion of

prescription contraceptives from a generally comprehensive insurance policy

constitutes sex discrimination under Title VII").

      Here, Congress similarly understood that the Women's Health

Amendment—including its broadening of access to contraceptives—would be "a

huge step forward for justice and equality in our country."  155 Cong. Rec.

S12,033, S12,052 (daily ed. Dec. 1, 2009) (statement of Sen. Franken); *see also*

*supra* Section I.

## IV.   THAT THE ADMINISTRATION PROVIDES FOR CERTAIN EXEMPTIONS DOES NOT NEGATE THE COMPELLING GOVERNMENTAL INTERESTS

Plaintiffs argue that certain "exemptions" from the contraception regulations—including employers with "grandfathered" group health plans and employers with fewer than fifty employees—undermine the government's assertion of compelling interests.  (App. Br. 55-57.)  Plaintiffs' argument misses the mark.

First, the so-called exemption for grandfathered plans is not a true exemption at all.  *See* 42 U.S.C. § 18011; 45 C.F.R. § 147.140.  A health insurance plan relinquishes its grandfathered status if certain changes are made to the plan, such as a significant reduction in coverage or increase in co-payments.  45 C.F.R. § 147.140.  Rather than providing a true exemption, the grandfathering provision contemplates a gradual transition to the new, complex regulatory scheme as health plans lose their grandfathered status over time.  Indeed, "[t]o find the Government's interests other than compelling only because of the grandfathering rule would perversely encourage Congress in the future to require immediate and draconian enforcement *of all provisions of similar laws*, without regard to pragmatic considerations, simply in order to preserve 'compelling interest' status." *Legatus* v. *Sebelius*, No. 12-12061, 2012 WL 5359630, at *9 (E.D. Mich. Oct. 31, 2012) (emphasis added), *appeal pending*, No. 13-1092 (6th Cir.).  In any event, the

26

government estimated that as many as 69% of all plans that had grandfathered

status when the ACA was enacted will lose that status by the end of 2013.  75 Fed.

Reg. 34,538, 34,552 (June 17, 2010).  Additional plans can be expected to lose

their grandfathered status each year, thus bringing those plans within the scope of

the contraception regulations.

Second, there is no exemption from the contraception regulations for

employers with fewer than 50 full-time employees.  Instead, these employers are

exempt from the shared responsibility provision of the ACA, which requires

certain employers who fail to provide health insurance to pay an assessable fee.

*See* 26 U.S.C. § 4980H(a), (c)(2)(A).  Even employers with fewer than 50

employees who provide non-grandfathered health insurance plans must comply

with the contraception regulations.

Even were these provisions actually exemptions, it is not uncommon

for federal statutes promoting equality interests to exempt certain actors.  Even

Title VII—the landmark federal statute prohibiting employment discrimination in

the Civil Rights Act of 1964—exempts employers with fewer than 15 employees

from its non-discrimination provisions.  *See* 42 U.S.C. § 2000e(b).  Yet no court

has found or suggested that, as a result of this exemption, Title VII does not

forward the government's compelling interest in eliminating employment

discrimination.

27

Contrary to Plaintiffs' argument, the contraception regulations will have widespread effects. According to HHS, approximately 47 million American women were, at the time the mandate went into effect, enrolled in non-grandfathered health plans that were required to cover contraception and the other preventive services mandated by the new regulations. Simmons & Skopec, HHS, 47 MILLION WOMEN WILL HAVE GUARANTEED ACCESS TO WOMEN'S PREVENTIVE SERVICES WITH ZERO COST-SHARING UNDER THE AFFORDABLE CARE ACT (2012), *available at* http://aspe.hhs.gov/health/reports/2012/womensPreventiveServices ACA/ib.shtml (last visited June 12, 2013). The contraception regulations will protect all 47 million of those women by guaranteeing them access to contraception without cost-sharing. Moreover, the regulations will guarantee contraception to millions of additional women as health plans lose their grandfathered status over time.

## V.    THE CONTRACEPTION REGULATIONS ARE THE LEAST RESTRICTIVE MEANS OF FURTHERING THE GOVERNMENT'S COMPELLING INTERESTS

The contraception regulations are the least restrictive means of furthering the government's compelling interests in women's health and equality. By guaranteeing women access to contraception without cost sharing within the existing framework of employer-provided health insurance plans, the regulations present a seamless and efficient means of advancing the government's compelling

28

interests.  Moreover, the contraception regulations are highly effective at

guaranteeing contraception without cost sharing to millions of women.  Indeed, the

regulations will affect not only women who currently cannot access birth control,

but also women who are already enrolled in health plans that cover contraception,

by ensuring that contraception costs no longer force women to choose less-

effective methods of birth control, or to forego contraception altogether in favor of

other necessary medical care.

   Plaintiffs purport to identify four alternative means of furthering the

government's compelling interests: (1) a government-created insurance plan to

cover the contraceptives at issue; (2) incentives for pharmaceuticals companies to

provide contraception to pharmacies, doctors' offices and health clinics free of

charge; (3) government reimbursement; and (4) tax credits or deductions.  (App.

