[ORAL ARGUMENT NOT YET SCHEDULED]
No. 13-5069

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

FRANCIS A. GILARDI, et al.,

*Plaintiffs-Appellants*,

v.

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES, et al.,

*Defendants-Appellees*.

———————————————

On Appeal from the U.S. District Court
for the District of Columbia
(No. 1:13-CV-00104-EGS) (Hon. Emmet G. Sullivan)

———————————————

## BRIEF OF THE CENTER FOR REPRODUCTIVE RIGHTS, AMERICAN PUBLIC HEALTH ASSOCIATION, GUTTMACHER INSTITUTE, NATIONAL FAMILY PLANNING & REPRODUCTIVE HEALTH ASSOCIATION, NATIONAL LATINA INSTITUTE FOR REPRODUCTIVE HEALTH, NATIONAL WOMEN'S HEALTH NETWORK, PROFESSOR R. ALTA CHARO, AND REPRODUCTIVE HEALTH TECHNOLOGIES PROJECT AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

———————————————

JULIANNA S. GONEN
CENTER FOR REPRODUCTIVE RIGHTS
1634 Eye Street, NW
Suite 550
Washington, DC 20006
(202) 628-0286
jgonen@reprorights.org

LISA S. BLATT
  *Counsel of Record*
ROBERT J. KATERBERG
ANDREW S. MACURDY
ARNOLD & PORTER LLP
555 12th Street, NW
Washington, DC 20004
(202) 942-5000
lisa.blatt@aporter.com

*Counsel for Amici Curiae*

June 14, 2013

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28, *amici* make the following declarations:

A)      Except for the following and any *amici* filing on this same date or subsequently, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Brief for Defendants-Appellees:

      American College of Obstetricians and Gynecologists

      American Medical Women's Association

      American Public Health Association

      American Society for Emergency Contraception

      American Society for Reproductive Medicine

      Association of Reproductive Health Professionals

      Center for Reproductive Rights

      Don Downing

      Guttmacher Institute

      International Association of Forensic Nurses

      James Trussell

      Kathleen Besinque

      National Association of Nurse Practitioners in Women's Health

      National Family Planning & Reproductive Health Association

i

National Latina Institute for Reproductive Health

National Women's Health Network

Physicians for Reproductive Health

Professor R. Alta Charo

Reproductive Health Technologies Project

Society for Adolescent Health and Medicine

Society of Family Planning

Susan F. Wood

B)    References to the rulings at issue appear in the Brief for the

Defendants-Appellees.

C)    Related cases appear in the Brief for the Defendants-Appellees.

D)    All applicable statutes, etc., are contained in the Brief for the

Plaintiffs-Appellants.

Dated: June 14, 2013                      /s/ Lisa S. Blatt
                                         Lisa S. Blatt

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1:

The Center for Reproductive Rights, American Public Health Association, Guttmacher Institute, National Family Planning & Reproductive Health Association, National Latina Institute for Reproductive Health, National Women's Health Network, and Reproductive Health Technologies Project are nonprofit organizations that, as relevant to this litigation, seek to advance reproductive health and rights in the United States.  Each organization has no parent corporation, and no publicly held corporation owns 10% or more of any organization's stock.

Dated:  June 14, 2013                                  /s/ Lisa S. Blatt
                                                       Lisa S. Blatt

## CERTIFICATE IN SUPPORT OF SEPARATE BRIEF

Pursuant to Circuit Rule 29(d), counsel for *amici* the Center for Reproductive Rights et al. certify that, after conferring with a number of other organizations filing *amicus* briefs in this case, *amici* believe this separate brief is necessary and appropriate to convey the unique expertise and interest of the Center for Reproductive Rights et al. in the status of reproductive freedom as a fundamental human right. *Amici* the Center for Reproductive Rights et al. have substantial experience not only with the intersection of U.S. constitutional law and reproductive rights, but also with international human rights law as implicated by this case. Counsel for *amici* is not aware of any party or other *amicus* before the Court that can address this specific expertise and interest of *amici*. Moreover, in service of efficiency, this brief consolidates the arguments of eight separate *amici*.

Dated:  June 14, 2013                              /s/ Lisa S. Blatt
                                                    Lisa S. Blatt

# TABLE OF CONTENTS

IDENTITY AND INTERESTS OF AMICI CURIAE ............................................ 1

SUMMARY OF THE ARGUMENT ........................................................ 8

ARGUMENT ....................................................................... 9

I.     THE CONTRACEPTION REGULATION DOES NOT
       SUBSTANTIALLY BURDEN APPELLANTS' EXERCISE OF
       RELIGION ................................................................ 9

       A.    The Independent Choices of Others to Pursue and to Provide
             Contraceptive Care Render Any Burden Too Attenuated to
             Be Substantial ................................................ 10

       B.    Shifting the Source of Payment for Contraceptive Care from
             One Form of Employee Compensation to Another Does Not
             Amount to a Substantial Burden .............................. 14

       C.    The Regulation Does Not Substantially Burden Appellants'
             Religious Exercise Because It Does Not Compel
             Participation in Conduct that Violates Appellants' Religious
             Beliefs ...................................................... 15

II.    THE GOVERNMENT HAS COMPELLING INTERESTS IN
       IMPROVING ACCESS TO CONTRACEPTIVES .................................. 17

       A.    The Contraception Regulation Promotes Public Health by
             Helping to Prevent Unintended Pregnancies .................... 19

       B.    The Substantial Health Benefits of Contraceptive Use Vastly
             Outweigh Any Potential Risks to the Health and Well-Being
             of Women .................................................... 24

       C.    International Human Rights Law Reinforces the
             Government's Compelling Interest in Providing Affordable
             Access to Contraceptives .................................... 28

CONCLUSION ..................................................................... 32

# TABLE OF AUTHORITIES*

<u>CASES</u>                                                                                    <u>PAGE(S)</u>

*Autocam Corp. v. Sebelius*,
  No. 1:12-CV-1096, 2012 WL 6845677 (W.D. Mich. Dec. 24, 2012),
  *appeal docketed*, No. 12-2673 (6th Cir.) ........................................................9, 15

*Citizens for Responsibility and Ethics in Washington v. Office of Admin.*,
  566 F.3d 219 (D.C. Cir. 2009)...........................................................................18

*Civil Liberties for Urban Believers v. City of Chicago*,
  342 F.3d 752 (7th Cir. 2003) .............................................................................11

*Conestoga Wood Specialities Corp. v. Sebelius*,
  No. 12-6744, 2013 WL 140110 (E.D. PA. Jan. 11, 2013),
  *appeal docketed*, No. 13-1144 (3d Cir.).........................................................9, 12

*Emp't Div. v. Smith*,
  494 U.S. 872 (1990)...........................................................................................11

*Goehring v. Brophy*,
  94 F.3d 1294 (9th Cir. 1996) .............................................................................15

*Grote Industries, LLC v. Sebelius*,
  No. 4:12-cv-00134-SEB-DML, 2012 WL 6725905 (S.D. Ind. Dec. 27,
  2012), *appeal docketed*, No. 13-1077 (7th Cir.).................................................13

*Henderson v. Kennedy*,
  253 F.3d 12 (D.C. Cir. 2001)..............................................................................11

*Hernandez v. Comm'r of Internal Revenue*,
  490 U.S. 680 (1989)......................................................................................10, 18

*Hobby Lobby Stores, Inc. v. Sebelius*,
  870 F. Supp. 2d 1278 (W.D. Okla. 2012),
  *appeal docketed*, No. 12-6294 (10th Cir.) ....................................................10, 11

*Hodel v. Va. Surface Mining & Reclam. Ass'n*,
  452 U.S. 264 (1981)...........................................................................................19

---

\*   Authorities upon which we chiefly rely are marked with asterisks.

