## NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 13-5069

### UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

FRANCIS A. GILARDI; PHILIP M. GILARDI; FRESH UNLIMITED
INCORPORATED, doing business as Freshway Foods;
FRESHWAY LOGISTICS INCORPORATED;

Plaintiffs-Appellants

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES; KATHLEEN SEBELIUS, in her official capacity as
Secretary of the United States
Department of Health and Human Services;
UNITED STATES DEPARTMENT OF THE TREASURY;
JACOB J. LEW, in his official capacity as Secretary of the
United States Department of the Treasury;
UNITED STATES DEPARTMENT OF LABOR; SETH D. HARRIS, in
his official capacity as Acting Secretary of the United States
Department of Labor;

Defendants-Appellees

## BRIEF OF *AMICUS CURIAE* LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC. IN SUPPORT OF APPELLEES AND FOR AFFIRMANCE OF THE DISTRICT COURT

On Appeal from the United States District Court for the District of
Columbia in Case No. 1:13-cv-104 (EGS) (Hon. Emmet G. Sullivan)

| | | |
|---|---|---|
| Thomas W. Ude, Jr. | Camilla B. Taylor | Jennifer C. Pizer |
| Lambda Legal | Lambda Legal | Lambda Legal |
| Defense and | Defense and | Defense and |
| Education Fund, Inc. | Education Fund, Inc. | Education Fund, Inc. |
| 120 Wall St., | 105 W. Adams, | 3325 Wilshire Blvd. |
| 19th Floor | Suite 2600 | Suite 1300 |
| New York, NY 10005 | Chicago, IL 60603 | Los Angeles, CA |
| 212-809-8585 | 312-663-4413 | 90010 |
| | | 213-382-7600 |

*Counsel for Amicus Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici.

All parties and *amici curiae* appearing before the district court and in this court are listed in the Briefs of Appellants and Appellees.

### B. Rulings under review.

References to the rulings at issue appear in the Briefs of Appellants and Appellees.

### C. Related cases.

The case on review was never previously before this Court or any other court. The Briefs of Appellants and Appellees list cases and appeals that they have identified as either related or the same, or substantially the same, issue presented in this appeal; counsel for *amicus is* not aware of other such cases.

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rules 26.1 and 29(c)(1), the undersigned counsel for *amicus curiae* Lambda Legal Defense and Education Fund, Inc. hereby certifies that *amicus* is a not-for-profit corporation dedicated to full

recognition of the civil rights of lesbian, gay, bisexual and transgender people and those with HIV through impact litigation, education and public policy work, that *amicus* has no parent companies, and that there is no publicly-held company that has a 10% or greater ownership interest (such as stock or partnership shares) in *amicus*.

## AUTHORITY TO FILE

Appellants and Appellees have consented to the filing of this brief.

## STATEMENT OF AUTHORSHIP

No party's counsel authored this brief in whole or in part, and no party, party's counsel, or person other than *amicus*, its members, or its counsel, contributed money intended to fund this brief's preparation or submission.

## CERTIFICATE OF NEED FOR SEPARATE BRIEF

Pursuant to D.C. Circuit Rule 29(d), counsel for *amicus* hereby certifies that this separate brief is necessary for the following reasons. *Amicus* submits this brief based on its unique experience in responding to assertions that religious beliefs warrant exemption from generally applicable laws for the protection of others. This

brief's principal point is to address the potential ramifications of the issues in this appeal, and, in particular, to explain that those ramifications extend well beyond the areas of employer-provided health coverage and contraception. By contrast, other *amicus* briefs in support of Defendants-Appellants address interpretation of the Religious Freedom Restoration Act, the importance of contraception and other preventive care, and the fundamental right of women to make decisions concerning procreation, including contraception. Accordingly, the arguments in this brief and those of other *amici* will not substantially overlap, and counsel for *amicus* certifies that filing a joint brief is not practicable and that this separate brief is necessary.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........................................................................ i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ...................... i

AUTHORITY TO FILE........................................................................ ii

STATEMENT OF AUTHORSHIP ...................................................... ii

CERTIFICATE OF NEED FOR SEPARATE BRIEF............................ ii

TABLE OF CONTENTS .................................................................... iv

TABLE OF AUTHORITIES................................................................ vi

GLOSSARY...................................................................................... xii

INTEREST OF *AMICUS CURIAE* ...................................................... 1

SUMMARY OF ARGUMENT ............................................................. 3

ARGUMENT ..................................................................................... 7

I. For-profit secular corporations do not exercise religion within the meaning of RFRA....................................................... 7

II. Even if for-profit corporations could engage in religious exercise, the contraception coverage requirement is not a substantial burden on the religious exercise of those who choose to pursue profit in businesses regulated to protect others............................................................................ 13

III.   To exempt for-profit corporations from the
       contraception coverage requirement would contravene
       sound, settled precedents requiring commercial actors,
       whether religiously motivated or not, to respect third
       parties' rights and interests. ...................................................... 25

CONCLUSION ................................................................................ 39

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
       LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE
       STYLE REQUIREMENTS ........................................................... 41

CERTIFICATE OF SERVICE .......................................................... 42

ADDENDUM

# TABLE OF AUTHORITIES[1]

**Cases**                                                                   **Page**

*Agostini v. Felton*, 521 U.S. 203 (1997) .......................................... 20

*Backus v. Mena Newspapers, Inc.*, 224 F. Supp. 2d 1228 (W.D. Ark. 2002) ...................................................... 30

*Berry v. Department of Social Services,* 447 F.3d 642 (9th Cir. 2006).................................................................. 17

*Bob Jones Univ. v. United States*, 461 U.S. 574 (1983) .................. 31

*Bodett v. Coxcom, Inc.*, 366 F.3d 736 (9th Cir. 2004)................ 28-29

*Bollenbach v. Bd. of Educ.*, 659 F. Supp. 1450 (S.D.N.Y. 1987) ................................................................ 33

\* *Bruff v. North Mississippi Health Servs., Inc.,* 244 F.3d 495 (5th Cir. 2001)........................................... 17, 19, 29

*Catholic Charities of Sacramento v. Superior Court (Sacramento),* 32 Cal.4th 527 (2004)......................................... 23

*Chalmers v. Tulon*, 101 F.3d 1012 (4th Cir. 1996)......................... 29

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ................................ 22

*Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987) ...................8-9

*Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358 (3rd Cir. 2008)................................................................ 11

*Dole v. Shenandoah Baptist Church*, 899 F.2d 1389 (4th Cir. 1990)........................................................ 15, 19

---

[1] Authorities upon which we chiefly rely are marked with asterisks.

vi

\* *Donovan v. Tony and Susan Alamo Found.*, 722 F.2d 397 (8th Cir. 1983), *aff'd* 471 U.S. 290 (1985)................................ 14, 25

*EEOC v. Fremont Christian Sch.*, 781 F.2d 1362 (9th Cir. 1986) ......................................................................... 32

*EEOC v. Preferred Mgmt. Corp.*, 216 F. Supp. 2d 763 (S.D. Ind. 2002) .................................................................. 9

*EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610 (9th Cir. 1988) ......................................................................... 11

*Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703 (1985) ................ 10

*Goehring v. Brophy*, 94 F.3d 1294 (9th Cir. 1996)......................... 21

*Henderson v. Kennedy,* 253 F.3d 12 (D.C. Cir. 2001).................... 18

*Henegar v. Sears, Roebuck and Co.*, 965 F. Supp. 833 (N.D. W.Va. 1997)....................................................... 30

*Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 132 S.Ct. 694 (2012) ...................................................... 8

*Hyman v. City of Louisville,* 132 F. Supp. 2d 528 (W.D. Ky. 2001), *vacated on other grounds by* 53 Fed. Appx. 740 (6th Cir. 2002)................................................ 34

*Int'l Union  v. Johnson Controls*, 499 U.S. 187 (1991) ........ 11, 36, 37

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905)............................ 27

*Jimmy Swaggart Ministries v. Bd. of Equalization of California,* 493 U.S. 378 (1990)................................................. 18

*Kaminsky v. Saint Louis University School of Med.*, No. 4:05CV1112 CDP,  2006 WL 2376232, (E.D. Mo. Aug. 16, 2006)........................................................... 30

*Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2011) ............. 28

*Knight v. Connecticut Dep't of Pub. Health*, 275 F.3d 156 (2d Cir. 2001) .................................................................... 17, 34

\* *Lawrence v. Texas*, 539 U.S. 558 (2003) .............................. 4, 6, 35

*Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001) ................... 21

*Loving v. Virginia*, 388 U.S. 1 (1967) ............................................. 31

*Minnesota by Johnson v. Porter Farms, Inc.*, 382 N.W.2d 543 (Minn. App. 1986).................................................................. 9

*Minnesota by McClure v. Sports and Health Club, Inc.,* 370 N.W.2d 844 (Minn. 1985) ........................................................... 9

*Moore v. Metropolitan Human Service Dist.,* Slip Copy, 2010 WL 3982312 (E.D. La. Oct. 8, 2010) ................................ 17

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (2012)........................................................................................... 16

*Newman v. Piggie Park Enters., Inc.*, 256 F. Supp. 941 (D.S.C. 1966), *rev'd* 377 F.2d 433 (4th Cir. 1967), *aff'd and modified on other grounds*, 390 U.S. 400 (1968)................ 31