Br. 61.)  These proposals each seek to shift the cost of coverage to the government,

but RFRA does not require the government to subsidize private religious practice.

In any event, each fails as a feasible and equally-effective alternative and so does

not present a less restrictive means than the contraception regulations.  *See*

*Kaemmerling* v. *Lappin*, 553 F.3d 669, 684 (D.C. Cir. 2008) (rejecting plaintiff's

proposed alternative means because "[a]ny alternative method . . .would be less

effective"); *U.S.* v. *Wilgus*, 638 F.3d 1274, 1289 (10th Cir. 2011) ("It is incumbent

upon us, therefore, to limit ourselves to consideration of the alternative regulation

schemes proffered by the parties, and supported in the record."); *Fegans* v. *Norris*,

537 F.3d 897, 904-06 (8th Cir. 2008).

      Plaintiffs' proposals would require the government to create an

entirely new mechanism for funding and distributing a single element of basic

health care, while also placing a great burden on women to separately access a key

component of preventive care, apart from their existing health insurance plans.  In

passing the ACA, Congress chose to build on the existing employer-provided

insurance system.  *See* H.R. Rep. No. 111-443, pt. 2, at 984-86 (2010) (explaining

why Congress chose to reform and build on the employer-based system).  The

costs and administrative burdens of creating a new scheme, and the difficulties of

uprooting millions of women who already access contraception through their

existing insurance plans, make Plaintiffs' proposals both infeasible and ineffective.

*See Kaemmerling*, 553 F.3d at 684; *S. Ridge Baptist Church*, 911 F.2d at 1208

(rejecting plaintiff's argument that proposed accommodation was a "feasible and

thus constitutionally required 'least restrictive means'"); *New Life Baptist Church*

*Acad.* v. *Town of E. Longmeadow*, 885 F.2d 940, 947 (1st Cir. 1989)

("[A]dministrative considerations play an important role in determining whether or

not the state can follow its preferred means.").

      Plaintiffs' suggestion that alleviating direct costs could somehow

compensate for denying insurance coverage is similarly misguided.  As discussed

above, women earn less and face higher health care costs than men.  *See supra*

Section III.B.1.  The promise of a future reimbursement or a credit in next year's

tax return does little to help a woman who cannot afford contraceptives today.

Meanwhile, the consequences of lack of access to contraceptives are immediate

and pressing.  *See supra* Section II.B.  For these reasons, these proposals "fail[] to

advance the government's compelling interests."  *Wilgus*, 638 F.3d at 1295; *see*

*also St. John's United Church of Christ* v. *City of Chicago*, 502 F.3d 616, 636 (7th

Cir. 2007) (means are least restrictive where accommodation of religious concerns

is not "possible without compromising [the government's] compelling interests").

      Plaintiffs have not offered a feasible and equally-effective alternative

to the contraception regulations, and so the regulations are the least restrictive

means of furthering the government's compelling interests, and withstand scrutiny.

## CONCLUSION

For all of the foregoing reasons, this Court should affirm the District

Court's ruling.

Dated:  June 14, 2013

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By:  /s/ Charles E. Davidow
           Charles E. Davidow
           Ilana D. Waxman
           Andrée J. Goldsmith
           Kimberley K. Allen
2001 K Street, NW
Washington, D.C. 20006
(202) 223-7300

Marcia D. Greenberger
Judith G. Waxman
Emily J. Martin
Gretchen Borchelt
Leila Abolfazli
NATIONAL WOMEN'S LAW CENTER
11 Dupont Circle, NW #800
Washington, D.C. 20036
(202) 588-5180

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 29(d) because it contains 6,671 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Dated:  June 14, 2013

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:  /s/ Charles E. Davidow
   Charles E. Davidow
   Ilana D. Waxman
   Andrée J. Goldsmith
   Kimberley K. Allen
2001 K Street, NW
Washington, D.C. 20006
(202) 223-7300

Marcia D. Greenberger
Judith G. Waxman
Emily J. Martin
Gretchen Borchelt
Leila Abolfazli
NATIONAL WOMEN'S LAW CENTER
11 Dupont Circle, NW #800
Washington, D.C. 20036
(202) 588-5180

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of June, 2013, I electronically

filed the foregoing *amicus curiae* brief with the Clerk of the Court for the United

States Court of Appeals for the District of Columbia Circuit by using the CM/ECF

system.  I certify that all participants in the case are registered CM/ECF users and

that service will be accomplished by the CM/ECF system.

Dated:  June 14, 2013

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By:  /s/ Charles E. Davidow
       Charles E. Davidow
       Ilana D. Waxman
       Andrée J. Goldsmith
       Kimberley K. Allen
2001 K Street, NW
Washington, D.C. 20006
(202) 223-7300

Marcia D. Greenberger
Judith G. Waxman
Emily J. Martin
Gretchen Borchelt
Leila Abolfazli
NATIONAL WOMEN'S LAW CENTER
11 Dupont Circle, NW #800
Washington, D.C. 20036
(202) 588-5180

*Counsel for Amici Curiae*