*Jimmy Swaggart Ministries v. Bd. of Equalization*,
    493 U.S. 378 (1990)......................................................................................10

*\*Korte v. U.S. Dep't of Health & Human Servs.*,
    No. 3:12-CV-01072-MJR, 2012 WL 6553996 (S.D. Ill. Dec. 14, 2012),
    *appeal docketed*, No. 12-3841 (7th Cir.)......................................10, 17

*Medellin v. Texas*,
    552 U.S. 491 (2008)......................................................................................30

*\*O'Brien v. U.S. Dep't of Health & Human Serv.*,
    No. 4:12-CV-476 (CEJ), 2012 WL 4481208 (E.D. Mo. Sept. 28, 2012),
    *appeal docketed*, No. 12-3357 (8th Cir.)......................................10, 13

*\*Sherbert v. Verner*,
    374 U.S. 398 (1963)................................................................................16, 17

*\*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*,
    450 U.S. 707 (1981)......................................................................................17

*\*United States v. Lee*,
    455 U.S. 252 (1982)................................................................................17, 18

*\*Wisconsin v. Yoder*,
    406 U.S. 205 (1972)................................................................................16, 17

*\*Zelman v. Simmons-Harris*,
    536 U.S. 639 (2002)................................................................................11, 12

## STATUTES AND REGULATIONS

*Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat.
    119 (2010)........................................................................................................8

42 U.S.C. § 254b(b)(1)(A)(i)(III)(gg)....................................................................22

42 U.S.C. § 1396d(a)(4)(C)....................................................................................22

*42 U.S.C. §§ 2000bb-2000bb-4 ...........................................................................8

*42 U.S.C. § 2000bb-1(a)................................................................................9, 11

*42 U.S.C. § 2000bb-1(b).......................................................................................9

*42 U.S.C. § 2000bb-1(b)(1)-(2) ...........................................................18

Cal. Penal Code § 13823.11(e) ...............................................................22

Conn. Gen. Stat. § 19a-112e ..................................................................22

D.C. Code § 7-2123 .................................................................................22

Mass. Gen. Laws ch. 111, § 70E(o) .......................................................22

Minn. Stat. § 145.4712 ............................................................................22

N.J. Stat. Ann. § 26:2H-12.6c .................................................................22

N.M. Stat. Ann. § 24-10D-3 ...................................................................22

N.Y. Pub. Health Law § 2805-p ..............................................................22

Or. Rev. Stat. § 435.254(1) .....................................................................22

28 Pa. Code § 117.53 ...............................................................................22

S.C. Code Ann. § 16-3-1350(B) ..............................................................22

Utah Code Ann. § 26-21b-201 .................................................................22

Wash. Rev. Code § 70.41.350...................................................................22

Wis. Stat. § 50.375 ..................................................................................22

77 Fed. Reg. 8725 (Feb. 15, 2012) ..........................................................24

**INTERNATIONAL AUTHORITIES**

*Concluding Observations of the Committee on the Elimination of
      Discrimination Against Women: Slovakia*, U.N. Doc.
      CEDAW/C/SVK/CO/4 (July 17, 2008)..............................................29

Convention on the Elimination of All Forms of Discrimination Against
      Women art. 12, Dec. 18, 1979, G.A. Res. 34/180, U.N. GAOR, 34th
      Sess., Supp. No. 46, U.N. Doc. A/34/46 (entered into force Sept. 3, 1981) ......29

International Covenant on Civil and Political Rights, art. 3, Dec. 16, 1966,
      999 U.N.T.S. 171 (ratified June 8, 1992) ...........................................28

IARC 2007 Monograph 91, Combined estrogen-progestogen contraceptives and combined estrogen-progestogen menopausal therapy, *available at* http://monographs.iarc.fr/ENG/Monographs/vol91/mono91.pdf......................27

U.N. Comm. on Econ., Social & Cultural Rights, *General Comment No. 14: The Right to the Highest Attainable Standard of Health*, U.N. Doc. E/C.12/2000/4 (Aug. 11, 2000) ...................................................................30, 31

UNDP/UNFPA/WHO/World Bank Special Programme of Research, Dev. & Research Training in Human Reprod. (HRP), *Carcinogenicity of Combined Hormonal Contraceptives and Combined Menopausal Treatment* (2005), *available at* http://www.who.int/reproductivehealth/publications/ageing/cocs_hrt_stat ement.pdf ...........................................................................................................27

U.N. Human Rights Comm., *Concluding Observations: Poland*, U.N. Doc. CCPR/CO/82/POL (Dec. 2, 2004)..................................................................28

U.N. Human Rights Comm., *Concluding Observations: Poland*, U.N. Doc. CCPR/C/POL/CO/6 (Nov. 15, 2010) ................................................................29

**OTHER AUTHORITIES**

Adam Sonfield, *The Case for Insurance Coverage of Contraceptive Services and Supplies Without Cost-Sharing,* Guttmacher Pol'y Rev., Winter 2011, *available at* http://www.guttmacher.org/pubs/gpr/14/1/gpr140107.pdf. .........................20, 21

Am. Acad. of Fam. Physicians, *Contraceptive Advice*, http://www.aafp.org/online/en/home/policy/policies/c/contraceptiveadvic e.html ..................................................................................................................23

Am. Acad. of Pediatrics, *Contraception and Adolescents*, 120 Pediatrics 1135 (2007), *available at* http://pediatrics.aappublications.org/content/120/5/1135.full.pdf ....................23

Am. Coll. of Obstetricians & Gynecologists, *ACOG Practice Bulletin No. 73: Use of Hormonal Contraception in Women with Coexisting Medical Conditions*, 107 Obstetrics & Gynecology 1453 (2006) ....................................26

ix

Am. Coll. of Obstetricians & Gynecologists, *ACOG Practice Bulletin No. 110: Noncontraceptive Uses of Hormonal Contraceptives*, 115 Obstetrics & Gynecology 206 (2010) ...............................................................25

Am. Coll. Of Obstetricians & Gynecologists, *Over-the-Counter Access to Oral Contraceptives*, Committee Opinion No. 544 (Dec. 2012) http://www.acog.org/~/media/Committee%20Opinions/Committee%20o n%20Gynecologic%20Practice/co544.pdf?dmc=1&ts=20121210T17265 82223 ...............................................................................................23, 26

Am. Cong. of Obstetricians and Gynecologists, Press Release, *ACOG Applauds HHS for Requiring Insurance Coverage of Key Womens Preventive Health Services*, (Aug. 1, 2011), *available at* http://www.acog.org/About_ACOG/News_Room/News_Releases/2011/ ACOG_Applauds_HHS_for_Requiring_Insurance_Coverage_of_Key_W omens_Preventive_Health_Services .................................................20

Am. Med. Ass'n, *AMA-MSS Digest of Policy Actions* (Dec. 2012), *available at* http://www.ama-assn.org/resources/doc/mss/digest_of_actions.pdf .............23

Am. Pub. Health Ass'n, *About Population, Family Planning and Reproductive Health*, *available at* http://www.apha.org/membergroups/sections/aphasections/population/ab out.......................................................................................................23

Ass'n of Women's Health, Obstetric and Neonatal Nurses, *Emergency Contraception*, 41 J. of Obstetric, Gynecologic, & Neonatal Nursing 711 (2012), *available at* http://onlinelibrary.wiley.com/doi/10.1111/j.1552-6909.2012.01407.x/pdf .................................................................23

Bea C. Tanis et al., *Oral Contraceptives and the Risk of Myocardial Infarction*, 345 New Eng. J. of Med. 1787 (2001) ............................27

Buck Consultants, *Total Remuneration*, *available at* https://www.buckconsultants.com/Services/Compensation/Totalremunera tion.aspx ...........................................................................................14

Caroline Mala Corbin, *The Contraception Mandate*, 107 Nw. U. L. Rev. Colloquy 151 (2012)..........................................................................12

CDC, *Achievements in Public Health, 1900-1999: Family Planning,*

48 Morbidity & Mortality Wkly. Rep. 1073 (1999), *available at* http://www.cdc.gov/mmwr/preview/mmwrhtml/mm4847a1.htm......................19

CDC*, Recommendations to Improve Preconception Health and Health Care—United States: A Report of the CDC/ATSDR Preconception Care Work Group and the Select Panel on Preconception Care*, Morbidity & Mortality Wkly. Rep., Apr. 21, 2006, *available at* http://www.cdc.gov/mmwr/PDF/rr/rr5506.pdf....................................................23