*North Coast Women's Care Med. Grp., Inc. v. San Diego Cnty. Superior Court (Benitez)*, 189 P.3d 959 (Cal. 2008) ........................................................................... 28, 34

*Noyes v. Kelly Services*, 488 F.3d 1163 (9th Cir. 2007) ........... 29, 30

*Panchoosingh v. General Labor Staffing Services, Inc.*, No. 07-80818-CI, 2009 WL 961148, (S.D. Fla. Apr. 8, 2009) ...................................................................................... 30

*Paul v. Watchtower Bible and Tract Soc'y of New York, Inc.*, 819 F.2d 875 (9th Cir. 1987) ..........................................9-10

*People v. Handzik*, 102 N.E.2d 340 (Ill. 1951) ............................... 28

*People v. Pierson*, 68 N.E. 243 (N.Y. 1903) .................................... 28

*Peterson v. Hewlett-Packard Co.,*358 F.3d 599 (9th Cir. 2004) ..................................................................... 34

\* *Planned Parenthood of Southeastern Pennsylvania. v. Casey*, 505 U.S. 833 (1992)............................................. 4, 6, 35-36

*Prince v. Massachusetts*, 321 U.S. 158 (1944).............................. 27

*Pruneyard Shopping Ctr. v. Robins,* 447 U.S. 74 (1980) ................ 23

*Reynolds v. United States*, 98 U.S. 145 (1878) .............................. 28

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.* 547 U.S. 47 (2006) ............................................................ 22

*Sarenpa v. Express Images Inc.*, Civ.04-1538(JRT/JSM), (D. Minn. Dec. 1, 2005) ........................................................... 30

*Seven-Sky v. Holder*, 661 F.3d 1 (D.C. Cir. 2011).................... 16, 19

*Shapolia v. Los Alamos Nat'l. Laboratory*, 992 F.2d 1033 (10th Cir. 1993)..................................................................... 29

*Smith v. Fair Emp. and Housing Comm'n*, 913 P.2d 909 (Cal. 1996) ......................................................................... 19, 33

*Spratt v. Kent Cnty.,* 621 F. Supp. 594 (D.C. Mich. 1985) ............. 28

*Stepp v. Review Bd. of Indiana Emp. Sec. Div.*, 521 N.E.2d 350 (Ind. 1988)...................................................................... 35

*Swanner v. Anchorage Equal Rights Comm'n*, 874 P.2d 274 (Alaska 1994) ................................................................... 33

*Tarsney v. O'Keefe*, 225 F.3d 929 (8th Cir. 2000) ......................... 21

*Tillery v. ATSI, Inc., 242 F. Supp. 2d 1051* (N.D. Ala. 2003), *aff'd without opinion*, 97 Fed. Appx. 906 (Table) (11th Cir. 2004) ......................................................................... 30

*Turic v. Holland Hospitality, Inc.,* 85 F.3d 1211 (6th Cir. 1996) ................................................................................... 11

\* *United States v. Lee*, 455 U.S. 252 (1982) ......................... 13, 26, 27

*Venters v. City of Delphi*, 123 F.3d 956 (7th Cir. 1997) ........... 29, 30

*Whitney v. Greater New York Corp. of Seventh-Day Adventists*, 401 F. Supp. 1363 (S.D.N.Y. 1975) ........................ 32

*Wilson v. U.S. West Communications*, 58 F.3d 1337 (8th Cir. 1995) ............................................................................... 34

*Winters v. Miller*, 446 F.2d 65 (2d Cir. 1971), *cert. denied*, 404 U.S. 985 (1971) ............................................................... 27

*Witters v. Washington Dep't of Servs. for the Blind*, 474 U.S. 481 (1986) ................................................................ 20-21

*Yancey v. Nat'l Ctr. on Insts. and Alternatives*, 986 F. Supp. 945 (D. Md. 1997) ......................................................... 30

*Zelman v. Simmons-Harris*, 536 U.S. 639 (2002) ........................... 20

## Constitutional Provisions

U.S. Const. Am. 1 (Establishment Clause & Free Exercise Clause) ................................................................. 9, 10, 20, 26

## Statutes

29 U.S.C. § 201, *et seq.* (Fair Labor Standards Act of 1938) ....................................................................................... 15

42 U.S.C. § 300gg–13 – Coverage of preventive health
   services provision of the Patient Protection and
   Affordable Care Act ................................................................... 22

\* 42 U.S.C. § 2000bb, *et seq.* (Religious Freedom
   Restoration Act)..................................3, 4, 5, 7, 9, 13, 16, 18, 21, 24

\* 42 U.S.C. § 2000e, et seq. (Title VII of the Civil Rights
   Act of 1964)..................................8, 9, 10, 11, 12, 17, 29, 30, 34, 36

## Rules

D.C. Circuit Rule 26. ....................................................................... 1

D.C. Circuit Rule 29(c)(1).................................................................. i

D.C. Circuit Rule 29(d) .................................................................... ii

Fed. R. App. P. 26.1 ........................................................................ i

# GLOSSARY

ACA: Patient Protection and Affordable Care Act, 42 U.S.C. § 300gg–
      13 - Coverage of preventive health services

FDA: Food and Drug Administration

FLSA: Fair Labor Standards Act of 1938, 29 U.S.C. § 201, *et seq.*

Freshway Corporations: Plaintiffs-Appellants Fresh Unlimited, Inc.,
      d/b/a Freshway Foods and Freshway Logistics, Inc.

Gilardis: Plaintiffs Francis Gilardi and Philip Gilardi

Government: Defendants-Appellees United States Department of
      Health and Human Services; Kathleen Sebelius, in her official
      capacity as Secretary of the United States Department of
      Health and Human Services; United States Department of the
      Treasury; Jacob J. Lew, in his official capacity as Secretary of
      the United States Department of the Treasury; United States
      Department of Labor; and Seth D. Harris, in his official
      capacity as Acting Secretary of the United States Department
      of Labor

HHS: U.S. Department of Health and Human Services

Lambda Legal: Lambda Legal Defense and Education Fund, Inc.

xii

LGBT: Lesbian, gay, bisexual, and/or transgender

RFRA: Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et*

    *seq.*

Title VII: Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e,

    *et seq.*

## INTEREST OF *AMICUS CURIAE*

Lambda Legal is a national organization dedicated to achieving full recognition of the civil rights of LGBT people and people with HIV through impact litigation, education and public policy work. Lambda Legal has litigated numerous cases to promote equality and to reduce the discrimination that LGBT people and people with HIV have faced in various realms, including the workplace. *See, e.g., Glenn v. Brumby,* 663 F.3d 1312 (11th Cir. 2011) (state employer's termination of transgender employee was unconstitutional sex discrimination); *Taylor v. Rice,* 451 F.3d 898 (D.C. Cir. 2006) (evidence warranted trial in challenge to U.S. Foreign Service's blanket exclusion of HIV-positive applicants).

Lambda Legal has participated in numerous cases involving assertions by individuals or corporate entities that enforcement of neutral statutes, rules, or policies regulating employment, or the provision of professional services to the public, infringed upon religious freedom.  *See Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2011) (requirement that public university's counseling student counsel lesbian and gay clients without discriminating

based on sexual orientation, irrespective of student's religious beliefs, did not infringe upon student's right to free speech or free exercise of religion); *North Coast Women's Care Med. Grp., Inc. v. San Diego Cnty. Superior Court (Benitez)*, 189 P.3d 959 (Cal. 2008) (rejecting claim by physician that enforcement of nondiscrimination requirement in the provision of medical care infringed upon physician's right to free speech and free exercise of religion); *Catholic Charities of Springfield Diocese v. Illinois*, No. 2011-MR-245 (Sangamon Cty., Aug. 18, 2011) (involving claim by not-for-profit religious social services agency that nondiscrimination requirement in provision of foster care services violated First Amendment and state Religious Freedom Restoration Act). Lambda Legal also has challenged unequal employee compensation, including discriminatory restrictions on health insurance. *See, e.g., Diaz v. Brewer*, 656 F.3d 1008 (9th Cir. 2011). Thus, Lambda Legal has expertise concerning Plaintiffs' claims that their asserted religious objections should exempt them from the federal requirement to provide certain health insurance coverage to employees. Lambda Legal believes that Plaintiffs' arguments undermine equality

guarantees and other religiously neutral regulations of the public marketplace to the detriment of our society generally and, in particular, the vulnerable constituencies Lambda Legal serves. Conversely, rejection of Plaintiffs' arguments would affirm core principles that remain essential for maintaining public harmony in our diverse nation.

## SUMMARY OF ARGUMENT

The District Court correctly held that Plaintiffs are unlikely to prevail on their claims under RFRA because the federal rule they challenge – requiring that FDA-approved contraceptive methods (among other preventive services) be offered in employer-sponsored health coverage – does not substantially burden Appellants' free exercise of religion. *See* App. 57-81. *Amicus* also agrees with the Government's arguments, below and on appeal, that the rule challenged by Plaintiffs "advance[s] compelling government interests in public health and gender equality"– and, more specifically, the related individual interest in a woman's control over her procreation. Gov. Br. at 39. The Supreme Court has emphasized the compelling nature of this individual liberty interest, explaining that

3

"our laws and traditions accord constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education" because such matters, "involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the Fourteenth Amendment." *Lawrence v. Texas*, 539 U.S. 558, 573-74 (2003), quoting *Planned Parenthood of Southeastern Pennsylvania. v. Casey*, 505 U.S. 833 (1992).