CDC, *Reproductive Health: Pregnancy Complications, available at* http://www.cdc.gov/reproductivehealth/maternalinfanthealth/PregCompli cations.htm#2 .........................................................................................................20

CDC, *Use of Contraception in the United States 1982-2008,* Vital Health & Stat., Aug. 2010, *available at* http://www.cdc.gov/nchs/data/series/sr_23/sr23_029.pdf..................................21

Comm. On Preventive Servs. for Women, Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* (2011) .............................................25, 26

Ctr. for Am. Progress, Press Release, *The High Costs of Birth Control* (Feb. 15, 2012), *available at* http://www.americanprogress.org/wp-content/uploads/issues/2012/02/pdf/BC_costs.pdf.............................................21

Ctrs. for Medicare & Medicaid Services, *State Medicaid Manual* ch. 4, *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021927.html........................................................................................22

Debbie Postlethwaite et al., *A Comparison of Contraceptive Procurement Pre- and Post-Benefit Change,* 76 Contraception 360 (2007) .....................21, 24

FDA, *Birth Control Guide* (2012), *available at* http://www.fda.gov/downloads/ForConsumers/ByAudience/ForWomen/F reePublications/UCM282014.pdf .......................................................................24

Guttmacher Inst., *Contraception Use in the United States* (2012), http://www.guttmacher.org/pubs/fb_contr_use.pdf............................................21

Guttmacher Inst., *Insurance Coverage of Contraceptives* (2012), http://www.guttmacher.org/statecenter/spibs/spib_ICC.pdf. .............................22

Health Div., Nat'l Governors Ass'n Ctr. for Best Practices, *Healthy Babies: Efforts to Improve Birth Outcomes and Reduce High Risk Births* (2004), *available at* http://www.nga.org/files/live/sites/NGA/files/pdf/0406BIRTHS.pdf ...............20

Jessica D. Gipson et al., *The Effects of Unintended Pregnancy on Infant, Child and Parental Health: A Review of the Literature*, 39 Stud. in Fam. Plan. 18 (2008)..................................................................................................20

John Santelli et al., *The Measurement and Meaning of Unintended Pregnancy,* 35 Persp. on Sexual & Reprod. Health 94 (2003), *available at* http://www.guttmacher.org/pubs/journals/3509403.pdf ..........19, 21

Justin Falk, *Comparing Benefits and Total Compensation in the Federal Government and the Private Sector*, Cong. Budget Office, Working Paper 2012-4 (2012), *available at* http://www.cbo.gov/sites/default/files/cbofiles/attachments/2012-04FedBenefitsWP_0.pdf ...................................................................................14

March of Dimes, *Access to Health Coverage*, *available at* http://www.marchofdimes.com/advocacy/healthcoverage_medicaid.html ......23

Monica Dragoman et al., *Contraceptive Options for Women with Preexisting Medical Conditions*, 19 J. of Women's Health 575 (2010)................................26

Office of the Surgeon General, U.S. Dep't of Health & Human Servs., *National Prevention Strategy* (2011), *available at* http://www.healthcare.gov/prevention/nphpphc/strategy/report.pdf .................22

Population Reference Bureau, *Contraceptive Safety: Rumors and Realities* (1998), *available at* http://www.prb.org/pdf/ContraceptiveSafety_Eng.pdf .......................................25

Rachel Benson Gold, *Wise Investment: Reducing the Steep Cost to Medicaid of Unintended Pregnancy in the United States,* Guttmacher Pol'y Rev., Summer 2011, *available at* http://www.guttmacher.org/pubs/gpr/14/3/gpr140306.pdf ................................20

Ronald Burkman et al., *Safety Concerns and Health Benefits Associated with Oral Contraception*, Am. J. of Obstetrics & Gynecology, Apr. 2004 .........25, 26

Soc'ty for Adolescent Health & Medicine, *Reproductive Health Care for Adolescents*, 12 J. of Adolescent Health 649 (1991)..........................................23

U.S. Dep't of Health & Human Services, *Healthy People 2020* (2010), http://www.healthypeople.gov/2020/TopicsObjectives2020/pdfs/HP2020 _brochure_with_LHI_508.pdf ..........................................................................22

# GLOSSARY

**ACOG:**      American College of Obstetricians & Gynecologists

**APHA:**      American Public Health Association

**BCPI:**      Breast Cancer Prevention Institute

**CDC:**      Centers for Disease Control and Prevention

**Center:**      Center for Reproductive Rights

**FDA:**      U.S. Food and Drug Administration

**HHS:**      U.S. Department of Health & Human Services

**IARC:**      International Agency for Research on Cancer

**IOM:**      Institute of Medicine

**LANs:**      Latina Advocacy Networks

**NFPRHA:**  National Family Planning & Reproductive Health Association

**NLIRH:**      National Latina Institute for Reproductive Health

**NWHN:**      National Women's Health Network

**RFRA:**      Religious Freedom Restoration Act

**RHTP:**      Reproductive Health Technologies Project

**RWV:**      Raising Women's Voices for the Health Care We Need

**WHO:**      World Health Organization

## IDENTITY AND INTERESTS OF AMICI CURIAE*

The **Center for Reproductive Rights** (the "Center") is a nonprofit organization that uses the law to advance reproductive freedom as a fundamental human right that all governments are legally obligated to respect, protect, and fulfill. The Center has worked in over 50 countries across the globe on litigation, fact-finding reports, and law reform efforts to secure legal protections for reproductive rights. These efforts include securing access to contraception as a fundamental human right in constitutional and international human rights law.

The Center has undertaken a variety of initiatives, including legal action, to ensure that women have timely access to a comprehensive range of contraceptive options in the United States. For example, the Center filed a citizen petition with the U.S. Food and Drug Administration ("FDA") on behalf of over 70 medical and public health organizations seeking to make emergency contraception available over-the-counter, and it is currently serving as lead counsel in related litigation on that issue. In 2011, the Center submitted extensive comments to the Department of Health and Human Services ("HHS") regarding the importance of including the

---

\* Pursuant to Federal Rule of Appellate Procedure 29, *amici* certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than the *amici*, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief. *Amici* submit this brief with the consent of all parties.

full range of FDA-approved contraceptive methods in the Women's Preventive Services provision in the Affordable Care Act, and in opposition to the adoption of religious exemptions that would undercut this important benefit. The Center also works to promote state and federal legislation aimed at increasing access to contraception, such as laws requiring that health insurance plans cover contraceptive drugs and devices and requiring pharmacies and other providers to make the full range of contraceptive options available.

The Center also conducts advocacy on numerous issues concerning contraceptive access around the globe, including complete or partial bans on modern contraception (including emergency contraception), and state failure to subsidize contraception. Advocacy has included work with human rights treaty bodies as well as litigation at the national level on these issues. The Center's fact-finding reports on the topic have exposed human rights violations related to the impact Manila City's effective ban on modern contraception has on the lives of women and their families (*Imposing Misery*) and how the Slovak Republic's failure to subsidize contraceptives is a violation of women's human rights (*Calculated Injustice*).

Using its expertise in U.S. constitutional law and international human rights law, the Center seeks to highlight why the regulation enacted by HHS at issue in

this case strikes an appropriate balance between respect for religious practices and protection of women's health and rights.

The **American Public Health Association** ("APHA") is the oldest, largest, and most diverse organization of public health professionals in the world and has been working to improve public health since 1872.  APHA strives to assure community-based health promotion and disease prevention activities and preventive health services are universally accessible in the United States.  It has been the longstanding position of the Association that access to the full range of reproductive health services, including contraceptive care, is a fundamental right and integral to the health and well-being of individual women and to public health.