This brief provides additional authority concerning three interrelated points to underscore the important differences between commercial businesses and religious entities – differences that Plaintiffs blithely ask this Court to disregard – and to explain the harmful potential consequences of ignoring or minimizing those differences.

First, the Freshway Corporations are secular, for-profit corporations formed not for worship, but to package and distribute fresh produce and refrigerated goods. *See* App. 21, ¶¶ 16, 17. Accordingly, they do not hold religious beliefs and do not engage in religious exercise protected by RFRA. The contrary conclusion that

4

Plaintiffs seek would depart dramatically from the established, fundamental distinction between religious and commercial corporations reflected in our statutes as well as court precedents. For example, unlike religious organizations, the Freshway Corporations are prohibited from employment discrimination based on religion, and may not require or coerce employees to follow the tenets of any particular faith.

Second, even if secular for-profit corporations could be seen to exercise religion as a general matter, any free exercise claim they might bring would fail here because the manner in which such companies provide employee health coverage under a regulatory scheme is not a form of religious exercise within the meaning of RFRA; even if it were, the burden imposed by the contraception coverage requirement is far from substantial. As described below, a significant body of law establishes that those who enter commerce and hire employees to make a profit voluntarily accept limitations on commercial conduct imposed by laws regulating that business–even against religious beliefs that some conduct required by those regulations, or some employee conduct protected by such laws, is

sinful. Accordingly, even if the present limitation on Freshway Corporations' conduct burdened their exercise of religion incidentally, that burden is not substantial.

Third, as numerous courts have noted, laws and regulations governing for-profit businesses, including employers, provide essential safeguards when a commercial participant's activities, in the absence of those laws and regulations might harm third parties, whether in employment, public accommodations, or other commercial transactions. Here, the Freshway Corporations' employees are entitled to their own beliefs about contraception, reproductive health, and related health decisions. This Court should reject Plaintiffs' demand for an exemption from rules that protect employees' ability to make "the most intimate and personal choices a person may make in a lifetime." *Casey*, 505 U.S. at 851. *See also Lawrence*, 539 U.S. at 578 (explaining that *Casey* confirmed that decisions concerning intimate adult relationships "are a form of 'liberty' protected by the Due Process Clause of the Fourteenth Amendment" for both married and unmarried persons,

and that those decisions are protected regardless of gender or sexual orientation).

## ARGUMENT

### I.   For-profit secular corporations do not exercise religion within the meaning of RFRA.

Many people, including owners of for-profit corporations, may look to their religious beliefs for guidance during their daily lives, including when making business decisions. But a secular for-profit corporation is, by definition, created to make a profit, not to further religious or even charitable goals. Our multicultural society distinguishes between religious and for-profit secular corporations, and restrains for-profit employers from imposing religious constraints on employees based, at least in part, on a shared respect for one another's right to hold different beliefs, whether religious or derived from other sources. By contrast, religious corporations often are accorded significantly greater latitude, particularly in employment decisions; churches and religiously-affiliated entities often are permitted to behave differently from the ways our laws require people and corporations in commercial settings to interact.

For example, the religion clauses grant not-for-profit religious corporations unique authority to make employment decisions for positions deemed "ministerial" exempt from federal antidiscrimination laws. *See, e.g., Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 132 S.Ct. 694, 710 (2012). In *Hosanna-Tabor,* the Supreme Court expressly distinguished the right to free exercise from freedom of association, which is enjoyed "by religious and secular groups alike," explaining pointedly that "the text of the First Amendment itself . . . gives special solicitude [with respect to free exercise] to the rights of religious organizations." *Id.* at 706.

That solicitude exists not only in the Constitution, but also in many statutes. For example, consider two court decisions involving health clubs, one operated by a not-for-profit religious organization; the other by a for-profit corporation. The religious organization operating a health club was exempt from liability under Title VII for firing a janitor who did not conform to the religious precepts of the club's owner, the Mormon Church. *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S.

327, 337 (1987). By contrast, a for-profit health club was not exempt from liability under a state antidiscrimination law for refusing to hire and promote persons whose religious faith differed from that of the owners. *Minnesota by McClure v. Sports and Health Club, Inc.,* 370 N.W.2d 844 (Minn. 1985).

Indeed, it is beyond dispute that for-profit employers are not free to discriminate because of their religious beliefs. *See, e.g., EEOC v. Preferred Mgmt. Corp.*, 216 F. Supp. 2d 763, 804-13 (S.D. Ind. 2002) (rejecting free exercise and RFRA claims of for-profit employer charged with violating Title VII by discriminating against employees who did not conform to employer's religious beliefs); *Minnesota by Johnson v. Porter Farms, Inc.*, 382 N.W.2d 543, 548 (Minn. App. 1986) (rejecting free exercise claim by for-profit corporate employer who fired employee for unmarried cohabitation in employer-provided housing).

Moreover, although the Ninth Circuit concluded that the Free Exercise Clause insulated a *religious* corporation that engaged in "shunning" a woman who left her former congregation after it had "disfellowshipped" her parents, *Paul v. Watchtower Bible and Tract*

9

*Soc'y of New York, Inc.*, 819 F.2d 875, 876 (9th Cir. 1987), it is simply not the case that for-profit corporations like Freshway Corporations would be similarly insulated from liability for religious discrimination if they were to "shun" an employee who had been "disfellowshipped" – even if religious beliefs motivated the corporations' owners to do so. Indeed, the Supreme Court has explained, in an employment-related case that did not involve Title VII, that the First Amendment does not permit an unequivocal preference for those whose conduct is motivated by religious belief; instead, consideration must also be accorded to the interests of others – including those for whom, and with whom, they work – whether those interests are religious or not. *See, e.g., Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 709 (1985)(statute violated Establishment Clause by requiring employers to accommodate Sabbath observers without allowing consideration of the interests of the employer or of other employees who do not observe a Sabbath).[1]

---

[1]    Likewise, Title VII's requirement that a covered, for-profit employer also avoid discriminating based on religion by accommodating employees' religious exercise rights (42 U.S.C. § 2000e(j)) has been construed "to require the employer, who structures the workplace to a substantial degree, to travel the extra

10

Freshway Corporations could not condition female employees' employment on their agreement to refrain from using contraception or from using their wages to purchase it. *Cf. Int'l Union v. Johnson Controls*, 499 U.S. 187, 198-200 (1991) (it was unlawful sex discrimination to limit women's employment opportunities based on their fertility when imposing no such limits on men). Nor, under Title VII, could Freshway Corporations discharge or punish an employee for exercising her right to make pregnancy-related decisions – including whether to have an abortion. *See, e.g., Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 364 (3rd Cir. 2008) (reversing entry of summary judgment for employer because evidence was sufficient to support finding that employee was discharged for terminating her pregnancy); *Turic v. Holland Hospitality, Inc.,* 85 F.3d 1211, 1214 (6th Cir. 1996) (affirming trial court's finding that employer violated Title VII because employee's contemplated abortion, "which caused controversy among her

---

mile in adjusting its free exercise rights, if any, to accommodate [the employee]" when the religious beliefs of an employer and employee conflict. *See, e.g., EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 621 (9th Cir. 1988) (employer must accommodate employee's request to be excused from at-work prayer meetings).

coworkers, was a motivating factor for her discharge"). That the Freshway Corporations may not lawfully impose a no-contraceptives rule on their female employees makes two things evident: 1) the absence of any substantial burden imposed by a regulatory requirement ensuring employees access to the medical care necessary to make contraception choices; and 2) the degree of intrusion into employee privacy and procreative decision-making that Plaintiffs seek.

As these examples from the Title VII context demonstrate, a new rule of law permitting for-profit businesses to exempt themselves from regulation based on their owners' religious convictions would up-end the principles embraced and the balance struck in constitutional precedents and statutory protections for religious liberty within our secular society. Indeed, in many cases, granting secular for-profit employers exemption, based on their owners' religious beliefs, from laws and regulations that protect their employees would negate those laws entirely.

12

**II.  Even if for-profit corporations could engage in religious exercise, the contraception coverage requirement is not a substantial burden on the religious exercise of those who choose to pursue profit in businesses regulated to protect others.**

RFRA does not require that owners of a for-profit company or the company itself be permitted to impose on others, such as employees, the religious constraints that the owners voluntarily assume for themselves. Under RFRA, the federal government "shall not substantially burden a person's exercise of religion" unless that burden is the least restrictive means to further a compelling government interest. 42 U.S.C. § 2000bb-1(a), (b). Even if the Freshway Corporations could engage in religious exercise, the contraception coverage requirement does not burden Plaintiffs' exercise of religion, let alone burden it substantially. As the Supreme Court explained more than thirty years ago, "[w]hen followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." *United States v. Lee*, 455 U.S. 252, 261 (1982).