The **Guttmacher Institute** (the "Institute") is a nonprofit, nonpartisan organization founded in 1968 that advances sexual and reproductive health and rights through an interrelated program of research, policy analysis, and public education designed to generate new ideas, encourage enlightened public debate, and promote sound policy and program development.  Methodological rigor and accuracy are the cornerstones of the Institute's research program and the basis of its public policy and communications work.  The Institute is a trusted source of accurate, reliable, and policy-relevant information on a range of topics relating to sexual and reproductive health and rights.  This includes the fundamental principle that contraception is basic preventive health care for women.  Contraception, when

3

used consistently, is highly effective at preventing unintended pregnancy. Pregnancies that are properly timed and spaced lead to healthier outcomes for women and their families. Insurance coverage of contraception, especially without additional out-of-pocket costs, is key to removing a major barrier to consistent use.

The **National Family Planning & Reproductive Health Association** ("NFPRHA") represents the broad spectrum of family planning administrators and clinicians serving the nation's low-income and uninsured. NFPRHA's more than 400 organizational members operate or fund a network of more than 3,700 health centers and service sites in 49 states and the District of Columbia, providing family planning and other preventive health services to millions of low-income and uninsured individuals each year.

NFPRHA believes that all people should have timely access to affordable, confidential, high-quality sexual and reproductive health services and supplies, including a broad range of contraceptive methods. Many women, men, and teens are in need of contraceptive services but cannot afford them and therefore unfairly go without necessary care. NFPRHA supports commercial insurance coverage of contraception at no additional cost-sharing to plan beneficiaries and encourages the federal government to ensure the full implementation of the contraceptive coverage requirement.

The **National Latina Institute for Reproductive Health** ("NLIRH") is a reproductive justice and human rights organization based in New York City, with a policy office in Washington, D.C. and grassroots Latina Advocacy Networks ("LANs") in various states.  NLIRH is the only national organization working on behalf of the reproductive health and justice of the 24 million Latinas, their families, and communities in the United States through public education, community mobilization, and policy advocacy.  Latinas are least likely to have access to contraceptives due to the high cost of contraceptives and lack of access to health insurance and suffer from other severe health disparities.  The issues addressed in this case will profoundly affect Latinas' health and access to care and therefore are central concerns to the organization.

The **National Women's Health Network** ("NWHN") improves the health of all women by influencing health policy and supporting informed consumer decision-making in health care.  The NWHN aspires to a health care system that is guided by social justice and reflects the needs of diverse women.  The NWHN was founded in 1975 to give women a greater voice within the health care system.  It is a membership-based organization supported by individuals and organizations nationwide.  It does not accept financial support from health insurance companies, pharmaceutical companies, tobacco companies, or medical device manufacturers.

To advance the goal of establishing universal access to health care that meets the needs of diverse women, the NWHN works through the Raising Women's Voices for the Health Care We Need ("RWV") initiative to make sure women's voices are heard in the health reform debate and women's concerns are addressed by policymakers developing national and state health reform plans. RWV has a special focus on engaging women of color, low-income women, immigrant women, young women, women with disabilities, and members of the lesbian, gay, bisexual, and transgender community.

RWV is particularly concerned with the provision of the health care law requiring all new health insurance plans to cover without cost-sharing a robust list of preventive health services for women, including comprehensive contraceptive care as well as well-woman preventive care visits, cancer screening, screening and counseling about intimate partner violence and abuse, screening pregnant women for diabetes, breastfeeding support from trained counselors, and screening and counseling for sexually transmitted infections. The implementation of this provision means more women are finally getting affordable access to the services that are essential to our health.

**R. Alta Charo** is the Warren P. Knowles Professor of Law & Bioethics at the University of Wisconsin, with appointments in both the Law School and the School of Medicine & Public Health. Professor Charo has worked on legal and

ethical issues related to human reproduction in a variety of settings, including the congressional Office of Technology Assessment, the U.S. Agency for International Development, the NIH Human Embryo Research Panel, the presidential National Bioethics Advisory Commission, the National Academies' Board on Population Health, and the FDA.  She has also testified to Congress and to various state legislatures, as well as served as an expert witness in federal litigation, on a number of matters related to reproductive health.  She is the author of numerous articles and government reports related to human reproduction.

**Reproductive Health Technologies Project** ("RHTP") is a national non-profit advocacy organization working to drive innovation in and promote access to reproductive health technologies so every woman has more choices when it comes to promoting her health and planning her family.  Bringing together experts, using solid science and clinical data, and seeking consensus among diverse communities, RHTP ensures that new technologies including contraception are developed and introduced with appropriate safeguards, a well-informed consumer constituency, and broad-based public support.

## SUMMARY OF THE ARGUMENT

Women face chronically higher out-of-pocket health care costs than do men. A driving force behind this disparity is the cost of contraceptive care. In an effort to combat this disparity, the federal government has mandated through regulation under the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), that employers provide their employees with health insurance that covers certain approved contraceptive methods, without cost-sharing.

Appellants are Fresh Unlimited, Inc. and Freshway Logistics, Inc.—for-profit, secular corporations—and their owners. Appellants filed suit claiming that the contraception regulation violates their rights under the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb-2000bb-4, and the Free Exercise Clause of the First Amendment. Appellants moved for a preliminary injunction against application of the regulation to them. The district court denied Appellants' motion. App. 56.

*Amici* join the Government in seeking affirmance of the decision below. In particular, *amici* support the Government's position, and the district court's conclusion, that Appellants do not have a reasonable likelihood of success on the merits of their RFRA claim because the contraception regulation does not "substantially burden" their exercise of religion. Moreover, even if the regulation did substantially burden Appellants' exercise of religion, it still would not violate

RFRA: Compelling governmental interests justify requiring Appellants to provide their employees with health insurance that covers access to contraception without cost-sharing, and the regulation is the least restrictive means of furthering those compelling interests. *See* 42 U.S.C. § 2000bb-1(b). Indeed, these compelling interests are enshrined in international human rights law, which requires governments not only to ensure affordable access to contraceptives, but to protect that access from third-party interference. This Court should affirm the ruling below.

## ARGUMENT

### I. THE CONTRACEPTION REGULATION DOES NOT SUBSTANTIALLY BURDEN APPELLANTS' EXERCISE OF RELIGION

Appellants cannot obtain a preliminary injunction based on their RFRA claim unless they have a reasonable likelihood of establishing that the contraception regulation "substantially burdens [their] exercise of religion." 42 U.S.C. § 2000bb-1(a). Appellants failed to establish such a burden. Whatever alleged effect the contraception regulation might have on Appellants' exercise of religion, that effect would be too attenuated to amount to a substantial burden. *See Conestoga Wood Specialties Corp. v. Sebelius*, No. 12-6744, 2013 WL 140110, at *10-14 (E.D. Pa. Jan. 11, 2013), *appeal docketed*, No. 13-1144 (3d Cir.); *Autocam Corp. v. Sebelius*, No. 1:12-CV-1096, 2012 WL 6845677, at *6 (W.D. Mich. Dec. 24, 2012), *appeal docketed*, No. 12-2673 (6th Cir.); *Korte v. U.S. Dep't of Health*

& *Human Servs.*, No. 3:12-CV-01072-MJR, 2012 WL 6553996, at *10 (S.D. Ill.

Dec. 14, 2012), *appeal docketed*, No. 12-3841 (7th Cir.); *Hobby Lobby Stores, Inc.*

*v. Sebelius*, 870 F. Supp. 2d 1278, 1294-95 (W.D. Okla. 2012), *appeal docketed*,

No. 12-6294 (10th Cir.); *O'Brien v. U.S. Dep't of Health & Human Servs.*, No.

4:12-CV-476 (CEJ), 2012 WL 4481208, at *5 (E.D. Mo. Sept. 28, 2012), *appeal*

*docketed*, No. 12-3357 (8th Cir.).    Although this Court, after first denying

Appellants' motion for an injunction pending appeal, App. 84, later ordered—on a

highly expedited basis—an injunction pending appeal, App. 86, *amici* respectfully

submit that fuller analysis will show that Appellants cannot establish a substantial

burden.

> **A.    The Independent Choices of Others to Pursue and to Provide Contraceptive Care Render Any Burden Too Attenuated to Be Substantial**

The Supreme Court has, on numerous occasions, held that various generally

applicable laws do not give rise to a substantial burden on the exercise of religion.