13

In reviewing free exercise challenges to commercial regulations governing employers, courts consistently have rejected employers' claims that regulatory schemes protecting employees substantially burdened the employer's religious exercise. For example, in *Donovan v. Tony and Susan Alamo Found.*, 722 F.2d 397, 403 (8th Cir. 1983), *aff'd* 471 U.S. 290 (1985), the court concluded that "enforcement of wage and hour provisions" against religious non-profits that both engaged in evangelism and also employed convicts and recovering addicts to operate commercial businesses as part of their rehabilitation "cannot possibly have any direct impact on [the employers'] freedom to worship and evangelize as they please." *Id.* Because "there comes a time when secular endeavor must be recognized as such, and passes over the line separating it from the sacred functions of religious worship," and this "metamorphosis or transmogrification occurs when a religious organization turns from the things of God to the things of Caesar," the court concluded that the religious employers' free exercise claim was "clearly without merit." *Id.* at 400, 403.

14

Similarly, in *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389 (4th Cir. 1990), the court rejected a religious school's free exercise claim that the school be exempt from FLSA's minimum wage and equal pay requirements. The school argued that these requirements impaired its ability to determine matters of internal church governance "as well as those of faith and doctrine," including "its head-of-household practice," which "was based on a sincerely-held belief derived from the Bible," and which required payment of a salary supplement to male but not female teachers. *Id.* at 1397. The school's employees intervened to support the school, arguing that having their wages set by the government, rather than by church governors acting under divine guidance, deprived them of blessings they would otherwise receive by allowing their Lord to supply their needs. *Id.* Nevertheless, the court concluded that "any burden [imposed by fair pay requirements] would be limited." *Id.* The "increased payroll expenses to conform to FLSA requirements is not the sort of burden that is determinative in a free exercise claim." *Id.* at 1397-98.

15

More recently, this Court rejected a company's free exercise claim seeking exemption from the ACA's provisions in their entirety. *Seven-Sky v. Holder*, 661 F.3d 1, 5 n.4, 9 (D.C. Cir. 2011)(affirming dismissal of RFRA claim because requiring company to purchase health insurance in contravention of belief that "insurance expresses skepticism in God's ability to provide" imposed only a de minimis burden on those religious beliefs),*abrogated on other grounds by Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S.Ct. 2566 (2012).

These cases upholding regulations of employers are consistent with precedent in other commercial contexts finding that generally applicable rules governing marketplace conduct impose only minimal burdens, if any cognizable burden at all, on commercial participants' religious beliefs. For example, courts repeatedly have rejected individual employees' assertions that religious beliefs should exempt them from generally applicable constraints on professional conduct when offering services to the public. Indeed, rather than requiring accommodation, courts consistently have held that an employee's religious objection to such constraints renders

16

the employee unqualified to perform the job. *See, e.g., Bruff v. North Mississippi Health Services, Inc.,* 244 F.3d 495, 497-98 (5th Cir. 2001) (Title VII did not require employer to accommodate counselor-employee's request that she be excused from counseling patients on subjects conflicting with her religious beliefs; in contrast to typical religious accommodation requests, by refusing to counsel patients about nonmarital relationships, counselor "determined that she would not perform some aspects of the position itself"); *Knight v. Connecticut Dept. of Public Health,* 275 F.3d 156, 164-65 (2d Cir. 2001) (denying free exercise claims of two public employees, a nurse and sign language interpreter, noting that their religious speech at work impeded their ability to do the job); *Berry v. Department of Social Services,* 447 F.3d 642 (9th Cir. 2006) (county social services employer entitled to prohibit employee from discussing religious beliefs with clients); *Moore v. Metropolitan Human Service Dist.,* Slip Copy, 2010 WL 3982312 (E.D. La. Oct. 8, 2010) (public employee social worker not entitled to religious accommodation after being told not to engage in Christian counseling methods).

17

In other commercial contexts, too, courts have held that a decision to engage in for-profit activity necessarily accepts certain regulatory constraints, and that therefore any burden imposed by generally applicable marketplace regulations is insufficiently substantial to support a free exercise claim. *See, e.g., Jimmy Swaggart Ministries v. Bd. of Equalization of California,* 493 U.S. 378, 389-91 (1990) (under strict scrutiny test now relevant to RFRA claims, generally applicable sales tax did not impose "constitutionally significant" burden on ministry's sale of religious material because such a tax is "no different from other generally applicable laws and regulations – such as health and safety regulations – to which [the ministry] must adhere," and "is not a tax on the right to disseminate religious information, ideas, or beliefs, *per se*; rather, it is a tax on the privilege of making retail sales of tangible personal property and on the storage, use, or other consumption of tangible personal property in California"); *Henderson v. Kennedy,* 253 F.3d 12 (D.C. Cir. 2001) (under RFRA, regulation banning sale of t-shirts on National Mall did not substantially burden claimants' religious exercise, even though t-

shirts bore religious message); *Smith v. Fair Employment and Housing Commission,* 913 P.2d 909 (Cal. 1996) (under strict scrutiny, burden imposed by fair housing law on landlord with religious objection to unmarried tenants not substantial).

Moreover, the supposed burden alleged by Freshway Corporations is even more attenuated than the pay equity requirement in *Shenandoah Baptist Church,* the requirement to purchase health insurance in the face of a belief that such a purchase conveys lack of trust concerning God's will in *Seven-Sky,* or the requirement to help patients engage happily in sinful behavior in *Bruff*. Those requirements demanded that complainants directly engage in conduct violating their professed religious beliefs. Here, the contraception coverage requirement does not force the Freshway Corporations or their owners themselves to use contraception against their religious beliefs, or even to involve themselves in evaluating options and prices for separate contraception coverage. Instead, the requirement allows the corporations' employees to make decisions for themselves about their own contraceptive use based on recommendations of medical

19

professionals for selection from among covered options. Accordingly, the burden consists of – at most – paying for a group plan that includes coverage for many services chosen by others for inclusion, which may or may not be used by employees or their family members, based on private decisions (and health needs) in which the employer will not be involved nor even aware. Neither Freshway Corporations nor their owners, the Gilardis, can claim burdens on religious exercise, much less substantial burdens, merely because Freshway Corporations comply with a generally applicable regulatory scheme that makes possible the independent choices of other people.

Courts have recognized this principle in other contexts. *See, e.g., Zelman v. Simmons-Harris*, 536 U.S. 639 (2002)(school voucher program did not violate Establishment Clause because parents' private choice to use a voucher broke the circuit between government and religion); *Agostini v. Felton*, 521 U.S. 203, 226 (1997) (no Establishment Clause violation where individual decision-making interrupts connection between governmental source of funding and religious recipient); *Witters v. Washington*

20

*Dep't of Servs. for the Blind*, 474 U.S. 481, 486-87 (1986)(accord).

The same principle – that intervening decisions by an independent

actor disconnect the source of funding from the conduct eventually

undertaken with the funding – has been recognized in other First

Amendment contexts as well. *See, e.g., Legal Servs. Corp. v.*

*Velazquez*, 531 U.S. 533 (2001) (concluding that, when the

government funded a legal services program designed to facilitate

private speech, not to promote a governmental message, any

connection between the government and the resulting legal

advocacy was indirect and incidental). Even more squarely on point,

courts have affirmed dismissal of free exercise challenges by those

who, based on religious beliefs, objected to use of tax or student fee

dollars to help pay for broad health insurance programs that

included abortion coverage. *Tarsney v. O'Keefe*, 225 F.3d 929, 932

(8th Cir. 2000) (rejecting challenge by taxpayers who objected on

religious grounds to use of their tax dollars to pay for Medicaid

recipients' medically necessary abortions); *Goehring v. Brophy*, 94

F.3d 1294, 1297 (9th Cir. 1996) (rejecting public school students'

RFRA and free exercise-based objections to university tuition fee

used, in part, to subsidize school's health insurance program, which included abortion care), *abrogated on other grounds by City of Boerne v. Flores*, 521 U.S. 507 (1997).

Plaintiffs also argue that the contraception coverage requirement burdens their free exercise because it "force[s] [them] to engage in immoral behavior themselves." (Pl. Br. at 31).[2]  This argument, too, fails as a matter of law. Courts repeatedly have rejected assertions that compliance with generally applicable rules governing workplace conduct constitutes any form of expression, let alone "encouragement" of regulated conduct. When a company complies with a regulatory scheme, its compliance with a legal mandate does not send any message at all, let alone a message of embrace or promotion of the regulation's content. For example, in *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006) (*"FAIR"*)*,* the Court rejected a claim by law schools that the schools' compliance with a statutory mandate to facilitate military recruitment on campus in the same way that the schools supported

---

[2]  In fact, as the Government explains in detail, the ACA does not actually require the Gilardis to purchase anything.  Gov. Br. 22-34.

22

recruitment by other employers would send a message of agreement with the military's recruitment policies. The Court concluded that compliance with that mandate was not expressive and sent no message at all, let alone a message "that law schools agree with any speech by recruiters." *Id. at* 65, (citing *Pruneyard Shopping Ctr. v. Robins,* 447 U.S. 74, 88 (1980), which upheld a state law requiring shopping center owners to allow expressive activities by others on their property, explaining that "there was little likelihood that the views of those engaging in expressive activities would be identified with the owner, who remained free to disassociate himself from those views and was "not … being compelled to affirm [a] belief in any governmentally prescribed position or view"); *see, also, Catholic Charities of Sacramento v. Superior Court (Sacramento),* 32 Cal.4th 527, 558-559 (2004) (explaining that "Catholic Charities' compliance with a law regulating health care benefits is not speech. The law leaves Catholic Charities free to express its disapproval of prescription contraceptives and to encourage its employees not to use them. …  [S]imple obedience to a law that does not require one

to convey a verbal or symbolic message cannot reasonably be seen as a statement of support for the law or its purpose").