*See, e.g.*, *Jimmy Swaggart Ministries v. Bd. of Equalization*, 493 U.S. 378, 392

(1990) (sales tax on religious organization's sale of religious literature was not

substantial burden); *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699

(1989) (government's refusal to allow fixed payments to Church of Scientology for

auditing and training services to qualify as deductible charitable contributions did not violate free exercise).[1]

Only *substantial* burdens on the exercise of religion trigger RFRA— insubstantial or *de minimis* burdens do not. 42 U.S.C. § 2000bb-1(a). A law or regulation imposes a substantial burden when it "bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003). RFRA thus requires "some reasonably direct and personal connection between the religious exercise and the restraint in question." *Hobby Lobby*, 870 F. Supp. 2d at 1294.

"Directness" is lacking when the independent choices of others effectively sever the link between the conduct prescribed by law and any effect on the plaintiff's religious exercise. In *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002), for example, the Supreme Court rejected a claim that a parent's use of government vouchers for religious school tuition gave rise to an unconstitutional endorsement of religion by the government in violation of the Establishment Clause. Any endorsement was "reasonably attributable to the individual recipient, not to the government, whose role ends with the disbursement of benefits." *Id.* at 652. Thus,

---

[1] Courts look to pre-*Employment Division v. Smith*, 494 U.S. 872 (1990), cases for the "substantial burden" standard under RFRA. *See, e.g.*, *Henderson v. Kennedy*, 253 F.3d 12, 17 (D.C. Cir. 2001).

11

the intervening choice of the parent severed any unconstitutional nexus between government funding and the use of vouchers to pay for a religious education.

Although *Zelman* was an Establishment Clause case, a similar logic applies here, where intervening choices of third parties separate the employer from the conduct the employer wishes not to endorse. Here, as in *Zelman*, any effect on Appellants' exercise of religion would be attributable "only [to] the genuine and independent choices of [others]," chiefly Appellants' employees. *Id.* at 649; *see also* Caroline Mala Corbin, *The Contraception Mandate*, 107 Nw. U. L. Rev. Colloquy 151, 158-59 (2012). Indeed, the connection between Appellants' purchase of health insurance and the actual use of contraceptives is so attenuated— so lacking in "directness"—that any effect on Appellants' exercise of religion would be *de minimis* at best. *Conestoga*, 2013 WL 140110, at *14.

Appellants' role begins and ends with the allocation of funds for its self-insured health plan. *See* App. 24. That allocation, by itself, threatens no effect on Appellants' exercise of religion. This pool of money is used to reimburse all manner of health care services, and a number of intervening, independent choices occur between this allocation and any contraceptive act. An employee must decide to seek contraceptives. A licensed medical professional must typically exercise his or her medical judgment and prescribe contraceptives. A pharmacist must decide to dispense the contraceptives. And even after all of this, before there could be any

12

link between Appellants' provision of health benefits and an employee's use of contraception to which Appellants object on religious grounds, an employee ultimately would have to decide to take the contraceptives prescribed. *See Grote Industries, LLC v. Sebelius*, No. 4:12-cv-00134-SEB-DML, 2012 WL 6725905, at *7 (S.D. Ind. Dec. 27, 2012), *appeal docketed*, No. 13-1077 (7th Cir.) ("Regardless of whether the corporation is self-insured, it remains the fact that any burden on Plaintiffs' religious exercise rests on 'a series of independent decisions by health care providers and patients.'" (quoting *O'Brien,* 2012 WL 4481208, at *6)).[2]

The district court therefore properly rejected Appellants' claim of a substantial burden, given the "indirect" and attenuated relationship between Appellants' religious exercise and the contraception regulation. App. 79; *accord O'Brien*, 2012 WL 4481208, at *6 ("RFRA does not protect against the slight burden on religious exercise that arises when one's money circuitously flows to support the conduct of other free-exercise-wielding individuals who hold religious beliefs that differ from one's own.").

---

[2]   In any event, Appellants' health plan remains "a separate legal entity from the sponsoring employer," *Grote*, 2012 WL 6725905, at *7, ensuring another layer of attenuation.

**B.    Shifting the Source of Payment for Contraceptive Care from One Form of Employee Compensation to Another Does Not Amount to a Substantial Burden**

Employees receive compensation from their employers in a variety of forms—including wages, paid leave, and health insurance.[3] Employees' use of these benefits is not typically subject to the religious beliefs of their employers. For example, an employee might use earned vacation time to visit a religious site or to attend a convention of atheists. Or an employee might donate some of her wages to a religious charity or to fund stem cell research. Appellants could not complain under RFRA that their religious exercise had been substantially burdened simply because one of their employees decided to use wages or paid leave in a way that offended their religious views.

The same must hold true for an employee's use of health insurance. Under the current regime, when employer-provided health insurance does not cover contraceptive care, employees must pay for such care out of pocket—presumably with the wages paid by their employers. Accordingly, requiring employers to provide health insurance that covers contraceptive care without cost-sharing does

---

[3]    Justin Falk, *Comparing Benefits and Total Compensation in the Federal Government and the Private Sector* 2, 4, Cong. Budget Office, Working Paper 2012-4                (2012),                *available                at* http://www.cbo.gov/sites/default/files/cbofiles/attachments/2012-04FedBenefitsWP_0.pdf; *see also Total Remuneration*, Buck Consultants, https://www.buckconsultants.com/Services/Compensation/Totalremuneration.aspx (last visited Dec. 10, 2012).

14

no more than substitute one form of compensation for another as the payment source for contraceptives. This is a change in form, not substance. Of course, no one would argue that Appellants could seek, on religious grounds, to preclude their employees from spending their wages on contraception. This same rationale requires rejecting employers' demands to impose their religious views on employees through restrictions on the use of health insurance benefits. *See Autocam*, 2012 WL 6845677, at *6 ("Plaintiffs . . . want to draw a line between the moral culpability of paying directly for contraceptive services their employees choose, and of paying indirectly for the same services through wages or health savings accounts. . . . The incremental difference between providing the benefit directly, rather than indirectly, is unlikely to qualify as a substantial burden on . . . Plaintiffs.").

### C. The Regulation Does Not Substantially Burden Appellants' Religious Exercise Because It Does Not Compel Participation in Conduct that Violates Appellants' Religious Beliefs

Critically, whether employees use their wages or employer-provided health insurance to obtain contraceptive care, Appellants are not compelled to "accept, participate in, or advocate in any manner for the provision of [contraceptive care]," *Goehring v. Brophy*, 94 F.3d 1294, 1300 (9th Cir. 1996), let alone engage in the actual conduct to which they religiously object—the contraceptive act. *See, e.g.*, *id.* at 1299−1300 (holding that the plaintiff-students' anti-abortion religious beliefs

15

were not substantially burdened by their public university's use of mandatory student fees to subsidize premiums for health insurance that covered abortion services).

All that the regulation requires is that Appellants switch the group health insurance policy they already provide to one that covers contraceptive care without cost-sharing. This switch is a marginal one at best: Appellants' existing health insurance policy already would cover an employee's appointment with a physician for the purpose of obtaining a written prescription for contraception. There is no significant difference between indirectly subsidizing a medical visit that results in a prescription for treatment, as would be the case now under Appellants' current plan, and indirectly subsidizing the treatment itself under a plan that complies with the regulation.

Requiring employers to expand health insurance coverage in this way falls well short of the substantial burden that necessarily flows from "affirmatively compel[ling someone] . . . to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972). In *Yoder*, for example, the law impermissibly forced Amish parents to choose between sending their children to school in violation of their religious tenets and criminal prosecution. *Id.* at 208, 219. Similarly, the Sabbatarian in *Sherbert v. Verner*, 374 U.S. 398 (1963), was unlawfully compelled "to choose between

16

following the precepts of her religion and forfeiting [unemployment] benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." *Id.* at 404; *see also Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 717 (1981) ("[E]mployee was put to a choice between fidelity to religious belief or cessation of work."). And in *United States v. Lee*, 455 U.S. 252 (1982), the Amish employer was compelled to participate in a social security system that itself "violate[d] Amish religious beliefs." *Id.* at 257.