Furthermore, the contraception coverage requirement, as a matter of logic as well as law, does not "promote" use of contraception over childbearing any more than coverage for chiropractic care "promotes" that treatment option as opposed to spinal surgery, pain medication, or physical therapy for severe back pain. Inclusion of coverage for multiple care options for particular health needs does not endorse or promote any particular choice beyond the overall choice to pursue wellness with professional medical guidance.

Consequently, even if secular corporations were permitted to bring a free exercise claim based on their owners' or shareholders' religious objections, or if owners were permitted to bring one based on their companies' regulatory obligations, the burden on free exercise rights posed by the contraception coverage requirement is simply too slight to trigger RFRA's protection. Compliance by for-profit businesses with a complex regulatory scheme governing an employer's compensation to employees is not a burden on the

24

employer's free exercise as a matter of law. Just as "[t]here is surely no constitutional right, under the religion clauses of the First Amendment, to pay substandard wages" irrespective of an employer's sincerely-held religious beliefs about employee compensation, *see Donavan*, 722 F.3d at 402 n.21, there is no constitutional right, under the religion clauses, to provide employees with health insurance while evading rules requiring inclusion of certain types of reproductive health care.

**III.  To exempt for-profit corporations from the contraception coverage requirement would contravene sound, settled precedents requiring commercial actors, whether religiously motivated or not, to respect third parties' rights and interests.**

Plaintiffs' argument, if accepted, would open a door for other secular, for-profit businesses to claim religious immunity from the full spectrum of generally applicable laws protecting people – including employees, customers, and coworkers – who may not conform to the employer's religious beliefs. Like Plaintiffs' contention here, such claims run afoul of principles that our laws have deemed long settled, under which businesses cannot create their own immunity from laws protecting third parties from harm by

25

asserting a religious motive for business conduct. Thus, even when courts have found that a challenged regulation of commercial conduct *does* burden free exercise, they nevertheless generally have upheld such regulations in service of governmental interests in protecting others whose religious beliefs may differ from those of the claimant, and who could be harmed if the claimant received an exemption from the challenged regulatory scheme. *See, e.g., Lee*, supra, 455 U.S. at 261.

Because *Lee* has striking parallels to Plaintiffs' free exercise claims, *Lee's* facts bear close examination. Note first that the claimant in *Lee* was not a corporation but a self-employed farmer who also employed others. He asserted that the Free Exercise Clause exempted him from responsibility to pay social security taxes for his employees, because of his – and his employees' – religious beliefs that accepting social security benefits, and paying social security taxes, is a sin.[3] The Court acknowledged a conflict between Mr. Lee's religious beliefs and his tax payment obligations.

---

[3]    Mr. Lee "indicate[d] that his scriptural basis for this belief was: 'But if any provide not . . . for those of his own house, he hath denied the faith, and is worse than an infidel.'" *Lee*, 455 U.S. at 256 n.3 (citation omitted).

*Id.* at 257. However, although a statutory provision exempted him from payment of such taxes for his own self-employment, the Court held that Mr. Lee was nonetheless required to pay social security taxes due for his employees because "[g]ranting an exemption from social security taxes to an employer operates to impose the employer's religious faith on the employees." *Id.* at 261.

The Court's conclusion in *Lee* is the governing rule. Indeed, courts have considered religious exercise claims in diverse contexts and consistently have rejected such claims where accommodating one's religious belief would cause harm to others. On this point, the Second Circuit has noted that courts frequently "have held that the state's interest outweighs any First Amendment rights" where there is a "clear interest, either on the part of society as a whole or at least in relation to a third party, which would be substantially affected by permitting the individual to assert what he claimed to be his 'free exercise' rights." *Winters v. Miller*, 446 F.2d 65, 70 (2d Cir. 1971), *cert. denied*, 404 U.S. 985 (1971), *citing Jacobson v. Massachusetts*, 197 U.S. 11 (1905) (compulsory vaccination); *Prince v. Massachusetts*, 321 U.S. 158 (1944) (violation of child labor

27

laws); *Reynolds v. United States*, 98 U.S. 145 (1878)(polygamy); *People v. Handzik*, 102 N.E.2d 340 (Ill. 1951) (criminal prosecution of faith healers who practice medicine without a license); *People v. Pierson*, 68 N.E. 243 (N.Y. 1903) (serious illness of a child). *See also, e.g., Spratt v. Kent Cnty.,* 621 F. Supp. 594, 600-02 (D.C. Mich. 1985) (public employer justified in firing social worker for inclusion of religious practices in counseling inmates); *North Coast Women's Care Med. Grp., Inc. v. San Diego Cnty. Superior Court (Benitez)*, 189 P.3d 959, 967 (Cal. 2008) (no federal or state religious exercise exemption from nondiscrimination law for physicians with religious objection to treating lesbian patients); *Keeton v. Anderson-Wiley*, 664 F.3d 865, 880 (11th Cir. 2011) (college not required to accommodate counseling student's religious accommodation request that would allow her "to evade the curricular requirement that she not impose her moral values on clients").

Likewise, many *employees* also have religious beliefs that inform their conduct, but settled legal principles limit the extent to which they can act on their religious beliefs when interacting with coworkers and business associates. *See, e.g., Bodett v. Coxcom, Inc.,*

28

366 F.3d 736 (9th Cir. 2004) (Christian supervisor wrongfully claimed a religious right to harass lesbian subordinate); *Bruff,* 244 F.3d at 497-98  (Title VII did not require employer to accommodate counselor-employee by excusing her from counseling patients on relationships to which she had religious objection); *Chalmers v. Tulon*, 101 F.3d 1012, 1021 (4th Cir. 1996) (employee not entitled to send religiously motivated letters to co-workers criticizing their private lives).

Consistent with this body of law, Title VII also protects employees' religious liberty from harm posed by an employer's insistence on conformity with the employer's religious creed, and will not permit firing an employee "simply because he did not hold the same religious beliefs as his supervisors." *Shapolia v. Los Alamos Nat'l. Laboratory*, 992 F.2d 1033, 1037 (10th Cir. 1993). *See also, e.g., Noyes v. Kelly Services*, 488 F.3d 1163, 1166, 1168-69 (9th Cir. 2007) (evidence sufficient to proceed with plaintiff's claim that supervisor wrongfully denied her promotion because she was not part of his small religious group); *Venters v. City of Delphi*, 123 F.3d 956, 972 (7th Cir. 1997) ("Venters need only show that her

perceived religious shortcomings [her unwillingness to strive for salvation as Ives understood it, for example] played a motivating role in her discharge.").[4]  Under this standard, an employee who gets a divorce, has an extramarital affair, or simply fails to adhere generally to the employer's religious precepts, can invoke Title VII if the employer fires him or her on that basis.[5]

No doubt some forms of religiously motivated discrimination have receded. And yet, American history captures the recurring saga of

_____

[4]     Lower federal court decisions applying this principle are legion. *See, e.g., Panchoosingh v. General Labor Staffing Services, Inc.*, No. 07-80818-CI, 2009 WL 961148, *6 (S.D. Fla. Apr. 8, 2009); *Tillery v. ATSI, Inc.,* 242 F. Supp. 2d 1051, 1062-63 (N.D. Ala. 2003), *aff'd without opinion*, 97 Fed. Appx. 906 (Table) (11th Cir. 2004) (unpublished); *Backus v. Mena Newspapers, Inc.*, 224 F. Supp. 2d 1228, 1233 (W.D. Ark. 2002); *Henegar v. Sears, Roebuck and Co.*, 965 F. Supp. 833, 837 (N.D. W.Va. 1997); *Yancey v. Nat'l Ctr. on Insts. and Alternatives*, 986 F. Supp. 945, 955 (D. Md. 1997); *Sarenpa v. Express Images Inc.*, Civ.04-1538(JRT/JSM), *3 (D. Minn. Dec. 1, 2005); *Kaminsky v. Saint Louis University School of Med.*, No. 4:05CV1112 CDP,  2006 WL 2376232, *5 (E.D. Mo. Aug. 16, 2006).

[5]     *See Kaminsky*, 2006 WL 2376232, *5 (getting a divorce); *Sarenpa v. Express Images Inc.*, 2005 WL 3299455 at *3 (extramarital affair); *Henegar*, 965 F. Supp. at 834 (living with a man while still in divorce proceedings against her husband); *Noyes*, 488 F.3d at 1166, 1168-69 (failure to live up generally to employer's religious beliefs); *Venters*, 123 F.3d at 972 (same).

30

successive generations positing anew the question whether our protections for religious liberty warrant exemptions from laws protecting others' liberties and right to participate equally in public life. Our courts rightly and consistently have recognized that the answer to that question must remain the same: religious beliefs do not entitle any of us to exemptions from generally applicable laws protecting all of us.