Thus, in these cases, the law imposed a penalty because the individual refused to engage personally in the activity that ran counter to the religious belief, *i.e.*, sending children to school (*Yoder*), working on Saturdays (*Sherbert*), manufacturing weapons (*Thomas*), and participating in a social security system (*Lee*). In contrast, Appellants here are in no way required to participate in the act of using contraceptives. *See Korte*, 2012 WL 6553996, at *11. Appellants simply must continue providing or purchasing group health insurance for employees, which now covers a slightly different set of health care services. Accordingly, Appellants remain free to exercise their religion as they see fit.

## II.    THE GOVERNMENT HAS COMPELLING INTERESTS IN IMPROVING ACCESS TO CONTRACEPTIVES

Not all laws that substantially burden religious exercise give rise to actionable RFRA claims. To the contrary, RFRA expressly permits the government to "substantially burden a person's exercise of religion" if the burden

"is [applied] in furtherance of a compelling government interest" and "is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000bb-1(b)(1)-(2). Although the district court did not reach the issue, this Court may affirm the judgment below on the alternate ground that Appellants had no reasonable likelihood of success on the merits of their RFRA claim because the regulation meets the compelling interest test. *See, e.g.*, *Citizens for Responsibility and Ethics in Washington v. Office of Admin.*, 566 F.3d 219, 225 (D.C. Cir. 2009).

In *Lee*, even though the Supreme Court found a substantial burden, it ultimately rejected an Amish employer's challenge to social security taxes because of the government's compelling interest in uniform administration of the social security system. 455 U.S. at 257-61. The Court emphasized that "[w]hen followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." *Id.* at 261. Given this voluntarily accepted limitation, the Court refused to grant an exemption to an employer that would "operate[] to impose the employer's religious faith on the employees." *Id.*; *see also Hernandez*, 490 U.S. at 699-700 ("[E]ven a substantial burden would be justified by the 'broad public interest in maintaining a sound tax system,' free of 'myriad exceptions flowing from a wide variety of religious beliefs.'" (quoting *Lee*, 455 U.S. at 260)).

As in these cases, even if the Court concluded that the contraception regulation here substantially burdened Appellants' exercise of religion, the government's compelling interest in promoting public health through improved access to contraception would nevertheless outweigh that burden.

### A.    The Contraception Regulation Promotes Public Health by Helping to Prevent Unintended Pregnancies

The Supreme Court has recognized that "[p]rotection of the health and safety of the public is a paramount governmental interest . . . ."  *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 300 (1981).  Family planning is an essential component of public health.  Indeed, the Centers for Disease Control and Prevention ("CDC") have identified family planning as one of the ten great public health achievements of the past century.[4]

In particular, unintended pregnancies can adversely affect the health of both mother and child.  Simply put, women who do not know they are pregnant cannot properly plan ahead.[5]  Women who are able to plan their pregnancies are more

---

[4]    CDC, *Achievements in Public Health, 1900-1999: Family Planning*, 48 Morbidity & Mortality Wkly. Rep. 1073 (1999), *available at* http://www.cdc.gov/mmwr/preview/mmwrhtml/mm4847a1.htm.

[5]    John Santelli et al., *The Measurement and Meaning of Unintended Pregnancy*, 35 Persp. on Sexual & Reprod. Health 94, 95 (2003), *available at* http://www.guttmacher.org/pubs/journals/3509403.pdf.

likely to seek prompt prenatal care,[6] and to take affirmative steps—such as discontinuing certain medications, taking folic acid, and changing their diets—to increase the likelihood of an uncomplicated pregnancy and a healthy child.[7]  By contrast, women with unplanned pregnancies are more likely to inadvertently endanger themselves and their babies either because of the short interval between a prior pregnancy,[8] or because of their preexisting medical conditions—such as hypertension, diabetes, or obesity—make adverse pregnancy outcomes more likely.[9]

---

[6]    Adam Sonfield, *The Case for Insurance Coverage of Contraceptive Services and Supplies Without Cost-Sharing*, Guttmacher Pol'y Rev., Winter 2011, at 7, 8, *available at* http://www.guttmacher.org/pubs/gpr/14/1/gpr140107.pdf.

[7]    Health Div., Nat'l Governors Ass'n Ctr. for Best Practices, *Healthy Babies: Efforts to Improve Birth Outcomes and Reduce High Risk Births* 1, 4 (2004), http://www.nga.org/files/live/sites/NGA/files/pdf/0406BIRTHS.pdf;    Jessica    D. Gipson et al., *The Effects of Unintended Pregnancy on Infant, Child and Parental Health: A Review of the Literature*, 39 Stud. in Fam. Plan. 18, 21-29 (2008); Press Release, Am. Cong. of Obstetricians and Gynecologists, ACOG Applauds HHS for Requiring Insurance Coverage of Key Womens Preventive Health Services, (Aug. 1,                                                                                    2011), http://www.acog.org/About_ACOG/News_Room/News_Releases/2011/ACOG_A pplauds_HHS_for_Requiring_Insurance_Coverage_of_Key_Womens_Preventive_ Health_Services (last visited Dec. 10, 2012) [hereinafter *ACOG Press Release*].

[8]    Rachel Benson Gold, *Wise Investment: Reducing the Steep Cost to Medicaid of Unintended Pregnancy in the United States*, Guttmacher Pol'y Rev., Summer 2011, at 6, *available at* http://www.guttmacher.org/pubs/gpr/14/3/gpr140306.pdf.

[9]    *Reproductive        Health:        Pregnancy        Complications*,        CDC, http://www.cdc.gov/reproductivehealth/maternalinfanthealth/PregComplications.ht m#2 (last visited Dec. 10, 2012); *see also ACOG Press Release*, *supra* note 7.

The number of unintended pregnancies in the United States is shockingly high, accounting for about half of all pregnancies.[10]  Forty-three million women, or roughly 70 percent of all women nationwide, are sexually active yet do not want to become pregnant.[11]  Although nearly all sexually active women will use contraceptives at some point, the costs associated with contraceptive care can be a barrier to regular and effective use of contraception.[12]  Indeed, women currently face chronically higher out-of-pocket health care costs than do men, largely due to the costs of contraceptive care.[13]  The contraception regulation directly addresses this significant barrier to effective contraceptive use by requiring coverage and removing cost-sharing at the time of use.

---

[10]    Santelli et al., *supra* note 5, at 94.

[11]    Guttmacher Inst., *Contraception Use in the United States* 1 (2012), http://www.guttmacher.org/pubs/fb_contr_use.pdf.

[12]    CDC, *Use of Contraception in the United States 1982-2008*, Vital Health & Stat.,        Aug.        2010,        at        15,        *available        at* http://www.cdc.gov/nchs/data/series/sr_23/sr23_029.pdf; Debbie Postlethwaite et al., *A Comparison of Contraceptive Procurement Pre- and Post-Benefit Change*, 76 Contraception 360, 363-64 (2007).

[13]    Press Release, Ctr. for Am. Progress, The High Costs of Birth Control (Feb. 15,        2012),        http://www.americanprogress.org/wp-content/uploads/issues/2012/02/pdf/BC_costs.pdf.; *see generally* Sonfield, *supra* note 6, at 9-10.

The government has long strived to ensure that all pregnancies are intended.[14]  Current federal health and insurance programs reflect this goal by including contraceptive care among covered preventive services.[15]  Twenty-eight states require insurance policies that cover prescription drugs to cover FDA-approved contraceptive services, and only two of these states allow an exemption broad enough to encompass secular employers such as Appellants here.[16]  In addition, at least thirteen states and the District of Columbia require hospital emergency rooms to dispense emergency contraceptives to rape victims.[17]  Finally,

---

[14]  *See, e.g.*, U.S. Dep't of Health & Human Services, *Healthy People 2020*, 5-6 (2010), http://www.healthypeople.gov/2020/TopicsObjectives2020/pdfs/HP2020_brochure _with_LHI_508.pdf; Office of the Surgeon General, U.S. Dep't of Health & Human Servs., *National Prevention Strategy* 44 (2011), *available at* http://www.healthcare.gov/prevention/nphpphc/strategy/report.pdf.