Thus, for example, during the past century's struggles over racial integration, some Christian schools restricted admissions of African American applicants based on beliefs that "mixing of the races" would violate God's commands. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 580, 583 n.6 (1983). Some restaurant owners refused to serve African American customers citing religious objections to "integration of the races." *Newman v. Piggie Park Enters., Inc.*, 256 F. Supp. 941, 944-45 (D.S.C. 1966), *rev'd* 377 F.2d 433 (4th Cir. 1967), *aff'd and modified on other grounds*, 390 U.S. 400 (1968). Religious tenets also were used to justify laws and policies against interracial relationships and marriage. *See, e.g.*, *Loving v. Virginia*, 388 U.S. 1, 3 (1967) (in decision invalidating

31

state interracial marriage ban, quoting trial judge's admonition that "Almighty God created the races white, black, yellow, malay and red, and he placed them on separate continents. . . . The fact that he separated the races shows that he did not intend for the races to mix."); *Whitney v. Greater New York Corp. of Seventh-Day Adventists*, 401 F. Supp. 1363 (S.D.N.Y. 1975) (firing of white clerk typist for friendship with black person was not protected exercise of religion despite church's religious objection to interracial friendships).

As our society began coming to grips with the desire and need of women for equal treatment in the workplace, some who objected on religious grounds sought exemptions from employment non-discrimination laws as a free exercise right. Notwithstanding the believers' sincerity and longstanding religious traditions on which such claims often were premised, courts recognized that these religious views could not be accommodated in the workplace context without vitiating the sex discrimination protections on which American workers are entitled to depend. *See, e.g., EEOC v. Fremont Christian Sch.*, 781 F.2d 1362 (9th Cir. 1986) (school

32

violated federal antidiscrimination law by offering unequal health benefits to female employees based on religious tenets); *Bollenbach v. Bd. of Educ.*, 659 F. Supp. 1450, 1473 (S.D.N.Y. 1987) (employer improperly refused to hire women bus drivers due to religious objection of Hasidic male student bus riders).

Similarly, after some state and local governments enacted fair housing laws that included protections for unmarried renters, those protections came under fire from landlords who sought exemptions based on their belief that they would sin if they were to provide a residence in which their tenants would commit the sin of fornication. *See, e.g., Smith*, 913 P. 2d at 925 (rejecting religious exercise claim of landlord who refused to rent to unmarried heterosexual couple, finding fair housing law did not substantially burden her religious exercise rights); *Swanner v. Anchorage Equal Rights Comm'n*, 874 P.2d 274 (Alaska 1994) (same).

And yet again, as laws and company policies began to offer more protections against discrimination based on sexual orientation, gender identity, and HIV status, some who objected to this development on religious grounds tested whether the courts would

33

hold their course or allow religious exemptions where they had not done so in past discrimination cases. For the most part, the past principle has held true and the rights of third parties have been safeguarded in these regulated commercial contexts. *See, e.g., Peterson v. Hewlett-Packard Co.,* 358 F.3d 599 (9th Cir. 2004) (under Title VII, rejecting free exercise wrongful termination claim of employee fired for anti-gay proselytizing at work); *Knight,* 275 F.3d 156 (rejecting free exercise wrongful termination claim of visiting nurse fired for antigay proselytizing to home-bound AIDS patient); *Wilson v. U.S. West Communications*, 58 F.3d 1337, 1342 (8th Cir. 1995) (rejecting Title VII religious discrimination claim by fired employee who insisted on wearing graphic antiabortion button that upset coworkers and disrupted workplace); *Hyman v. City of Louisville*, 132 F. Supp. 2d 528, 539-540 (W.D. Ky. 2001) (physician's religious beliefs did not exempt him from law prohibiting employment discrimination based on sexual orientation or gender identity), *vacated on other grounds by* 53 Fed. Appx. 740 (6th Cir. 2002); *North Coast Women's Care Medical. Group.,* 189 P.3d at 970 (physicians' free exercise rights did not exempt them

34

from law's prohibition against sexual orientation discrimination);
*Stepp v. Review Bd. of Indiana Emp. Sec. Div.*, 521 N.E.2d 350, 352
(Ind. 1988) (rejecting religious discrimination claim of lab technician
fired for refusing to do tests on specimens labeled with HIV warning
because he believed "AIDS is God's plague on man and performing
the tests would go against God's will").

Across generations, then, these questions have been asked and
answered, echoing with reassuring consistency as courts recognize
the government's abiding interests in securing fair access and
peaceful co-existence in the public marketplace. Here, Appellants
seek an exemption that would mark a sharp turn, newly enabling
them to impose religious views about family planning on their
female employees and casting an intrusive, condemning spotlight
on personal decisions that these women are constitutionally entitled
to make freely for themselves. The Supreme Court has recognized
our federal laws and traditions as "afford[ing] constitutional
protection to personal decisions relating to marriage, procreation,
contraception, family relationships, child rearing, and education."
*Lawrence,* 539 U.S. at 574, *citing Planned Parenthood of*

35

*Southeastern Pennsylvania*, 505 U.S. at 851. The Court's explanation of the "respect the Constitution demands for the autonomy of the person in making these choices," *id.*¸ has particular significance because the "person" whose autonomy is to be protected is the person herself – not her employer.

That there are limits on employers' right to treat differently female and male employees with respect to issues of reproductive health and choices is not a new theme. Before *Casey*, the Court had rejected an employer's arguments that it was entitled to establish employment policies based on its female employees' fertility – specifically, a policy excluding fertile women (but not fertile men) from particular jobs – and held that the policy discriminated based on sex and pregnancy in violation of Title VII. *See Johnson Controls*, *supra,* 499 U.S. at 198-200. The Court's observation that "[c]oncern for a woman's existing or potential offspring historically has been the excuse for denying women equal employment opportunities" compels rejection of the religious exemption sought in this appeal. *Id.* at 211. Just as in *Johnson Controls*, here, too:

> It is no more appropriate for the courts than it is for
> individual employers to decide whether a woman's

36

> reproductive role is more important to herself and
> her family than her economic role. Congress has left
> this choice for the woman as hers to make.

*Id.*

Many employees, like many business owners, hold religious and other beliefs that guide their lives and important decisions. Those beliefs remain with them when entering their shared place of business. But as recognized in the decisions discussed above, permitting employers to interject themselves into employees' home lives and decisions concerning conception, contraception, and procreation – which Plaintiffs' arguments do – not only would encourage others to seek to do the same, but would undermine or entirely subvert the compelling interests in autonomy, public health, and gender equity that are furthered by the rule Appellants resist.

Stepping back slightly from the reproductive health context of this case, imagine how American workplace standards would be transformed were our courts to embrace the principle Freshway Corporations offer. Owners of commercial businesses with religious objections to blood transfusion could exempt that life-saving service

37

from the health coverage they provide their employees. Business owners believing it sinful to take medications that control pain, alleviate depression, or manage HIV, could exclude coverage for those medications. Employers who believe all modern medical treatments interfere with Divine will could refuse coverage for all but faith healing.

These examples concern medical care, but the principle Plaintiffs offer is not necessarily confined to employer-provided health coverage. The notion that a commercial business sins when it complies with rules that decline to condemn the "sinful" independent conduct of its employees could apply just as well to the non-benefits portion of employee compensation – wages. Logically, a next contention could be that religious liberty vindicates an employer's insistence that its workers attest that they will use only monies procured elsewhere for purchase of any goods or services – from condoms to pornography, from pork to liquor – that an employer views as sinful. That is the principle advanced in this case. It is neither legally nor practically tenable within our religiously pluralistic, secular society.

38

## CONCLUSION

Accepting Plaintiffs' arguments would unsettle, if not eviscerate, many well-reasoned principles and practices that have developed over time based on our Constitution and laws. Because these legal rules and established practices permit and actively encourage a flourishing coexistence of the myriad religious, secular, and other belief systems that animate our nation, Plaintiffs' inconsistent approach should be rejected.

Respectfully submitted,

s/Thomas W. Ude, Jr.
THOMAS W. UDE, JR
Lambda Legal Defense and
Education Fund, Inc.
120 Wall Street, 19th Floor
New York, New York 10005
212-809-8585 ext. 280

CAMILLA B. TAYLOR
Lambda Legal Defense and
Education Fund, Inc.
105 W. Adams, Suite 2600
Chicago, Illinois 60603
312-663-4413 ext. 325

JENNIFER C. PIZER
Lambda Legal Defense and
Education Fund, Inc.

39

3325 Wilshire Blvd., Suite 1300
Los Angeles, CA  90010
213- 382-7600 ext. 242

*Attorneys for Amicus Curiae*

JUNE 14, 2013

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(a)(3)because the brief contains 6,977 words, excluding the parts of the brief exempted under Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1), according to the count of Microsoft Word.

I hereby further certify that this brief complies with the typeface requirements of Fed. R. App. R. 32(a)(5) and the type style requirements of Fed. R. App. R. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word Version 2007 in 14-point Bookman Old Style.

/s/Thomas W. Ude, Jr.
THOMAS W. UDE, JR.

41

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2013, I electronically filed the foregoing brief of *amicus curiae* Lambda Legal Defense and Education Fund, Inc., in support of appellees and for the affirmance of the District Court with the Clerk of the United State Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

DATED: June 14, 2013                    Respectfully submitted,


                                        /s/Thomas W. Ude, Jr.
                                        THOMAS W. UDE, JR.