[15]  *See, e.g.*, 42 U.S.C. § 254b(b)(1)(A)(i)(III)(gg) (requiring federally funded health centers to cover family planning care); Ctrs. for Medicare & Medicaid Services, *State Medicaid Manual* ch. 4, § 4270, *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021927.html (interpreting required Medicaid coverage for "family planning services" under 42 U.S.C. § 1396d(a)(4)(C) to include "services which either prevent or delay pregnancy").

[16]  Guttmacher Inst., *Insurance Coverage of Contraceptives* 2-3 (2012), http://www.guttmacher.org/statecenter/spibs/spib_ICC.pdf.

[17]  *See* Cal. Penal Code § 13823.11(e); Conn. Gen. Stat. § 19a-112e; D.C. Code § 7-2123; Mass. Gen. Laws ch. 111, § 70E(o); Minn. Stat. § 145.4712; N.J. Stat. Ann. § 26:2H-12.6c; N.M. Stat. Ann. § 24-10D-3; N.Y. Pub. Health Law § 2805-p; Or. Rev. Stat. § 435.254(1); 28 Pa. Code § 117.53; S.C. Code Ann. § 16-3-1350(B); Utah Code Ann. § 26-21b-201; Wash. Rev. Code § 70.41.350; Wis. Stat. § 50.375.

many public health and medical organizations recommend the use of family planning services as part of preventive care for women, including: the CDC; the American College of Obstetricians and Gynecologists; the American Academy of Family Physicians; the American Academy of Pediatrics; the Society for Adolescent Health and Medicine; the American Medical Association; the American Public Health Association; the Association of Women's Health, Obstetric and Neonatal Nurses; and the March of Dimes.[18]

---

[18] CDC, *Recommendations to Improve Preconception Health and Health Care—United States: A Report of the CDC/ATSDR Preconception Care Work Group and the Select Panel on Preconception Care*, Morbidity & Mortality Wkly. Rep., Apr. 21, 2006, at 8-10, *available at* http://www.cdc.gov/mmwr/PDF/rr/rr5506.pdf; Am. Coll. of Obstetricians & Gynecologists, *Over-the-Counter Access to Oral Contraceptives*, Committee Opinion No. 544 (Dec. 2012), at 3, http://www.acog.org/~/media/Committee%20Opinions/Committee%20on%20Gyn ecologic%20Practice/co544.pdf?dmc=1&ts=20121210T1726582223; *Contraceptive Advice*, Am. Acad. of Fam. Physicians, http://www.aafp.org/online/en/home/policy/policies/c/contraceptiveadvice.html (last visited Dec. 10. 2012); Am. Acad. of Pediatrics, *Contraception and Adolescents*, 120 Pediatrics 1135, 1135, 1144-45 (2007), *available at* http://pediatrics.aappublications.org/content/120/5/1135.full.pdf; Soc'ty for Adolescent Health & Medicine, *Reproductive Health Care for Adolescents*, 12 J. of Adolescent Health 649, 657 (1991); Am. Med. Ass'n, *AMA-MSS Digest of Policy Actions*, 75.009MSS (Dec. 2012), *available at* http://www.ama-assn.org/resources/doc/mss/digest_of_actions.pdf; *About Population, Family Planning and Reproductive Health*, Am. Pub. Health Ass'n, http://www.apha.org/membergroups/sections/aphasections/population/about/ (last visited Dec. 10, 2012); Ass'n of Women's Health, Obstetric and Neonatal Nurses, *Emergency Contraception*, 41 J. of Obstetric, Gynecologic, & Neonatal Nursing 711, 711 (2012), *available at* http://onlinelibrary.wiley.com/doi/10.1111/j.1552-6909.2012.01407.x/pdf; *Access to Health Coverage*, March of Dimes,

Footnote continued on next page

The regulation challenged here promotes the government's compelling interest in public health by making contraceptive treatment more affordable and, therefore, more accessible. Improved access to contraceptive care increases contraceptive use, which in turn helps to reduce the number of unplanned pregnancies that can endanger the health of mothers and children alike.[19]

### B. The Substantial Health Benefits of Contraceptive Use Vastly Outweigh Any Potential Risks to the Health and Well-Being of Women

The services covered by the contraception regulation are widely accepted as safe. Importantly, only contraceptive services that have been fully vetted and approved by the FDA will be covered by group health insurance plans required under the contraception regulation.[20] Thus, covered contraceptive care generally is

---

Footnote continued from previous page

http://www.marchofdimes.com/advocacy/healthcoverage_medicaid.html    (last visited Dec. 10, 2012).

[19]    Postlethwaite, *supra* note 12, at 363-64.

[20]    Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725 (Feb. 15, 2012) (to be codified at 26 C.F.R. pt. 54, 29 C.F.R. pt. 2590, 45 C.F.R. pt. 147) (referring to HRSA Guidelines, http://www.hrsa.gov/womensguidelines/ (last visited Dec. 10, 2012)); *see also* FDA, *Birth Control Guide* (2012), *available at* http://www.fda.gov/downloads/ForConsumers/ByAudience/ForWomen/FreePublications/UCM282014.pdf.

as safe as other FDA-approved drugs and medical treatments covered by private sector and government-supported health care programs.[21]

In addition, the use of contraceptives often has salutary health effects beyond the prevention of unintended pregnancies. Hormonal birth control, in the form of oral contraceptives or an intrauterine device, may be used to treat uterine fibroids, menstrual disorders, endometriosis, and pelvic inflammatory disease.[22] Hormonal birth control also has been shown to reduce the risk of endometrial, uterine, and colorectal cancer.[23]

Moreover, nearly all covered contraceptive treatment is subject to a physician's or other health care provider's individualized and informed medical judgment. A provider generally recommends which type of contraceptive is most appropriate for each individual patient, after balancing the relative benefits and

---

[21]  Comm. On Preventive Servs. for Women, Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 105 (2011) [hereinafter *IOM Report*] ("As with all pharmaceuticals and medical procedures, contraceptive methods have both risks and benefits.").

[22]  Ronald Burkman et al., *Safety Concerns and Health Benefits Associated with Oral Contraception*, Am. J. of Obstetrics & Gynecology, Apr. 2004, at S12; Am. Coll. of Obstetricians & Gynecologists, *ACOG Practice Bulletin No. 110: Noncontraceptive Uses of Hormonal Contraceptives*, 115 Obstetrics & Gynecology 206, 206 (2010).

[23]  Burkman et al., *supra* note 22, at S12; *see also* Population Reference Bureau, *Contraceptive Safety: Rumors and Realities* 12 (1998), *available at* http://www.prb.org/pdf/ContraceptiveSafety_Eng.pdf.

risks to that patient's health.[24]   Indeed, the government considered this inherent

medical safeguard when promulgating the contraception regulation.  Specifically,

the government relied on an Institute of Medicine report that acknowledges the

minor risks associated with contraceptive use, but emphasizes the critical role

health care providers play in ensuring that patients receive medically appropriate

contraceptive care.[25]   The IOM Report ultimately concluded, in agreement with

numerous other studies, that the benefits of contraceptives outweighed any risks.[26]

Appellants' *amici* are therefore profoundly wrong to claim that the IOM Report

overlooked the risks of contraceptives.  *See* Br. of *Amici Curiae* BCPI et al., in

Support of Plaintiffs-Appellants at 5 [hereinafter BCPI Br.].

Appellants' *amici* likewise make dubious suggestions about the risks of

contraceptives—for example, by stating without context that the World Health

Organization had classified combined oral contraceptives as a "Group 1

---

[24]   Am. Coll. of Obstetricians & Gynecologists, *ACOG Practice Bulletin No. 73: Use of Hormonal Contraception in Women with Coexisting Medical Conditions*, 107 Obstetrics & Gynecology 1453, 1453, 1464-65 (2006).