**ADDENDUM**

# ADDENDUM OF RELEVANT STATUTES, RULES, AND REGULATIONS

**Constitutional Provisions** **A - #**

U.S. Const. Amend. I ...................................................................A -1

**Statutes**

29 U.S.C. § 201, *et seq.* (Fair Labor Standards Act of 1938) ..........................................................................A - 1

42 USC § 300gg–13 - Coverage of preventive health services .............................................................................A - 6

42 U.S.C. § 2000bb, *et seq.* (Religious Freedom Restoration Act)......................................................................A - 7

42 U.S.C. § 2000e, *et seq.* (Title VII of the Civil Rights Act of 1964)...........................................................................A - 11

**U.S. Const. Amend. I**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

**Statutes**

**Relevant Provision of the Fair Labor Standards Act of 1938**

**29 U.S.C. § 206. Minimum wage**

(a) Employees engaged in commerce; home workers in Puerto Rico and Virgin Islands; employees in American Samoa; seamen on American vessels; agricultural employees
Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates:

(1) except as otherwise provided in this section, not less than--
(A) $5.85 an hour, beginning on the 60th day after May 25, 2007;
(B) $6.55 an hour, beginning 12 months after that 60th day; and
(C) $7.25 an hour, beginning 24 months after that 60th day;

(2) if such employee is a home worker in Puerto Rico or the Virgin Islands, not less than the minimum piece rate prescribed by regulation or order; or, if no such minimum piece rate is in effect, any piece rate adopted by such employer which shall yield, to the proportion or class of employees prescribed by regulation or order, not less than the applicable minimum hourly wage rate. Such minimum piece rates or employer piece rates shall be commensurate with, and shall be paid in lieu of, the minimum hourly wage rate applicable

A - 1

under the provisions of this section. The Administrator, or his authorized representative, shall have power to make such regulations or orders as are necessary or appropriate to carry out any of the provisions of this paragraph, including the power without limiting the generality of the foregoing, to define any operation or occupation which is performed by such home work employees in Puerto Rico or the Virgin Islands; to establish minimum piece rates for any operation or occupation so defined; to prescribe the method and procedure for ascertaining and promulgating minimum piece rates; to prescribe standards for employer piece rates, including the proportion or class of employees who shall receive not less than the minimum hourly wage rate; to define the term "home worker"; and to prescribe the conditions under which employers, agents, contractors, and subcontractors shall cause goods to be produced by home workers;

(3) if such employee is employed as a seaman on an American vessel, not less than the rate which will provide to the employee, for the period covered by the wage payment, wages equal to compensation at the hourly rate prescribed by paragraph (1) of this subsection for all hours during such period when he was actually on duty (including periods aboard ship when the employee was on watch or was, at the direction of a superior officer, performing work or standing by, but not including off-duty periods which are provided pursuant to the employment agreement); or

(4) if such employee is employed in agriculture, not less than the minimum wage rate in effect under paragraph (1) after December 31, 1977.

(5) Redesignated (4)

(b) Additional applicability to employees pursuant to subsequent amendatory provisions
Every employer shall pay to each of his employees (other than an employee to whom subsection (a)(5) of this section applies) who in any workweek is engaged in commerce or in the production of goods

A - 2

for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, and who in such workweek is brought within the purview of this section by the amendments made to this chapter by the Fair Labor Standards Amendments of 1966, title IX of the Education Amendments of 1972, or the Fair Labor Standards Amendments of 1974, wages at the following rate: Effective after December 31, 1977, not less than the minimum wage rate in effect under subsection (a)(1) of this section.

(c) Repealed. Pub.L. 104-188, [Title III], § 2104(c), Aug. 20, 1996, 110 Stat. 1929

(d) Prohibition of sex discrimination

(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

(2) No labor organization, or its agents, representing employees of an employer having employees subject to any provisions of this section shall cause or attempt to cause such an employer to discriminate against an employee in violation of paragraph (1) of this subsection.

(3) For purposes of administration and enforcement, any amounts owing to any employee which have been withheld in

A - 3

violation of this subsection shall be deemed to be unpaid minimum wages or unpaid overtime compensation under this chapter.

(4) As used in this subsection, the term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

(e) Employees of employers providing contract services to United States

(1) Notwithstanding the provisions of section 213 of this title (except subsections (a)(1) and (f) thereof), every employer providing any contract services (other than linen supply services) under a contract with the United States or any subcontract thereunder shall pay to each of his employees whose rate of pay is not governed by chapter 67 of Title 41 or to whom subsection (a)(1) of this section is not applicable, wages at rates not less than the rates provided for in subsection (b) of this section.

(2) Notwithstanding the provisions of section 213 of this title (except subsections (a)(1) and (f) thereof) and the provisions of chapter 67 of Title 41, every employer in an establishment providing linen supply services to the United States under a contract with the United States or any subcontract thereunder shall pay to each of his employees in such establishment wages at rates not less than those prescribed in subsection (b) of this section, except that if more than 50 per centum of the gross annual dollar volume of sales made or business done by such establishment is derived from providing such linen supply services under any such contracts or subcontracts, such employer shall pay to each of his employees in such establishment wages at rates not less than those prescribed in subsection (a)(1) of this section.

A - 4

(f) Employees in domestic service
Any employee--

> (1) who in any workweek is employed in domestic service in a household shall be paid wages at a rate not less than the wage rate in effect under subsection (b) of this section unless such employee's compensation for such service would not because of section 209(a)(6) of the Social Security Act  constitute wages for the purposes of title II of such Act, or

> (2) who in any workweek--
> (A) is employed in domestic service in one or more households, and
> (B) is so employed for more than 8 hours in the aggregate,

shall be paid wages for such employment in such workweek at a rate not less than the wage rate in effect under subsection (b) of this section.

(g) Newly hired employees who are less than 20 years old
> (1) In lieu of the rate prescribed by subsection (a)(1) of this section, any employer may pay any employee of such employer, during the first 90 consecutive calendar days after such employee is initially employed by such employer, a wage which is not less than $4.25 an hour.

> (2) No employer may take any action to displace employees (including partial displacements such as reduction in hours, wages, or employment benefits) for purposes of hiring individuals at the wage authorized in paragraph (1).

> (3) Any employer who violates this subsection shall be considered to have violated section 215(a)(3) of this title.

> (4) This subsection shall only apply to an employee who has not attained the age of 20 years.

A - 5

**Relevant Provision of the Patient Protection and Affordable Care Act**

**42 U.S.C. § 300gg–13 - Coverage of preventive health services**

(a) In general

A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for--

> (1) evidence-based items or services that have in effect a rating of " A" or "B" in the current recommendations of the United States Preventive Services Task Force;

> (2) immunizations that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention with respect to the individual involved; and

> (3) with respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the Health Resources and Services Administration.

> (4) with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph.

> (5) for the purposes of this chapter, and for the purposes of any other provision of law, the current recommendations of the United States Preventive Service Task Force regarding breast cancer screening, mammography, and prevention shall be considered the most current other than those issued in or around November 2009.

A - 6

Nothing in this subsection shall be construed to prohibit a plan or issuer from providing coverage for services in addition to those recommended by United States Preventive Services Task Force or to deny coverage for services that are not recommended by such Task Force.

(b) Interval

(1) In general

The Secretary shall establish a minimum interval between the date on which a recommendation described in subsection (a)(1) or (a)(2) or a guideline under subsection (a)(3) is issued and the plan year with respect to which the requirement described in subsection (a) is effective with respect to the service described in such recommendation or guideline.

(2) Minimum

The interval described in paragraph (1) shall not be less than 1 year.

(c) Value-based insurance design

The Secretary may develop guidelines to permit a group health plan and a health insurance issuer offering group or individual health insurance coverage to utilize value-based insurance designs.

**Relevant Provisions of the Religious Freedom Restoration Act**

**42 U.S.C. § 2000bb. Congressional findings and declaration of purposes**

(a) Findings

The Congress finds that--

(1) the framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;

A - 7

(2) laws "neutral" toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;

(3) governments should not substantially burden religious exercise without compelling justification;

(4) in Employment Division v. Smith, 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; and

(5) the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.

(b) Purposes

The purposes of this chapter are--

(1) to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and

(2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government.

## 42 U.S.C. § 2000bb-1. Free exercise of religion protected

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

A - 8

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--

> (1) is in furtherance of a compelling governmental interest; and

> (2) is the least restrictive means of furthering that compelling governmental interest.

(c) Judicial relief

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

## 42 U.S.C. § 2000bb-2. Definitions

As used in this chapter--

> (1) the term "government" includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity;

> (2) the term "covered entity" means the District of Columbia, the Commonwealth of Puerto Rico, and each territory and possession of the United States;

> (3) the term "demonstrates" means meets the burdens of going forward with the evidence and of persuasion; and

(4) the term "exercise of religion" means religious exercise, as defined in section 2000cc-5 of this title.[1]

## 42 U.S.C. § 2000bb-3. Applicability

(a) In general

This chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993.

(b) Rule of construction

Federal statutory law adopted after November 16, 1993 is subject to this chapter unless such law explicitly excludes such application by reference to this chapter.

(c) Religious belief unaffected

Nothing in this chapter shall be construed to authorize any government to burden any religious belief.

## 42 U.S.C. § 2000bb-4. Establishment clause unaffected

Nothing in this chapter shall be construed to affect, interpret, or in any way address that portion of the First Amendment prohibiting laws respecting the establishment of religion (referred to in this section as the "Establishment Clause"). Granting government funding, benefits, or exemptions, to the extent permissible under the Establishment Clause, shall not constitute a violation of this chapter. As used in this section, the term "granting", used with respect to government funding, benefits, or exemptions, does not include the denial of government funding, benefits, or exemptions.