[25]   *IOM Report*, *supra* note 21, at 105 (citing Burkman et al., *supra* note 22); *id.* ("For women with certain medical conditions or risk factors, some contraceptive methods may be contraindicated.  These can be assessed clinically so that an appropriate method can be selected for the individual." (citing Monica Dragoman et al., *Contraceptive Options for Women with Preexisting Medical Conditions*, 19 J. of Women's Health 575 (2010))); *see also id.* at 106−07 (maternal mortality rate is higher than that for oral contraceptive use).

[26]   *See, e.g.*, Am. Coll. of Obstetricians & Gynecologists, *supra* note 18, at 3.

carcinogen."[27]   Quite to the contrary, the WHO ultimately concluded that, "for most healthy women, the health benefits [of contraceptives] clearly exceed the health risks."[28]   Similarly, Appellants' *amici* suggest that contraceptive users with hypertension face "five times the risk" of heart attack compared with non-users.[29]   However, this assertion blatantly misrepresents the cited study, which clearly showed that non-contraceptive users with hypertension face *essentially the same risk* of heart attack as do contraceptive users.[30]

The substantial and widespread public health benefits promoted by easy access to affordable contraceptive care are not, as Appellants' *amici* suggest, somehow eclipsed by potential health risks to some individual patients, *see* BCPI Br. at 23—particularly when clinicians will help patients weigh their individualized risks and benefits.   Contraceptives simply are no different in this

---

[27]   BCPI Br. at 9 (citing IARC 2007 Monograph 91, Combined estrogen-progestogen contraceptives and combined estrogen-progestogen menopausal therapy,                     *available*                     *at* http://monographs.iarc.fr/ENG/Monographs/vol91/mono91.pdf).

[28]   UNDP/UNFPA/WHO/World Bank Special Programme of Research, Dev. & Research Training in Human Reprod. (HRP), *Carcinogenicity of Combined Hormonal Contraceptives and Combined Menopausal Treatment* 1 (2005), http://www.who.int/reproductivehealth/publications/ageing/ cocs_hrt_statement.pdf.

[29]   BCPI Br. at 8 (citing Bea C. Tanis et al., *Oral Contraceptives and the Risk of Myocardial Infarction*, 345 New Eng. J. of Med. 1787 (2001)).

[30]   Tanis et al., *supra* note 29, at 1791.

respect than any other prescription drug that the government helps make accessible in the pursuit of public health.

### C.    International Human Rights Law Reinforces the Government's Compelling Interest in Providing Affordable Access to Contraceptives

International human rights law recognizes women's fundamental right of access to contraception, and, to the extent permissible under U.S. law, the government has a compelling interest in upholding that right.  For example, the United States is a party to the International Covenant on Civil and Political Rights, which requires states to "ensure the equal right of men and women to the enjoyment of all civil and political rights set forth in the . . . Covenant."[31]  The Human Rights Committee—the treaty-monitoring body charged with authoritatively interpreting this Covenant—has specifically cited the "high cost of contraception" as a potential treaty violation.[32]  In fact, the Committee recently instructed a state party to "strengthen measures aimed at the prevention of unwanted pregnancies, by inter alia making a comprehensive range of

---

[31]   International Covenant on Civil and Political Rights, art. 3, Dec. 16, 1966, 999 U.N.T.S. 171 (ratified June 8, 1992).

[32]   U.N. Human Rights Comm., *Concluding Observations: Poland*, ¶ 9, U.N. Doc. CCPR/CO/82/POL (Dec. 2, 2004).

contraceptives widely available at an affordable price and including them on the list of subsidized medicines."[33]

Other human rights instruments, all of which the United States has signed, similarly require affordable access to contraception. For example, the Convention on the Elimination of All Forms of Discrimination Against Women requires states to "eliminate discrimination against women in the field of health care in order to ensure . . . access to health care services, *including those related to family planning*."[34]  This Convention has been interpreted to obligate states to "take measures to increase the access of women and adolescent girls to affordable health care services, including reproductive health care, and *to increase access to information and affordable means of family planning* . . . ."[35]  And, the body monitoring the International Covenant on Economic, Social and Cultural Rights has emphasized that states must endeavor to "provide access to a full range of high

---

[33]  U.N. Human Rights Comm., *Concluding Observations: Poland*, ¶ 12, U.N. Doc. CCPR/C/POL/CO/6 (Nov. 15, 2010).

[34]  Convention on the Elimination of All Forms of Discrimination Against Women art. 12, Dec. 18, 1979, G.A. Res. 34/180, U.N. GAOR, 34th Sess., Supp. No. 46, U.N. Doc. A/34/46, at 193 (entered into force Sept. 3, 1981) (emphasis added).

[35]  *See, e.g., Concluding Observations of the Committee on the Elimination of Discrimination Against Women: Slovakia*, ¶ 43, U.N. Doc. CEDAW/C/SVK/CO/4 (July 17, 2008) (emphasis added).

quality and *affordable health care, including sexual and reproductive services* . . . ."[36]

The Supreme Court has recognized in various constitutional contexts the "plainly compelling" nature of the government's "interests in ensuring the reciprocal observance of [treaties], protecting relations with foreign governments, and demonstrating commitment to the role of international law." *Medellin v. Texas*, 552 U.S. 491, 524 (2008). Similarly here, the United States' international law obligations and commitments underscore the gravity of the governmental interests advanced by the regulation at issue in this case.

What is more, international human rights law mandates that the right to health—which includes the right to access to affordable contraception discussed above—must be respected, protected, and fulfilled by governments. *General Comment*, *supra* note 36, ¶ 33.

Governments meet their obligation to *respect* the right to health by not interfering with individuals' enjoyment of the right. And governments *fulfill* the right by affirmatively facilitating access to health-related services, including "sexual and reproductive health services." *Id.* ¶ 36. The mandate to provide

---

[36] U.N. Comm. on Econ., Social & Cultural Rights, *General Comment No. 14: The Right to the Highest Attainable Standard of Health*, ¶ 21, U.N. Doc. E/C.12/2000/4 (Aug. 11, 2000) [hereinafter *General Comment*] (emphasis added).

insurance for contraceptive care without cost-sharing is a positive step toward respecting and protecting women's right to health, including reproductive health.

But international human rights law further requires governments to *protect* the right to health by "ensur[ing] that third parties do not limit people's access to health-related information and services." *Id.* ¶ 35. The United States cannot satisfy its obligations under international law by merely facilitating the provision of affordable contraceptive care. The government must also ensure that third parties, such as Appellants, do not frustrate the government's efforts to safeguard individuals' right to access affordable contraception. Consequently, exempting Appellants from the contraception regulation at issue here would effectively contravene both international legal norms and the United States' commitments under a variety of international human rights treaties. Nothing in RFRA mandates such an extreme result.

## CONCLUSION

*Amici curiae* respectfully request that this Court affirm the decision below.

Respectfully submitted,

/s/ Lisa S. Blatt

JULIANNA S. GONEN
CENTER FOR REPRODUCTIVE RIGHTS
1634 Eye Street, NW
Suite 550
Washington DC 20006
(202) 628-0286
jgonen@reprorights.org

LISA S. BLATT
   *Counsel of Record*
ROBERT J. KATERBERG
ANDREW S. MACURDY
ARNOLD & PORTER LLP
555 12th Street, NW
Washington, DC 20004
(202) 942-5000
lisa.blatt@aporter.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,753 words.

2.   This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word 2007, in 14-point Times New Roman font.

3.   Pursuant to this Court's guidelines on the use of the CM/ECF system, I hereby certify that:

   a.  all required privacy redactions have been made;

   b.  the hard copies that have been submitted to the Clerk's Office are exact copies of the ECF filing; and

   c.  the ECF submission has been scanned for viruses using Sophos Endpoint Security (version 10.0) and is free from viruses.

Dated:  June 14, 2013                          /s/  Lisa S. Blatt
                                               Lisa S. Blatt

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing brief with the Clerk of the Court of the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on June 14, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  June 14, 2013                                          /s/ Lisa S. Blatt
                                                               Lisa S. Blatt