---

[1]    "The term "religious exercise" includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).

A - 10

**Relevant Provisions of Title VII of the Civil Rights Act of 1964**

**42 U.S.C. § 2000e. Definitions**

For the purposes of this subchapter--

(a) The term "person" includes one or more individuals, governments, governmental agencies, political subdivisions, labor unions, partnerships, associations, corporations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, or receivers.

(b) The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include (1) the United States, a corporation wholly owned by the Government of the United States, an Indian tribe, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service (as defined in section 2102 of Title 5), or (2) a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of Title 26, except that during the first year after March 24, 1972, persons having fewer than twenty-five employees (and their agents) shall not be considered employers.

(c) The term "employment agency" means any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such a person.

(d) The term "labor organization" means a labor organization engaged in an industry affecting commerce, and any agent of such an organization, and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers

concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization.

(e) A labor organization shall be deemed to be engaged in an industry affecting commerce if (1) it maintains or operates a hiring hall or hiring office which procures employees for an employer or procures for employees opportunities to work for an employer, or (2) the number of its members (or, where it is a labor organization composed of other labor organizations or their representatives, if the aggregate number of the members of such other labor organization) is (A) twenty-five or more during the first year after March 24, 1972, or (B) fifteen or more thereafter, and such labor organization--

(1) is the certified representative of employees under the provisions of the National Labor Relations Act, as amended, or the Railway Labor Act, as amended;

(2) although not certified, is a national or international labor organization or a local labor organization recognized or acting as the representative of employees of an employer or employers engaged in an industry affecting commerce; or

(3) has chartered a local labor organization or subsidiary body which is representing or actively seeking to represent employees of employers within the meaning of paragraph (1) or (2); or

(4) has been chartered by a labor organization representing or actively seeking to represent employees within the meaning of paragraph (1) or (2) as the local or subordinate body through which such employees may enjoy membership or become affiliated with such labor organization; or

(5) is a conference, general committee, joint or system board, or joint council subordinate to a national or international

A - 12

labor organization, which includes a labor organization engaged in an industry affecting commerce within the meaning of any of the preceding paragraphs of this subsection.

(f) The term "employee" means an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision. With respect to employment in a foreign country, such term includes an individual who is a citizen of the United States.

(g) The term "commerce" means trade, traffic, commerce, transportation, transmission, or communication among the several States; or between a State and any place outside thereof; or within the District of Columbia, or a possession of the United States; or between points in the same State but through a point outside thereof.

(h) The term "industry affecting commerce" means any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry "affecting commerce" within the meaning of the Labor-Management Reporting and Disclosure Act of 1959, and further includes any governmental industry, business, or activity.

(i) The term "State" includes a State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, Wake Island, the Canal Zone, and Outer Continental Shelf lands defined in the Outer Continental Shelf Lands Act.

(j) The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates

A - 13

that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

(k) The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e-2(h) of this title shall be interpreted to permit otherwise. This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the mother would be endangered if the fetus were carried to term, or except where medical complications have arisen from an abortion: *Provided*, That nothing herein shall preclude an employer from providing abortion benefits or otherwise affect bargaining agreements in regard to abortion.

(l) The term "complaining party" means the Commission, the Attorney General, or a person who may bring an action or proceeding under this subchapter.

(m) The term "demonstrates" means meets the burdens of production and persuasion.

(n) The term "respondent" means an employer, employment agency, labor organization, joint labor-management committee controlling apprenticeship or other training or retraining program, including an on-the-job training program, or Federal entity subject to section 2000e-16 of this title.

## 42 U.S.C. § 2000e-2. Unlawful employment practices

(a) Employer practices

It shall be an unlawful employment practice for an employer--

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

(b) Employment agency practices

It shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color, religion, sex, or national origin.

(c) Labor organization practices

It shall be an unlawful employment practice for a labor organization--

> (1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

> (2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive

or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

(d) Training programs

It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.

(e) Businesses or enterprises with personnel qualified on basis of religion, sex, or national origin; educational institutions with personnel of particular religion

Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees, for an employment agency to classify, or refer for employment any individual, for a labor organization to classify its membership or to classify or refer for employment any individual, or for an employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining programs to admit or employ any individual in any such program, on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise, and (2) it shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other educational institution or institution of

learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

(f) Members of Communist Party or Communist-action or Communist-front organizations

As used in this subchapter, the phrase "unlawful employment practice" shall not be deemed to include any action or measure taken by an employer, labor organization, joint labor-management committee, or employment agency with respect to an individual who is a member of the Communist Party of the United States or of any other organization required to register as a Communist-action or Communist-front organization by final order of the Subversive Activities Control Board pursuant to the Subversive Activities Control Act of 1950.

(g) National security

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to fail or refuse to hire and employ any individual for any position, for an employer to discharge any individual from any position, or for an employment agency to fail or refuse to refer any individual for employment in any position, or for a labor organization to fail or refuse to refer any individual for employment in any position, if--

> (1) the occupancy of such position, or access to the premises in or upon which any part of the duties of such position is performed or is to be performed, is subject to any requirement imposed in the interest of the national security of the United States under any security program in effect pursuant to or administered under any statute of the United States or any Executive order of the President; and

A - 17

(2) such individual has not fulfilled or has ceased to fulfill that requirement.

(h) Seniority or merit system; quantity or quality of production; ability tests; compensation based on sex and authorized by minimum wage provisions

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29.

(i) Businesses or enterprises extending preferential treatment to Indians

Nothing contained in this subchapter shall apply to any business or enterprise on or near an Indian reservation with respect to any publicly announced employment practice of such business or enterprise under which a preferential treatment is given to any individual because he is an Indian living on or near a reservation.

(j) Preferential treatment not to be granted on account of existing number or percentage imbalance

Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.

(k) Burden of proof in disparate impact cases

    (1)(A) An unlawful employment practice based on disparate impact is established under this subchapter only if--

        (i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or

        (ii) the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

(B)(i) With respect to demonstrating that a particular employment practice causes a disparate impact as described in subparagraph (A)(i), the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice.

(ii) If the respondent demonstrates that a specific employment practice does not cause the disparate impact, the respondent shall not be required to demonstrate that such practice is required by business necessity.

(C) The demonstration referred to by subparagraph (A)(ii) shall be in accordance with the law as it existed on June 4, 1989, with respect to the concept of "alternative employment practice".

(2) A demonstration that an employment practice is required by business necessity may not be used as a defense against a claim of intentional discrimination under this subchapter.

(3) Notwithstanding any other provision of this subchapter, a rule barring the employment of an individual who currently and knowingly uses or possesses a controlled substance, as defined in schedules I and II of section 102(6) of the Controlled Substances Act (21 U.S.C. 802(6)), other than the use or possession of a drug taken under the supervision of a licensed health care professional, or any other use or possession authorized by the Controlled Substances Act  or any other provision of Federal law, shall be considered an unlawful employment practice under this subchapter only if such rule is adopted or applied with an intent to discriminate because of race, color, religion, sex, or national origin.

(l) Prohibition of discriminatory use of test scores

It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex, or national origin.

(m) Impermissible consideration of race, color, religion, sex, or national origin in employment practices

Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

(n) Resolution of challenges to employment practices implementing litigated or consent judgments or orders

> (1)(A) Notwithstanding any other provision of law, and except as provided in paragraph (2), an employment practice that implements and is within the scope of a litigated or consent judgment or order that resolves a claim of employment discrimination under the Constitution or Federal civil rights laws may not be challenged under the circumstances described in subparagraph (B).

>> (B) A practice described in subparagraph (A) may not be challenged in a claim under the Constitution or Federal civil rights laws--

>>> (i) by a person who, prior to the entry of the judgment or order described in subparagraph (A), had--

>>>> (I) actual notice of the proposed judgment or order sufficient to apprise such person that such judgment or order might adversely affect the

A - 21

interests and legal rights of such person and that an opportunity was available to present objections to such judgment or order by a future date certain; and

(II) a reasonable opportunity to present objections to such judgment or order; or

(ii) by a person whose interests were adequately represented by another person who had previously challenged the judgment or order on the same legal grounds and with a similar factual situation, unless there has been an intervening change in law or fact.

(2) Nothing in this subsection shall be construed to--

(A) alter the standards for intervention under rule 24 of the Federal Rules of Civil Procedure or apply to the rights of parties who have successfully intervened pursuant to such rule in the proceeding in which the parties intervened;

(B) apply to the rights of parties to the action in which a litigated or consent judgment or order was entered, or of members of a class represented or sought to be represented in such action, or of members of a group on whose behalf relief was sought in such action by the Federal Government;

(C) prevent challenges to a litigated or consent judgment or order on the ground that such judgment or order was obtained through collusion or fraud, or is transparently invalid or was entered by a court lacking subject matter jurisdiction; or

(D) authorize or permit the denial to any person of the due process of law required by the Constitution.

A - 22

(3) Any action not precluded under this subsection that challenges an employment consent judgment or order described in paragraph (1) shall be brought in the court, and if possible before the judge, that entered such judgment or order. Nothing in this subsection shall preclude a transfer of such action pursuant to section 1404 of Title 28.